## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KAREN L. KIMMEL, Ph.D.,**           )
1137 NORTH JOHNSON ST.                )
ARLINGTON, VA 22201,                  )
                                      )
    **Plaintiff,**               )        **CIVIL ACTION NO.**
**vs.**                               )
                                      )        **COMPLAINT**
**GALLAUDET UNIVERSITY,**             )        **JURY DEMAND**
800 FLORIDA AVENUE, N.E.              )
WASHINGTON, D.C. 20002,

    **Defendant.**


## COMPLAINT

Plaintiff Karen L. Kimmel, Ph.D. ("Dr. Kimmel" or "Plaintiff"), by and through counsel, files this Complaint against Defendant Gallaudet University ("Gallaudet" or "Defendant"), alleging as follows:

### PARTIES

1.      Dr. Kimmel is a citizen of Virginia, residing in Arlington, Virginia at 1137 North Johnson St., Arlington, VA 22201.

2.      Gallaudet is a private corporation created by Acts of Congress, which operates under the direction and control of the Board of Trustees of Gallaudet University. Gallaudet has its principal place of business in the District of Columbia and its registered office located at Kendall Green, 800 Florida Avenue, N.E., Washington, D.C. 20002-3695.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over all claims in this action pursuant to 28

U.S.C. § 1332(a)(1), as the parties have diverse citizenship within the meaning of the statute and

the amount in controversy exceeds $75,000 exclusive of interest and costs.  In addition, this

Court has jurisdiction pursuant to 28 U.S.C. § 1331 because one or more claims herein arise

under the laws of the United States.


4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) in that a

substantial part of the events giving rise to the claims herein occurred in this District and the

Defendant is a corporation located in this District.

## FACTUAL BACKGROUND

5.      Dr. Kimmel is the Dean of the College of Liberal Arts, Sciences, and

Technologies at Gallaudet, a position she has held since June 2004.  She is also a fully tenured

Associate Professor in the Department of English at Gallaudet.  Before serving as Dean, Dr.

Kimmel served as an Associate Dean for three years.  At the time that she accepted the position

of Dean, Gallaudet represented that the position would be renewable after five (5) years.


6.      Gallaudet is the premiere institution of higher education for the deaf in the United

States.


7.      It is Gallaudet's written and express policy that it "does not discriminate on the

basis of race, hearing status, disability, religion, color, national origin, age, sex, covered veterans

status, marital status, personal appearance, sexual orientation, family responsibilities,

matriculation, political affiliation, source of income, place of business or residence, pregnancy,

childbirth, or any other unlawful basis."  This policy and, in particular, the section of the policy

concerning non-discrimination on the basis of hearing status, is currently in effect and was in effect throughout the entire time period during which Dr. Kimmel has been a tenured faculty member and Dean.

8.    Dr. Kimmel suffers from mild (right ear) and moderate (left ear) high frequency hearing loss as a result of a degenerative and hereditary hearing loss. Though she has not yet fully lost her hearing, Dr. Kimmel is proficient in American Sign Language ("ASL"). She accommodates her partial hearing loss by aligning her better ear appropriately during social situations and meetings, using amplification, if possible, and speech reading. Although she is hard-of-hearing, and has a father, grandmother, and great grandfather who were deaf, Dr. Kimmel is not considered part of "Deaf Culture" because her family did not use sign communication and was not part of the Deaf community.

9.    Capitalizing the word deaf (Deaf) signifies a culture rather than the physical condition of hearing loss. Currently, ideas of what constitutes Deaf Culture concern a specific and, some would say, narrow view of what is deemed acceptable. The argument is that any deaf person can become Deaf by embracing certain ideas and practices which themselves create exclusion, hierarchy and discrimination. For example, Deaf Culture supports use only of ASL, which is used primarily by white, Deaf, middle-class people. Deaf Culture also rejects the notion of deafness as a disability and embraces the idea of Deaf people as an oppressed minority. Deaf Culture values only native ASL signers, particularly Deaf offspring of Deaf parents, as the elite members of this culture, and many Deaf individuals therefore socialize primarily, or even exclusively, only with others who share these culturally biased and discriminatory views. While the view that an individual can be "not Deaf enough" is a large part of the opposition that exists at Gallaudet University, this is only part of the Deaf Cultural view and tribal nature that

contribute to an unpleasant workplace. Those who are members of this group do not accept or fully recognize the authority of an abstract, hierarchical institution that is a typical university. Thus, difficult decisions are always seen as unfair and people feel entitled to criticize and take revenge for any perceived slight or disappointment. This aspect of Gallaudet's culture has its roots in the social structure of Deaf Culture's tribal, personal relations, where people pay dues by demonstrating allegiance to Deaf Culture values.

10.    As a result of her own hereditary and degenerative hearing loss, and experiences with deaf family members, Dr. Kimmel has always had an interest in education of the deaf, a pursuit she has followed for 30 years.

11.    Throughout the course of her administration as Dean, Dr. Kimmel has been a supporter of deaf/Deaf students, African-American and other minority students, and students that Gallaudet terms "developmental" or "at risk" owing to their lack of foundational skills and resulting need for more educational attention and remedial assistance. These students all fall within one or more protected classifications and are therefore protected from discrimination by federal, state, and District of Columbia laws.

12.    At various times in the recent past, Dr. Kimmel engaged in protected activity by voicing concerns and complaints over the discriminatory and unfair treatment of deaf/Deaf Culture, African-American and other minority, and "at risk" students and colleagues. As a result of these concerns and complaints, Dr. Kimmel has been the victim of illegal retaliatory actions by Gallaudet and its employees and agents. These illegal retaliatory actions have made Dr. Kimmel's workplace situation unbearable and have damaged her reputation and future in academia.

13.     In October of 2006, students at Gallaudet, supported and encouraged by several Gallaudet faculty and staff members, as well as alumni, staged lawless and widely publicized sit-ins, blockades, and protests against then-newly selected President Jane K. Fernandes.   The protests began and were primarily led by members of Gallaudet's Deaf Culture, a large faction of Gallaudet's community.   Deaf Culture believes ASL is the only acceptable form of communication and often expresses hostility toward deaf or hard-of-hearing individuals who choose to function within the hearing world.

14.     It was widely reported in the press, and well known on campus, that one of the chief complaints of the protestors regarding Dr. Fernandes was that she was "not Deaf enough." Dr. Fernandes was deaf, but grew up speaking and lip-reading.   She did not learn ASL until twenty-three years of age.   Dr. Fernandes also supported a climate of diversity and tolerance that would accommodate both Deaf and deaf students, as well as minorities who are not proficient in ASL, and those who embrace technology as a means to integrate more fully into the outside world (e.g., through use of cochlear implants).   Dr. Fernandes' beliefs in openness and diversity were viewed by Deaf Culture advocates as a threat to Deaf Culture.

15.     As a result of the months-long controversy and protests, the Board of Trustees of Gallaudet capitulated to pressure by Deaf Culture advocates and revoked Dr. Fernandes' appointment to the office of President, despite having previously elected her unanimously and praising her abilities and dedication.   Other than her being "not Deaf enough," there was no basis, much less a reasonable basis, for the revocation of Dr. Fernandes' appointment.   Although some faculty and students tried to fault Dr. Fernandes' administrative or leadership skills, this was *post hoc* and occurred only after it was clear the argument about her "not being Deaf enough" had backfired in the public mind.   The Board's removal of Dr. Fernandes was unlawful

and inappropriate.    At least one member of the Board of Trustees, Senator John McCain, resigned in opposition to the Board's actions.  Others resigned claiming undue stress or outright threats of death and injury by members of the Deaf Culture led protests.    Following the revocation of Dr. Fernandes' appointment, Gallaudet filled the offices of President and certain related positions with individuals who ascribed to or who were sympathetic to the Deaf Culture led protests.    These individuals thereupon took actions that had the effect of ostracizing or harassing members of the Gallaudet community, including Dr. Kimmel, who are "not Deaf enough" and/or who supported Dr. Fernandes and her views of diversity and tolerance.    Over time, these actions were intended to have the effect, and have in fact had the effect, of purging from Gallaudet anyone who has questioned the close-mindedness of Deaf Culture and who has suggested that Gallaudet be a place of diversity and tolerance.    Dr. Kimmel has been one of the many targets of this purge.    It is clear that the actions of Gallaudet employees and agents since the protests have been designed to harass Dr. Kimmel to the point that she will leave the University, and to retaliate against her for her statutorily protected support of others.

16.    Gallaudet is currently undergoing investigation by the Middle States Commission on Higher Education and is in serious jeopardy of losing its accreditation.    This investigation is the result of several problems noted by the Commission, including its "serious concern" regarding the 2006 protests over Jane Fernandes.    The Commission noted that "closing an institution through protest, preventing or intimidating students from attending class, or precluding the open exchange of ideas brings the institution out of compliance with Middle State's accreditation standards, and any further such actions will have dire consequences in terms of accreditation."

17.     Before, during, and after the October 2006 protests and other demonstrations, Dr. Kimmel openly supported Dr. Jane Fernandes and her beliefs in support of non-discrimination against students who are not members of Deaf Culture.

18.     Not only did Dr. Kimmel support Dr. Fernandes' non-discriminatory visions for Gallaudet, but she also learned ASL later in life and is also considered "not Deaf enough" by members of the Deaf Culture at Gallaudet.  As a result of being "not Deaf enough," Dr. Kimmel has suffered and been the victim of workplace discrimination and/or retaliation by Gallaudet employees and agents acting within the course and scope of their employment and/or agency.  Further, Dr. Kimmel's open support of Jane Fernandes, who was labeled "not Deaf enough" and discriminated against based upon her disability/hearing status during the 2006 protests, was protected activity, and the actions of Gallaudet toward Dr. Kimmel as a result were therefore both retaliatory and illegal.  Supporting Jane Fernandes, as well as being "not Deaf enough" herself, have made Dr. Kimmel's workplace environment intolerable.  Particularly since the October 2006 protests, the environment for those labeled "not Deaf enough" at Gallaudet has become increasingly hostile.  Dr. Kimmel has been harassed by various Gallaudet faculty members and other employees and/or agents of Gallaudet, her job responsibilities have been reduced, she has been routinely omitted from administrative decisions of which she would have once been a part, and she has been the victim of defamatory falsehoods spread by Gallaudet employees and agents and intended to destroy her reputation.

19.     Dr. Kimmel's efforts to ensure the protection of members of protected classes at Gallaudet have met with resistance on prior occasions, as well.  In the fall of 2005, Dr. Kimmel complained about the discriminatory treatment of a male African-American student who was dismissed from Gallaudet before undergoing learning disability testing after receiving poor

grades in mathematics.  Dr. Kimmel overrode the dismissal decision of Committee C, the faculty governance committee that dismisses students, and reappointed the student, who went on to do well at Gallaudet once given the opportunity to work with a faculty member whose sign communication matched his preferred method of communication (using sign *and* voice as opposed to signing only).  Dr. Kimmel's actions were in response to what she believed was discrimination against this student on the basis of race and disability, owing, in part, to his preferred mode of communication.

20.     In or about January or February of 2006, Dr. Kimmel expressed concerns over a discriminatory policy of the Mathematics Department that weighted final examinations such that a student who had received passing marks on all other coursework could still fail the entire course if he or she failed the final examination.  Dr. Kimmel believed that this policy, and specific actions taken by the Mathematics Department on the basis of this policy, discriminated against students, including African-American and developmental students, who were learning disabled, lacked sufficient math preparation because they are deaf, and possessed a range of communication skills from no signing to ASL, and therefore did not do well on high-stakes examinations, particularly in the context of mathematics.

21.     Dr. Kimmel's support for Dr. Fernandes and for a different and fairer policy regarding the weight of mathematics examinations, in order to prevent discrimination against developmental, African-American, or other students, resulted in retaliation by Gallaudet through its employees and agents.  This retaliation took the form of falsehoods spread by Gallaudet employees and agents regarding Dr. Kimmel's character and actions as Dean.  One example of this retaliation came through the defamation of her character and reputation in a November 9, 2006 *Washington Post* article titled "A Conflict on Integrity Surfaces."  In this article, Dr.

Kimmel is falsely accused by unnamed colleagues, speaking on behalf of Gallaudet, of having coerced professors into changing grades. Although the sources chose to remain anonymous in the *Post* article, it is clear that they were Gallaudet faculty members who had previously spread similar lies about Dr. Kimmel. The newspaper article repeated the false accusations of Gallaudet employees and agents that Dr. Kimmel had used coercion to force faculty members to change grades and lower standards when in fact Dr. Kimmel had merely questioned the use of a policy that she believed was discriminating against students who are protected from such discrimination. The falsehoods spread by Gallaudet employees and agents, and contained in the *Post* article, suggest that Dr. Kimmel lacked integrity and lowered standards when in fact her only goal was to protect the civil rights of Gallaudet's students by challenging what she believed to be illegal discrimination. The falsehoods were also designed to harass her in order to force her to leave Gallaudet.

22.    In November of 2006, Dr. Kimmel retained counsel out of concern for her reputation and the damage done to it as a result of the falsehoods spread by Gallaudet employees and agents. As a result, her legal representatives made contact with Gallaudet to inform the school of the potential claims against it, including, among other things, violations of Dr. Kimmel's rights protected by both District of Columbia and federal anti-discrimination laws. Dr. Kimmel's contacts with Gallaudet through counsel were activities that are protected from retaliation by both District of Columbia and federal law. Following these contacts, however, Dr. Kimmel experienced additional acts of retaliation and/or acts designed to purge her from Gallaudet for being "not Deaf enough."

23.    Since the time that Dr. Kimmel's legal representatives met with Gallaudet representatives, Dr. Kimmel has seen her job responsibilities as Dean reduced. For example, Dr.

Kimmel has been recently excluded from several important personnel decisions at Gallaudet that, absent retaliation against her for protected activities, would normally have included her in her capacity as Dean. Not only was Dr. Kimmel not consulted about these personnel changes, but she had no knowledge of them whatsoever until after they had occurred.

24.     In January of 2007, Dr. Kimmel was excluded from the Recruitment, Enrollment and Retention Team despite her position as Dean and the fact that her job duties traditionally included membership in that team and a focus on recruitment, enrollment and retention. When the President of Gallaudet requested participants for the Academic Rigor Working Team, Dr. Kimmel volunteered to serve based on her experience and knowledge of Gallaudet. However, her desire to participate, as part of her duties as Dean, has been largely ignored and appears even to have stalled the committee's formation.

25.     In addition to the *Post* article noted above, employees and agents of Gallaudet continue to spread defamatory lies and falsehoods about Dr. Kimmel. As just one example, a recent report prepared for the NCAA again alleges that Dr. Kimmel was involved in grade-changing. Dr. Kimmel was never interviewed about these allegations by the faculty members who comprised the on-campus NCAA team (appointed by the Interim Provost). Notably, all three members of this team are deaf and at least two of the three openly supported the October 2006 protests. The retaliatory and discriminatory climate of Gallaudet, however, led to the fact that Dr. Kimmel was not even asked about the alleged incident before the report was submitted, nor has she been able to have it properly amended to reflect the fact that she never supported grade changes for athletes, despite the fact that she has documentation proving her innocence.

26.    Despite having consistently received a commendable rating in her annual evaluations, and despite normally receiving a 6% merit pay increase, Dr. Kimmel was recently informed by the Interim Provost that he discussed the merit award with the President and that this year she would receive only a 3% merit pay increase.  She has thus far been given no explanation as to why she is receiving a smaller than usual raise.  The salary adjustment is an adverse employment action that was the result of retaliation by Gallaudet for Dr. Kimmel's prior protected activities and/or a discriminatory act intended to force Dr. Kimmel to leave Gallaudet because she is "not Deaf enough."

### FIRST CAUSE OF ACTION

### Retaliation Pursuant to Title VI of the Civil Rights Act of 1964

27.    Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 26 above.

28.    Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*) prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance.

29.    Gallaudet receives approximately 70% of its monies annually from federal funding.  This includes monies from the United States Department of Education.

30.    The Department of Education has promulgated regulations implementing Title VI of the Civil Rights Act of 1964 that forbid retaliation under Title VI.

31.    Gallaudet employs policies and practices that are unlawful under Title VI insofar as they discriminate against students based on race, color, or national origin in programs and activities that receive federal financial assistance.

32.    Gallaudet violated Title VI of the Civil Rights Act of 1964 by retaliating against Plaintiff due to her opposition to Gallaudet practices that were unlawful under Title VI. Specifically, Plaintiff engaged in protected activity when she questioned the legality and validity of a Mathematics Department policy that discriminated against African-American and other students in violation of Title VI. In addition to other adverse actions, falsehoods were spread about her to the *Washington Post* by employees and agents of Gallaudet who were aware of her opposition to the policy, which is featured prominently in at least one *Washington Post* article, described above. This retaliation was a direct consequence of her protected activity and has caused Dr. Kimmel to suffer compensatory damages in an amount to be proven at trial.

33.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs as a result of suffering retaliation by Gallaudet in violation of Title VI.

## SECOND CAUSE OF ACTION

### Retaliation Pursuant to the District of Columbia Human Rights Act

34.    Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 33 above.

35.    The District of Columbia Human Rights Act of 1977 ("DCHRA"), § 2-1401.01, *et seq.*, prohibits retaliation against any person who aids or encourages another to exercise his or

her rights under the Act. Gallaudet violated the DCHRA by retaliating against Plaintiff when she engaged in the protected activities discussed above: aiding and encouraging Jane Fernandes and exposing discrimination against African-American and developmental students.

36.    Dr. Kimmel engaged in statutorily protected activity by aiding and supporting Jane Fernandes, who was discriminated against by the University and its employees and agents, and supporting the policies of diversity and openness that Dr. Fernandes would have implemented as President, and which were violently opposed by Deaf Culture elements at Gallaudet who viewed such policies as a threat. Dr. Kimmel also engaged in statutorily protected activity by aiding students affected by a discriminatory policy of the Mathematics Department, the use of which had resulted in discrimination by Gallaudet on the basis of race and disability.

37.    As a result of her protected activity, various Gallaudet employees and agents took materially adverse actions against Dr. Kimmel. These adverse actions varied, but were such that they would dissuade a reasonable employee from making or supporting a charge of discrimination.

38.    Given the timeline of events, discussed above, as well as other factors, a clear connection exists between Dr. Kimmel's protected activity and the adverse actions taken by Gallaudet employees and agents.

39.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs as a result of suffering retaliation by Gallaudet in violation of the DCHRA.

## THIRD CAUSE OF ACTION

## Discrimination Due to Disability Pursuant to the District of Columbia Human Rights Act

40.    Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 39 above.

41.    Plaintiff has a physical disability that substantially limits one or more major life activities, as well as a record of her impairment.  Namely, Plaintiff suffers from degenerative and hereditary hearing loss that substantially limits the major life activity of hearing.

42.    Although Plaintiff has the aforementioned disability, she is considered "not Deaf enough" and has therefore been discriminated against by Gallaudet employees and agents.

43.    Gallaudet, through its employees and agents, has violated the non-discrimination mandates of the DCHRA by discriminating against Plaintiff with respect to her compensation, as well as the terms, conditions, and privileges of her employment.  Recently, without explanation, Plaintiff was informed she would not receive her usual 6% merit increase raise, but rather merely a 3% merit increase raise.  Additionally, as discussed above, her job responsibilities have been reduced and she has been excluded from important decisions.  Gallaudet has also limited, segregated, and classified Plaintiff in such a way as to deprive or tend to deprive Plaintiff of employment opportunities and otherwise adversely affect her status as an employee.  These actions were directly related to Plaintiff's disability, insofar as she is considered "not Deaf enough" by agents and employees of Gallaudet.  The degree of her disability was the cause of the many adverse employment actions Plaintiff has suffered, despite the fact that she was highly qualified for her job.

44.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs as a result of suffering discrimination by Gallaudet in violation of the DCHRA.

## FOURTH CAUSE OF ACTION

### Hostile Work Environment Pursuant to the District of Columbia Human Rights Act

45.    Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 44 above.

46.    Plaintiff is a member of a protected class due to her disability.  Namely, Plaintiff suffers from degenerative and hereditary hearing loss that substantially limits the major life activity of hearing.

47.    Plaintiff was repeatedly subjected to unwanted harassment from employees and agents of Gallaudet.  The harassment took the form of defamatory comments and ostracization, as well as other forms.  This harassment occurred because of Plaintiff's disability, specifically because she is considered "not Deaf enough."  This harassment affected a term, condition or privilege of Plaintiff's employment insofar as it created a pervasive atmosphere of disrespect, ridicule, insult, discriminatory animus, and a threatening environment to which no employee should have to be subjected.  Gallaudet certainly knew about the harassment, and failed to take any action to prevent it.

48.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs as a result of suffering a hostile work environment at, and caused by, Gallaudet in violation of the DCHRA.

## FIFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

49.    Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 48 above.

50.    Gallaudet's actions directed at Plaintiff have been extreme and outrageous, and included intentionally and/or recklessly spreading false and defamatory information concerning Plaintiff to the *Washington Post*, a national publication, and the NCAA.  These extreme and outrageous actions by Gallaudet employees and agents resulted in severe emotional distress to the Plaintiff, in violation of District of Columbia law.

51.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as costs as a result of Gallaudet's intentional infliction of emotional distress.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Prospective Business Relations

52.    Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 51 above.

53.    Dr. Kimmel is a highly educated professor and administrator who had, prior to the events outlined above, a valid business expectancy that she would be able to teach, and possibly also serve as an administrator, in higher education until her retirement.  This business expectancy was inherent and certainly known by Gallaudet.  However, agents and employees of Gallaudet intentionally interfered with this business expectancy by spreading false and defamatory lies

about Dr. Kimmel.  This spread of false information was calculated to cause damage to Plaintiff in her business relations, and has in fact destroyed her prospective business relations and damaged her reputation.  Further, she is being denied the ability to continue to pursue her dream of educating the deaf at the nation's premiere institution of higher education for the deaf.

54.     Gallaudet's actions of intentionally spreading false and defamatory information concerning Plaintiff to the *Washington Post* and the NCAA were improper, unlawful, and also tortiously interfered with Dr. Kimmel's prospective business interests with third parties, insofar as her ability to find future employment has been seriously jeopardized.  At least three potential sources of prospective employment have disappeared, which Plaintiff believes, on information and belief, were the results of the false information about her that was spread in the public domain by agents and/or employees of Gallaudet.

55.     Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as costs as a result of Gallaudet's tortious interference.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

56.     Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 55 above.

57.     Dr. Kimmel is a fully tenured member of the English Department at Gallaudet, and therefore has an expectation of continuous, lifetime employment at Gallaudet.

58.    Gallaudet formed a contract with Plaintiff, the terms of which included a written policy stating that Gallaudet would not discriminate on the basis of hearing status.  The contract is mutually binding upon the parties and is supported by adequate consideration.

59.    Gallaudet breached its contract with Dr. Kimmel by allowing its employees and agents to discriminate against Dr. Kimmel, Jane Fernandes, and possibly others, on the basis of hearing status.    Gallaudet further breached this contract by creating and/or allowing an atmosphere that oppresses, ostracizes, and harasses those individuals employed by or associated with Gallaudet who are "not Deaf enough."    Dr. Kimmel has experienced such oppression, ostracization and harassment to the point of not being able to perform her job or function effectively as a member of the faculty and the administration and, thus, has been damaged by Gallaudet's breach of contract.  By creating and/or allowing such an atmosphere, Gallaudet has in fact discriminated against Dr. Kimmel on the basis of her hearing status because she is "not Deaf enough" (and therefore not a member of Deaf Culture) in violation of Gallaudet's explicit, written policy, which is part of Dr. Kimmel's contract with Gallaudet.

60.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial, as well as costs, as a result of Gallaudet's breach of contract.

## JURY DEMAND

Plaintiff hereby requests a trial by jury.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that this Court:

    a.   award Plaintiff compensatory damages in an amount not less than three million dollars ($3,000,000);

    b.   award Plaintiff punitive damages in an amount not less than nine million dollars ($9,000,000) or any other such amount the jury deems proper;

    c.   award Plaintiff her costs and reasonable attorney's fees incurred in this action; and

    d.   grant such other relief as the Court may deem just and proper.

Dated: May 2,  2007                        Respectfully submitted,

                                           By:  __/s/ John M. Simpson_____
                                             John M. Simpson
                                           D.C. Bar No. 256412
                                           FULBRIGHT & JAWORSKI, L.L.P.
                                           801 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20004-2623
                                           Telephone:  (202) 662-4539
                                           Facsimile:  (202) 662-4643

                                           Attorneys for Plaintiff

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __88888__<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br><br>John M. Simpson      801 Pennsylvania Avenue, NW<br>Fulbright & Jaworski L.L.P.    Washington, DC 20004<br>                (202) 662-0200 | ATTORNEYS (IF KNOWN) |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☒ 4 Diversity
(Indicate Citizenship of Parties
in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G. Habeas Corpus/ 2255**<br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ **H. Employment Discrimination**<br>☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I. FOIA/PRIVACY ACT**<br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J. Student Loan**<br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K. Labor/ERISA (non-employment)**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ **L. Other Civil Rights (non-employment)**<br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ **M. Contract**<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ **N. Three-Judge Court**<br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ Multi district Litigation    ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Title VI and DCHRA    employment discrimination + retaliation, and others

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** 12,000,000 | Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES    ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES    ☒ NO    If yes, please complete related case form.

DATE **May 2, 2007**    SIGNATURE OF ATTORNEY OF RECORD    *John M. Shupe*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.