## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KAREN L. KIMMEL,** ) | |
| ) | **Case No. 1:07-cv-00797 (RWR)** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GALLAUDET UNIVERSITY,** ) | |
| ) | |
| **Defendant.** ) | |

### DEFENDANT'S MOTION TO DISMISS

Defendant Gallaudet University ("Gallaudet" or "Defendant"), by and through counsel,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, hereby moves this Honorable

Court for an Order pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure dismissing

the Complaint for failure to state a claim upon which relief may be granted for the reasons stated

in the accompanying Memorandum of Law in support of this motion.

**WHEREFORE**, Defendant respectfully requests that the Complaint be dismissed with

prejudice in its entirety, that Defendant be awarded the costs incurred as a result of this lawsuit,

and that Defendant be awarded such further relief as this Honorable Court deems just and proper.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP

_____/s/_____
Robert B. Wallace (D.C. Bar No. 108571)
Laura N. Steel (D.C. Bar No. 367174)
Yoora Pak (D.C. Bar No. 467007)
1341 G Street, NW, Fifth Floor
Washington, DC  20005-3186
Telephone (202) 626-7667
Facsimile (202) 628-3606
robert.wallace@wilsonelser.com
yoora.pak@wilsonelser.com
*Attorney for Defendant*
*Gallaudet University*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Motion to Dismiss and Memorandum

of Law in support thereof by Defendant Gallaudet University were served via Electronic Case

Filing (ECF) this 29th day of May, 2007 to:

John M. Simpson, Esq.
Fulbright & Jaworski, L.L.P.
801 Pennsylvania Avenue, NW
Washington, DC 20004-2623

_____/s/_____
Robert B. Wallace

2

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

FACTUAL BACKGROUND ......................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 3

ARGUMENT .................................................................................................................. 5

I.   STANDARD OF REVIEW ................................................................................... 5

II.  PLAINTIFF DOES NOT HAVE A PRIVATE RIGHT OF ACTION TO BRING A
     RETALIATION CLAIM BASED ON OPPOSITION TO DISPARATE IMPACT
     POLICIES. .......................................................................................................... 5

     A.   Title VI Only Confers A Private Right Of Action For Claims Of
          Intentional Discrimination And Does Not Prohibit Activities That
          Have A Disparate Impact Based On Race. ................................................ 6

     B.   There Is No Private Right Of Action For Retaliation Claims Based
          On Rights Created By Regulations Promulgated Pursuant To
          Section 602 .............................................................................................. 7

     C.   DOE Regulations Prohibiting Retaliation For Opposing Activities
          Or Policies Having A Disparate Impact May Not Be Enforced Via
          A Private Right Of Action. ...................................................................... 8

     D.   Plaintiff's Title VI Claim Must Be Dismissed As A Matter Of Law
          Because She Does Not Have A Private Right Of Action. .......................... 9

III. PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM UNDER THE
     DISTRICT OF COLUMBIA HUMAN RIGHTS ACT ....................................... 9

     A.   Plaintiff Cannot Establish That She Engaged In A Statutorily
          Protected Activity, Encouraged Another Person To Exercise A
          Right Protected By DCHRA, Or Opposed A Practice Made
          Unlawful By DCHRA. ............................................................................ 10

          1.   "Aiding and encouraging Jane Fernandes" is not a protected
               activity. ........................................................................................ 11

          2.   Plaintiff did not engage in a protected activity when she
               questioned a policy applied by the Mathematics Department. ........ 12

     B.   Plaintiff Cannot Establish An Adverse Action. ..................................... 14

          1.   Plaintiff cannot establish that an exclusion from personnel
               decisions was a "materially adverse action." ............................... 14

          2.   Plaintiff cannot establish that she suffered a "materially
               adverse action" because she was excluded from committees. .......... 15

3.    Plaintiff did not suffer an adverse employment action because she received a less than expected merit pay increase. ......................15

4.    Plaintiff cannot establish that the Washington Post article was a "materially adverse action." ..........................................................16

C.    Plaintiff Cannot Establish Causation. ....................................................16

IV.    PLAINTIFF CANNOT ESTABLISH THAT SHE WAS DISCRIMINATED AGAINST ON THE BASIS OF A DISABILITY UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT. ..........................18

V.    PLAINTIFF CANNOT ESTABLISH A CLAIM OF HOSTILE WORK ENVIRONMENT BASED ON A DISABILITY UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT ....................................................19

VI.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS AS A MATTER OF LAW. ..................................20

VII.    PLAINTIFF'S TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS FAILS AS A MATTER OF LAW...........................20

VIII.    PLAINTIFF CANNOT ESTABLISH A BREACH OF CONTRACT. ..........................22

CONCLUSION .........................................................................................................23

# TABLE OF AUTHORITIES

## Cases

Alexander v. Sandoval,
532 U.S. 275 (2001) .................................................................................................. 6, 7, 8

Boulton v. Institute of Int'l Educ.,
808 A.2d 499 (D.C. 2002) ......................................................................................... 22, 23

Broderick v. Donaldson,
437 F.3d 1226 (D.C. Cir. 2005) .................................................................................... 10

Browning v. Clinton,
292 F.3d 235 (D.C. Cir. 2002) ....................................................................................... 5

Burlington Northern & Santa Fe Ry. v. White,
126 S. Ct. 2405 (2006) ............................................................................................ 10, 14

Chandamuri v. Georgetown Univ.,
274 F. Supp. 2d 71 (D.D.C. 2003) ............................................................................ 6, 8, 9

Clark County Sch. Dist. v. Breeden,
532 U.S. 268 (2001) ...................................................................................................... 16

Coleman v. Potomac Elec. Power Co.,
422 F. Supp. 2d 209 (D.D.C. 2006) ............................................................................... 10

EEOC v. St. Francis Xavier Parochial Sch.,
117 F.3d 621 (D.C. Cir. 1997) ........................................................................................ 5

Ginger v. District of Columbia,
477 F. Supp. 2d 41 (D.D.C. 2007) ........................................................................ 9, 14, 16

Guardians Assn v. Civil Serv. Comm'n of New York City,
463 U.S. 582 (1983) ........................................................................................................ 6

Howard Univ. v. Best,
484 A.2d 958 (D.C. 1984) ................................................................................... 19, 20, 21

Islamic Am. Relief Agency v. Gonzales,
477 F.3d 728 (D.C. Cir. 2007) ........................................................................................ 5

Johnson v. Joo,
2006 U.S. Dist. LEXIS 13022 (D.D.C. Mar. 12, 2006) ............................................... 15

Lemmons v. Georgetown Univ. Hosp.,
431 F. Supp. 2d 76 (D.D.C. 2006) ............................................................................. 9, 10

McCain v. CCA of Tenn., Inc.,
   254 F. Supp. 2d 115 (D.D.C. 2003) ...................................................................... 19

Newman v. Legal Services Corp.,
   628 F. Supp. 535 (D.D.C. 1986) ........................................................................ 21

Peters v. Jenney,
   327 F.3d 307 (4th Cir. 2003) ......................................................................... 6, 8

Press v. Howard Univ.,
   540 A.2d 733 (D.C. 1988) ............................................................................. 21

Regents of Univ. of Cal. v. Bakke,
   438 U.S. 265 (1978) ..................................................................................... 6

Swanks v. Washington Metro. Area Transit Auth.,
   179 F.3d 929 (D.C. Cir. 1999) ........................................................................ 18

Trudeau v. FTC,
   456 F.3d 178 (D.C. Cir. 2006) .......................................................................... 5

Valles-Hall v. Center for Nonprofit Advancement,
   2007 U.S. Dist. LEXIS 22046  (D.D.C. Mar. 12, 2007).................................... 15, 16

Williams v. Federal Nat'l Mortgage Ass'n,
   2006 U.S. Dist. LEXIS 42911 (D.D.C. June 26, 2006) ......................................... 21

## Statutes

42 U.S.C. § 2000d.......................................................................................... 6
42 U.S.C. § 2000d-1 ...................................................................................... 7
D.C. Code § 2-1401.02(5A)........................................................................ 12, 18
D.C. Code § 2-1402.11(a)............................................................................... 10

## Regulations

34 C.F.R. §  100.7(e)..................................................................................... 8
34 C.F.R. §  100.3(b)(2)............................................................................... 7, 9
34 C.F.R. §  100.7(e)............................................................................... 7, 8, 9

iv

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **KAREN L. KIMMEL,** ) | **Case No. 1:07-cv-00797 (RWR)** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GALLAUDET UNIVERSITY,** ) | |
| ) | |
| **Defendant.** ) | |

---

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT'S MOTION TO DISMISS

Defendant Gallaudet University ("Gallaudet" or "Defendant"), by and through counsel, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, hereby submits this Memorandum of Law in support of its Motion to Dismiss.

### FACTUAL BACKGROUND

As alleged in the Complaint, Gallaudet is the premiere institution of higher education for the deaf in the United States. Complaint ("Comp.") at ¶ 6. Plaintiff is the Dean of the College of Liberal Arts, Sciences, and Technologies at Gallaudet, as well as a tenured Associate Professor in the Department of English at Gallaudet. *Id.* at ¶ 5.

The Complaint alleges that plaintiff overrode the dismissal decision of a faculty governance committee that dismisses students and reappointed an African-American student who had been dismissed from Gallaudet after receiving poor grades in mathematics. *Id.* at ¶ 19. Plaintiff alleges that she had complained that this student was dismissed "before undergoing learning disability testing" and that she believed that this student was being discriminated against based on his race and disability, "owing, in part, to his preferred mode of communication." *Id.*

It is also alleged in the Complaint that in or about January or February 2006, plaintiff

expressed her concerns about a policy utilized by the Mathematics Department "that weighted final examinations such that a student who had received passing marks on all other coursework could still fail the entire course if he or she failed the final examination." *Id.* at ¶ 20. Plaintiff alleges in her Complaint that she "believed that this policy, and specific actions taken by the Mathematics Department on the basis of this policy, discriminated against students, including African-America and developmental students, who were learning disabled, lacked sufficient math preparation because they are deaf, and possessed a range of communications skills from no signing to [American Sign Language], and therefore did not do well on high-stakes examinations, particularly in the context of mathematics." *Id.* Plaintiff alleges that she was supporting a "fairer policy regarding the weight of mathematics examinations, in order to prevent discrimination against developmental, African-American, or other students." *Id.* at ¶ 21.

It is further alleged in the Complaint that plaintiff "open[ly] supported" former Gallaudet President Jane Fernandes. *Id.* at ¶ 17-18. Plaintiff alleges that Ms. Fernandes was removed from her position because she was "not Deaf enough." *Id.* at ¶ 15. As alleged in the Complaint, "not Deaf enough" is a phrase used in a cultural debate on the Gallaudet campus, which "has it roots in the social structure …." *Id.* at ¶ 9. Because of her support of Ms. Fernandes, Plaintiff claims that she is being harassed, discriminated against and/or retaliated against for being "not Deaf enough." *Id.* at 18.

The Complaint also alleges that the Washington Post published an article titled, "A Conflict on Integrity Surfaces," on November 9, 2006. Plaintiff asserts that she is falsely accused in that article "by unnamed colleagues, speaking on behalf of Gallaudet, of having coerced professors into changing grades." *Id.* at 21. Plaintiff also asserts that she was again alleged to have been involved in grade-changing in an NCAA report prepared by Gallaudet. *Id.*

at ¶ 25.

It is alleged that plaintiff's job responsibilities were reduced in or around November 2006. *Id.* at ¶ 23. Specifically, plaintiff alleges that she was "recently excluded from several important personnel decisions," and that she was excluded from the Recruitment, Enrollment, and Retention Team. *Id.* at ¶¶ 23-24.

Finally, it is alleged that plaintiff received a "smaller than usual" 3% merit pay increase, "despite normally receiving a 6% merit pay increase." *Id.* at ¶ 26.

## SUMMARY OF ARGUMENT

Plaintiff's Complaint must be dismissed for failure to state a claim. As to her First Cause of Action, retaliation pursuant to Title VI of the Civil Rights Act of 1964, there is no private right of action to bring a retaliation claim based on opposition to policies having a disparate impact based on race, color, or national origin. Thus, the First Cause of Action must be dismissed as a matter of law.

As to her Second Cause of Action, retaliation pursuant to the District of Columbia Human Rights Act, plaintiff cannot establish that she engaged in a protected activity nor that she suffered adverse employment actions. Even if she could establish the first two elements of her *prima facie* case, she cannot establish a causal connection between the purported protected activity and the purported adverse employment action. Thus, the Second Cause of Action must be dismissed as a matter of law.

As to her Third Cause of Action, discrimination due to disability pursuant to the District of Columbia Human Rights Act, plaintiff does not allege that she is being discriminated on the basis of a disability but instead, because she is considered "not Deaf enough." As plaintiff concedes, such nomenclature is grounded on a cultural and social debate, not a physical

3

condition. Even if plaintiff could establish that being "nor Deaf enough" is a physical condition constituting a disability under the District of Columbia Human Rights Act, she cannot establish that she suffered an adverse employment action nor a causal connection between her purported disability and the purported adverse employment action. Thus, the Third Cause of Action must be dismissed as a matter of law.

As to her Fourth Cause of Action, hostile work environment pursuant to the District of Columbia Human Rights Act, plaintiff cannot establish that she was subjected to harassment because of a disability. As plaintiff concedes, being considered "not Deaf enough" does not refer to a physical condition but is a term used in a cultural and social debate on the Gallaudet campus. Thus, the Fourth Cause of Action must be dismissed as a matter of law.

As to her Fifth Cause of Action, intentional infliction of emotional distress, employer-employee conflicts do not, as a matter of law, rise to the level of outrageous conduct. Thus, the Fifth Cause of Action must be dismissed as a matter of law.

As to her Sixth Cause of Action, tortious interference with prospective business relations, Gallaudet cannot, as a matter of law, tortiously interfere with its own business relations with plaintiff. In addition, plaintiff cannot establish that Gallaudet tortiously interfered with any prospective business relations because she has not identified any specific expectancy. Thus, the Sixth Cause of Action must be dismissed as a matter of law.

Finally, as to her Seventh Cause of Action, breach of contract, plaintiff cannot establish that there was a contract, express or implied, based on Gallaudet's nondiscrimination policy. Consequently, she cannot establish that there was a breach of a nonexistent contract. Thus, the Seventh Cause of Action must be dismissed as a matter of law.

262150.1

**ARGUMENT**

**I.    STANDARD OF REVIEW**

A court may grant a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) if the plaintiff can prove no set of facts in support of her claim that would entitle her to relief.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The facts alleged in the Complaint must be treated as true and the plaintiff must be given the benefit of all reasonable inferences that can be derived from the facts.  *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006).  However, the Court "need not … accept inferences that are unsupported by the facts set forth in the complaint … [or] legal conclusions cast in the form of factual allegations."  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007) (citations omitted).  In its review, the Court may only consider the facts alleged in the Complaint, documents attached to or incorporated into the Complaint, and matters of which the court may take judicial notice.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-625 (D.C. Cir. 1997).

**II.    PLAINTIFF DOES NOT HAVE A PRIVATE RIGHT OF ACTION TO BRING A RETALIATION CLAIM BASED ON OPPOSITION TO DISPARATE IMPACT POLICIES.**

Plaintiff claims that Gallaudet retaliated against her for opposing Gallaudet "policies and practices that are unlawful under Title VI insofar as they discriminate against students based on race, color, or national origin in programs and activities that receive federal financial assistance."  Comp. at ¶ 31-32.  *See also* Comp. at ¶¶ 19-20.  Plaintiff does not allege that Gallaudet intentionally discriminated against any student.  Rather, it is clear that her Title VI retaliation claim is based on her opposition to the application of a neutral policy that allegedly has a disparate impact on African-American students.  As explained below, the Supreme Court has held that plaintiff does not have a private right of action to bring a lawsuit asserting retaliation

under Title VI based on opposition to a disparate impact policy.

> A.    Title VI Only Confers A Private Right Of Action For Claims Of Intentional Discrimination And Does Not Prohibit Activities That Have A Disparate Impact Based On Race.

Section 601 of Title VI of the Civil Rights Act of 1964 provides:

> No person in the United States shall, on the ground of race, color or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.  As held by the Supreme Court, Section 601 only prohibits intentional discrimination and there is a private right of action to enforce a right protected by Section 601. *Alexander v. Sandoval*, 532 U.S. 275, 280-281 (2001) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 272, 287 (1978)), and *Guardians Assn v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 610-611 (1983).  In *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71 (D.D.C. 2003), this Court held that Section 601 also prohibits retaliation for opposing a right protected by Section 601.  *Id.* at 83 (citing and quoting *Peters v. Jenney*, 327 F.3d 307, 316-317 (4th Cir. 2003)).

The Supreme Court made clear in *Sandoval*, however, that Section 601 does not prohibit activities or policies that have a disparate impact based on race, color or national origin. *Sandoval*, 532 U.S. at 281.  Instead, such proscriptions are found in the regulations promulgated by a federal department or agency.

B.    <u>There Is No Private Right Of Action For Retaliation Claims Based On Rights Created By Regulations Promulgated Pursuant To Section 602.</u>

Pursuant to Section 602 of Title VI,[1] federal agencies that provide financial assistance are authorized to promulgate regulations "proscrib[ing] activities that have a disparate impact on racial groups, even though such activities are permissible under § 601." *Sandoval*, 532 U.S. at 281. In accordance with this authority, the Department of Education ("DOE") has promulgated its own regulations, which are found at 34 C.F.R. Part 100. Provisions relevant to this matter include 34 C.F.R. § 100.3(b)(2), which prohibits Federal financial funds recipients from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin …." In addition, 34 C.F.R. § 100.7(e) provides:

> (e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Action *or this part* ….

Assuming that agency regulations prohibiting activities that have a disparate impact based on race are valid, the Supreme Court concluded that it "is clear that the disparate-impact regulations do not simply apply § 601 -- since they indeed forbid conduct that § 601 permits -- and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce those regulations" promulgated under Section 602. *Id.* at 285, 293. Accordingly, as recognized by this Court, the "Supreme Court held that Title VI does not display

---

[1] Section 602 of Title VI provides:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity … is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability….

42 U.S.C. § 2000d-1.

an intent to create a 'freestanding private right of action to enforce regulations promulgated under § 602." *Chandamuri*, 274 F. Supp. 2d at 82 (citing *Sandoval*, 532 U.S. at 293).

    C.    <u>DOE Regulations Prohibiting Retaliation For Opposing Activities Or Policies Having A Disparate Impact May Not Be Enforced Via A Private Right Of Action</u>.

The Fourth Circuit Court of Appeals reviewed DOE's retaliation regulations at issue in this case, 34 C.F.R. § 100.7(e), in *Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003). It separated the two clauses in this provision. First, the prohibition on retaliation "for the purpose of interfering with any right or privilege *secured by section 601 of the Act*." 34 C.F.R. § 100.7(e) (emphasis added). The Fourth Circuit concluded that this clause of the retaliation regulation was a "valid interpretation of § 601" because it "targets retaliatory action actually intended to bring about a violation of § 601's core prohibition on intentional racial discrimination," and therefore "enforceable via an implied private right of action." *Id.* at 318-19.

The second part of the retaliatory regulation prohibits retaliation "for the purpose of interfering with any right to privilege *secured by ... this part*." 34 C.F.R. § 100.7(e) (emphasis added). The Fourth Circuit concluded that this clause "encompasses every right or privilege created by Part 100 [regulations promulgated under Section 602] … [which] include[s] the right to be free of unintentional disparate impact practices." *Peters*, 327 F.3d at 319. Accordingly, it concluded that retaliation claims based on opposition to disparate impact claims could not be enforced via a Section 601 private right of action. *Id.* at 319.

Thus, following *Sandoval*, the Fourth Circuit held that the retaliation regulations codified at 34 C.F.R. § 100.7(e) may not be enforced "via the § 601 private right of action ..." to the extent that the regulations "forbid retaliation for opposing disparate impact practices not actionable under § 601." *Peters*, 329 F.2d at 319. The Fourth Circuit's analysis is consistent with this Court's conclusion that "no private right of action exists to enforce a regulation

promulgated under § 602 that is not also a failure to comply with § 601." *Chandamuri*, 274 F. Supp. 2d at 82.

        D.        <u>Plaintiff's Title VI Claim Must Be Dismissed As A Matter Of Law Because She Does Not Have A Private Right Of Action.</u>

It is clear from the allegations made in the Complaint that plaintiff's Title VI retaliation claim is based on opposition to a neutral policy that allegedly has a disparate impact on African-American students. *See* Comp. at ¶¶ 11, 12, 19, 20, 31, 32. She does not allege that Gallaudet intentionally discriminated against any specific student. *See* Complaint *passim*. Consequently, she has "plead[ed] [her]self out of court." *Chandamuri*, 274 F. Supp. 2d at 84. Because activities having a disparate impact are permitted under Section 601 and are only prohibited by DOE's regulations, specifically 34 C.F.R. § 100.3(b)(2), plaintiff does not have a private right of action to enforce the DOE's regulation prohibiting retaliation for "any right or privilege secured by … this part." 34 C.F.R. § 100.7(e); *Chandamuri*, 274 F. Supp. 2d at 82. Consequently, plaintiff's retaliation claim under Title VI must be dismissed as a matter of law.

## III.    PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT.

To establish a claim of retaliation under the District of Columbia's Human Rights Act ("DCHRA"), plaintiff must be able to establish the following: (1) that she engaged in a statutorily protected activity, encouraged another person to exercise a right protected by the DCHRA, or opposed a practice made unlawful by the DCHRA; (2) that Gallaudet took an adverse action; and (3) that there was a causal connection between the statutorily protected activity and the adverse action. *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 51 (D.D.C. 2007); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006). As held by the Supreme Court, "the anti-retaliation provision protects an individual not from all retaliation,

but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2414 (2006).  As shown below, because plaintiff cannot establish any of the elements of her retaliation claim, it must be dismissed as a matter of law.

      A.     <u>Plaintiff Cannot Establish That She Engaged In A Statutorily Protected Activity, Encouraged Another Person To Exercise A Right Protected By DCHRA, Or Opposed A Practice Made Unlawful By DCHRA.</u>

To constitute a "protected activity" for purposes of a retaliation claim under DCHRA, the activity must "involve[] opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Lemmons*, 431 F. Supp. 2d at 91 (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212 (D.D.C. 2006)).  The "'alleged discriminatory treatment,' however, cannot be generic; rather, the plaintiff must be opposing an employment practice made unlawful by [DCHRA]." *Id.* at 91-92 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2005)).  To that end, the plaintiff "must demonstrate that she had alleged harassment or discrimination based on . . . some . . . category protected by the DCHRA … before the retaliatory conduct occurred." *Id.* at 92.  The DCHRA prohibits discrimination on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identities or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation.  D.C. Code § 2-1402.11(a).

In this case, plaintiff alleges that she engaged in statutorily protected activities by (1) "aiding and encouraging Jane Fernandes" and (2) "exposing discrimination against African-American and developmental students."  Comp. at ¶¶ 35-36.  As explained below, the activities were not based on a category protected by DCHRA and thus, plaintiff has not engaged in a protected activity.

      1.     <u>"Aiding and encouraging Jane Fernandes" is not a protected activity</u>.

For purposes of this motion, the factual allegations contained in the Complaint are construed in the light most favorable to plaintiff.  In that regard, plaintiff goes to great lengths to explain what she refers to as "Deaf Culture" and the genesis of the term "not Deaf enough."  *See* Comp. at ¶ 9.  Plaintiff alleges that the word "deaf" with a capital "D" "signifies a culture rather than the physical condition of hearing loss."  *Id.*  She alleges that being "not Deaf enough" means that the individual does not subscribe to the "tribal nature" of "Deaf Culture," which supports the use of American Sign Language ("ASL") only and views "Deaf people" as an oppressed minority while "rejecting the notion of deafness as a disability."  *Id.*  Plaintiff further alleges that "one of the chief complaints of the protestors regarding Dr Fernandes was that she was 'not Deaf enough,'" and that Dr. Fernandes was removed from her position as President of Gallaudet because she was "not Deaf enough."  *Id.* at ¶ 14.  Plaintiff also alleges that she supported "the policies of diversity and openness that Dr. Fernandes would have implemented as President," which she describes as "a climate of diversity and tolerance that would accommodate both Deaf and deaf students, as well as minorities who are not proficient in [American Sign Language], and those who embrace technology as a means to integrate more fully into the outside world (e.g., through use of cochlear implants)."  Comp. at ¶ 14.  She further alleges that "Dr. Fernandes' beliefs in openness and diversity were viewed by Deaf Culture advocates as a threat to Deaf Culture."  *Id.*

In making these allegations, plaintiff is asking this Court to conclude that being "not Deaf enough" is a protected status under the DCHRA.  However, plaintiff's own allegations demonstrate that providing protected status on the basis of being "not Deaf enough" would be inappropriate.  First, plaintiff alleges that being "not Deaf enough" is a cultural phenomenon

rather than physical condition.  Accordingly, being "not Deaf enough" cannot be a disability, which is defined as a "physical or mental impairment."  D.C. Code § 2-1401.02(5A).  This conclusion is consistent with plaintiff's allegation that those who subscribe to the belief that an individual is "not Deaf enough" "rejects the notion of deafness as a disability."

Second, the diversity and openness policies advocated by Dr. Fernandes and supported by plaintiff are not based on a protected status.  Rather, as plaintiff alleges, she supported policies favoring different modes of communication on campus based on the needs of students who may not be proficient in ASL (*i.e.*, using ASL and voice as alleged in paragraph 19) and policies that encouraged and facilitated the use of technology to integrate deaf people into the "outside world."  Comp. at ¶ 14.  In other words, Dr. Fernandes' policies were not based on hearing as a disability, but based on her belief that students' needs should dictate the mode of communication used in the academic setting and that technology should be embraced.

Consequently, because being "not Deaf enough" is not a disability and the policies supported by plaintiff were not based on a disability, and because plaintiff has not alleged that she took the purported protected activity on any other protected basis, plaintiff did not engage in a protected activity under the DCHRA.  Thus, her retaliation claim fails based on this activity.

　　　　　　2.　　Plaintiff did not engage in a protected activity when she questioned a policy applied by the Mathematics Department.

Plaintiff alleges that she engaged in a protected activity "by aiding students affected by a discriminatory policy of the Mathematics Department, the use of which had resulted in discrimination by Gallaudet on the basis of race and disability."  Comp. at ¶ 36.  As explained by plaintiff, the policy that she expressed concerns about the weight given to final examinations "such that a student who had received passing marks on all other coursework could still fail the entire course if he or she failed the final examination."  Comp. at ¶ 20.  Plaintiff claims that this

policy "discriminated against students … who were learning disabled, lacked sufficient math preparation because they are deaf, and possessed a range of communication skills from no signing to ASL, and therefore did not do well on high-stakes examinations, particularly in the context of mathematics." *Id.* The deaf, learning disabled student adversely affected by this policy "includ[ed] African-American and developmental students." *Id.*

By her own pleading, plaintiff's concern about the policy implemented by the Mathematics Department was not grounded on the application of such policy to African-American students only, but to all learning disabled student who did not have sufficient math preparation and who used a range of communication skills. For instance, when she reinstated a student (who happened to be African-American) who had been dismissed from Gallaudet for poor grades in mathematics, she claims that his performance improved because he was "given the opportunity to work with a faculty member whose sign communication matched his preferred method of communication (using sign *and* voice as opposed to signing only)." Comp. at ¶ 19 (emphasis in original). Aiding students who may be adversely affected by a facially neutral policy because of the student's communication skills and learning abilities does not constitute a protected activity under the DCHRA. Such attributes are not protected under the DCHRA. Thus, plaintiff's efforts on behalf of learning disabled student who use a range of communication skills are not protected activity. Accordingly, her retaliation claim based on this activity fails.

In summary, plaintiff was not engaged in a protected activity when she supported Dr. Ferandes or when she expressed concerns about a Mathematics Department policy, and thus, her retaliation claim fails.

13

      B.    <u>Plaintiff Cannot Establish An Adverse Action</u>.

Even if plaintiff could establish that she engaged in statutorily protected activities, her retaliation claim fails because she cannot establish that "a reasonable employee would have found the challenged actions in this case to be 'materially adverse,' meaning it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Ginger*, 477 F. Supp. 2d at 51 (quoting *Burlington Northern & Santa Fe Ry.*, 126 S. Ct. at 2415) (quotations omitted). To that end, plaintiff makes a very general assertion that she suffered "materially adverse actions" that "varied, but were such that they would dissuade a reasonable employee from making or supporting a charge of discrimination." Comp. at ¶ 37. In other parts of her Complaint, plaintiff alleges that that her job responsibilities were reduced because she was excluded from "several important personnel decisions," that she was excluded from the Recruitment, Enrollment and Retention Team, that her desire to volunteer for the Academic Rigor Working Team was ignored, that she received a less than expected merit pay increase, and Gallaudet retaliated against her because the Washington Post published an article that included a discussion about her alleged role with respect to an allegation about grade changing,. Comp. at ¶¶ 21, 23, 24, 26. As shown below, none of these personnel actions rise to the level of materially adverse action.

      1.    <u>Plaintiff cannot establish that an exclusion from personnel decisions was a "materially adverse action."</u>

In this case, plaintiff does not allege that her job responsibilities were significantly diminished, that she was demoted, that she was given a less distinguished title, or that she lost pay or benefits. Plaintiff also does not claim that her ability to make all personnel decisions was revoked or otherwise taken away. Instead, she claims that a reasonable person would be dissuaded from making or supporting a change of discrimination if that person were excluded

14

from several personnel decisions.  Comp. at ¶ 37.  Plaintiff has not alleged that she has been injured or harmed in any way because she was not able to participate in these "several important personnel decisions."  Consequently, they do not constitute a materially adverse action. *See Valles-Hall v. Center for Nonprofit Advancement*, 2007 U.S. Dist. LEXIS 22046, at *101 (D.D.C. Mar. 12, 2007) (holding that threat of termination that was not carried out did not produce an injury or harm and thus was not a materially adverse action) (attached hereto as Exhibit 1).

> 2.    Plaintiff cannot establish that she suffered a "materially adverse action" because she was excluded from committees.

Plaintiff further claims that she suffered a "materially adverse action" because she was excluded from one committee and her "desire to participate" on another committee were "largely ignored."  Comp. at ¶ 24.  Again, Plaintiff has not alleged that she has been injured or harmed in any way because she was not able to participate in these committees.  Consequently, they do not constitute a materially adverse action. *See Valles-Hall*, 2007 U.S. Dist. LEXIS 22046, at *101.

> 3.    Plaintiff did not suffer an adverse employment action because she received a less than expected merit pay increase.

Plaintiff claims that she "normally receiv[es] a 6% merit pay increase," but that she "was recently informed" that she would only receive a "smaller than usual" 3% merit pay increase.  Comp. at ¶ 26.  This Court has noted that "it is not necessarily self-evident that providing an individual with an added benefit (a raise) that [falls] below their expectations is an 'adverse action' …."  *Johnson v. Joo*, 2006 U.S. Dist. LEXIS 13022, at *71 (D.D.C. Mar. 12, 2006) (attached hereto as Exhibit 2).

In any event, while plaintiff may have expected a 6% increase, she has not alleged that she was entitled to 6% increase.  She does not point to a contract that guarantees that she was

entitled to a 6% increase or any other source that would demonstrate her entitlement to a 6% increase. In addition, plaintiff has not alleged that her pay increase was treated any differently than other employees.

Accordingly, because plaintiff was not injured or harm by receiving a 3% increase instead of a 6% increase based solely on her unilateral expectation, the 3% pay increase is not a materially adverse action. *See Valles-Hall*, 2007 U.S. Dist. LEXIS 22046, at *101.

4.    <u>Plaintiff cannot establish that the Washington Post article was a "materially adverse action."</u>

Finally, plaintiff alleges that the Washington Post article referenced in her Complaint contained falsehoods, defamatory statements, and false accusations regarding her efforts to "question[] the use of a policy that she believed was discriminating against students …." Comp. at ¶ 21. Again, plaintiff does not claim any injury or harm as a result of this article. Consequently, the article is not a materially adverse action. *See Valles-Hall*, 2007 U.S. Dist. LEXIS 22046, at *101.

C.    <u>Plaintiff Cannot Establish Causation</u>.

Assuming for purposes of this motion that plaintiff was able to establish the first two elements of her retaliation claim, it would still fail because she would not be able to establish causation. To that end, plaintiff relies primarily on the "timeline of events" to establish causation. Comp. at ¶ 38. As held by this Court, to "qualify as a causal connection, the temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be 'very close.'" *Ginger*, 477 F. Supp. 2d at 53 (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), which held that a 3 or 4-month lapse between a protected activity and an adverse action is insufficient to establish a causal connection).

To establish her retaliation claim, plaintiff relies on purported protected activities that

16

occurred in the fall of 2005 (*see* Comp. at ¶ 19), January or February 2006 (*see* Comp. at ¶ 20), and October 2006 (*see* Comp. at ¶ 17).  The alleged adverse actions occurred in November 2006 (*see* Comp. at ¶¶ 21, 23) and January 2007 (*see* Comp. at ¶ 24).

As a matter of law, too much time has passed to infer a causal connection between plaintiff's efforts to aid the students (which occurred in 2005 and January or February 2006) and the purported adverse actions (which occurred in November 2006 and January 2007).   Thus, plaintiff cannot establish her retaliation claim based on the activities related to her concern about the Mathematics Department policy by relying solely on the timeline of events.  Plaintiff has not offered any other reasons to infer causation (*see* Comp. at ¶38); thus, her retaliation claim based on her efforts to aid the students fails.

Similarly, too much time has passed as a matter of law between plaintiff's support of Dr. Fernandes in October 2006 and her purported exclusion from two committees in January 2007. Plaintiff has not offered anything other than the timeline of events to establish causation. Accordingly, she cannot establish that she was retaliated against in January 2007 for events that occurred in October 2006.

Finally, there is no basis for inferring or concluding that there is a causal connection between plaintiff's aid and support of Dr. Fernandes in October 2006 and the Washington Post article and her alleged exclusion from several personnel decisions in November 2007.  Plaintiff has not alleged grounds to infer that Gallaudet was involved in any way in the publication of that article. She also has not alleged any grounds to infer that Gallaudet sanctioned or approved any statements made to the Washington Post reporter by the unidentified staff members referenced in the article.  Similarly, plaintiff has not alleged any grounds to infer that the decision to exclude her from several personnel decisions was in any way related to her aid and support of Dr.

Fernandes.  Consequently, her retaliation claim fails.

**IV.    PLAINTIFF CANNOT ESTABLISH THAT SHE WAS DISCRIMINATED AGAINST ON THE BASIS OF A DISABILITY UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT.**

To establish a claim of discrimination based on a disability under the DCHRA, plaintiff must be able to establish a *prima facie* case, demonstrating: (1) she has a disability under the DCHRA, (2) that she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation, and (3) that a causal connection exists between the disability and the adverse action.  *Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999). The DCHRA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment."  D.C. Code § 2-1401.02(5A).

For purposes of this motion, Gallaudet agrees that plaintiff suffers from hearing loss that substantially limited the major life activity of hearing.  However, plaintiff's claim of discrimination is not based on her hearing loss, but on her perception that she is being forced out of her job because she is "not Deaf enough."  *See* Comp. at ¶¶ 42-43.  In fact, she alleges throughout her Complaint that the adverse actions being taken against her are based on her being "not Deaf enough."  *See* Comp. at ¶¶ 8, 9, 13, 14, 15, 17, 18.  Being "not Deaf enough," as explained by plaintiff, "signifies a culture rather than the physical condition of hearing loss." Comp. at ¶ 9.  In other words, it is plain from the Complaint itself that being considered "not Deaf enough" has nothing to do with the physical condition of hearing loss, but that being "not Deaf enough" means that the individual does not embrace the philosophy of using only ASL to communicate.  *See* Comp. at ¶ 9.  Because being "not Deaf enough" is not a physical

18

impairment, it cannot be a disability under the DCHRA.    Accordingly, plaintiff's claim of discrimination based on a disability fails as a matter of law.[2]

## V.    PLAINTIFF CANNOT ESTABLISH A CLAIM OF HOSTILE WORK ENVIRONMENT BASED ON A DISABILITY UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT.

To establish a claim of hostile work environment based on a disability under the DCHRA, plaintiff must be able to establish a *prima facie* case, demonstrating: (1) that she has a disability under the DCHRA and thus a member of a protected class, (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her disability; and (4) that the harassment was severe and pervasive enough to affect a term, condition or privilege of employment.  *McCain v. CCA of Tenn., Inc.*, 254 F. Supp. 2d 115, 120 (D.D.C. 2003) (citing *Howard Univ. v. Best*, 484 A.2d 958, 978 (D.C. 1984)).

For the same reason that plaintiff cannot establish that she was discriminated on the basis of a disability, plaintiff also cannot establish that she was subjected to a hostile work environment based on a disability.  Plaintiff does not allege that she was unlawfully harassed because she has hearing loss. Rather, she pleads that the harassment occurred "specifically because she is considered 'not Deaf enough.'" Comp. at ¶ 47.  Being "not Deaf enough," as explained by plaintiff, "signifies a culture rather than the physical condition of hearing loss." Comp. at ¶ 9.   Because being "not Deaf enough" is not a physical impairment, it cannot be a disability under the DCHRA.  Accordingly, plaintiff's claim of hostile work environment based on a disability fails as a matter of law.[3]

---

[2] At this time, defendant does not intend to address the other two elements of a disability discrimination *prima facie* case.  Defendant reserves the right to address these elements in a later motion or at trial.

[3] At this time, defendant does not intend to address the other elements of a disability hostile work environment claim.  Defendant reserves the right to address these elements in a later motion or at trial.

## VI.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS AS A MATTER OF LAW.

To establish a claim of intentional infliction of emotional distress, plaintiff must establish:  "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Howard Univ.*, 484 A.2d at 985 (citations and quotations omitted).

In this case, plaintiff claims that the "extreme and outrageous actions of Gallaudet employees and agents resulted in severe emotional distress to" her.  Comp. at ¶ 50.  Thus, as pleaded in her Complaint, the actions that plaintiff alleges were "extreme and outrageous" occurred within the context of her employment.  For instance, the Washington Post article referred to plaintiff's request to other faculty members to changes the grades of some students. Comp. at ¶ 21.  The NCAA report also discussed an allegation that plaintiff was involved in changing grades.  Comp. at ¶ 25.  Whether or not plaintiff engaged in such activity is limited to the scope of her employment. Thus, at bottom, the statements that plaintiff contends are defamatory are based on an employer-employee conflict.  As held by the District of Columbia Court of Appeals, "employer-employee conflicts do not, as a matter of law, rise to the level of outrageous conduct."  *Howard Univ.*, 484 A.2d at 986.  According, plaintiff's claim for intentional infliction of emotional distress must be dismissed as a matter of law.

## VII.    PLAINTIFF'S TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS FAILS AS A MATTER OF LAW.

To prevail on a claim of tortious interference with prospective business relations, plaintiff must allege: "(1) a valid business relationship or expectancy with a third party; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) intentional interference by the defendant, causing a breach or termination of the relationship or expectancy; and (4) resultant

damage." *Williams v. Federal Nat'l Mortgage Ass'n*, 2006 U.S. Dist. LEXIS 42911, at *26 (D.D.C. June 26, 2006) (attached hereto as Exhibit 3).

Plaintiff first claims that "agents and employees of Gallaudet intentionally interfered with . . . her dream of educating the deaf at the nation's premiere institution of higher education for the deaf." Comp. at ¶ 53. The District of Columbia Court of Appeals has held that a party to the contract cannot tortiously interfere with its own contract. *Press v. Howard Univ.*, 540 A.2d 733, 735 (D.C. 1988). *See also Newman v. Legal Services Corp.*, 628 F. Supp. 535, 541 (D.D.C. 1986) (reiterating the holding that "it is a well settled principle of law that this tort arises only when there is interference with  a contract between the plaintiff *and a third party*" and that a "corporate officer is not a third-party to a contract between his corporation and one of its employees" (citations and quotations omitted)). In fact, a cause of action based on this assertion "borders on the frivolous." *Press*, 540 A.2d at 735. While plaintiff does not allege a contractual relationship, her claim that Gallaudet is intentionally interfering with its own business relations with plaintiff is equally unavailing.

Plaintiff then claims that Gallaudet tortiously interfered with plaintiff's prospective business interests with third parties, that "[a]t least three potential sources of prospective employment have disappeared, which … were the results of the false information about her that was spread in the public domain by agents and/or employees of Gallaudet." Comp. at ¶ 54. Plaintiff's allegation fails to allege the elements of this tort. She vaguely refers to "three potential sources" that are not identified. Her inability to specifically identify the third parties with whom she had a business expectancy is fatal to her tortious interference claim. *See Williams*, 2006 U.S. Dist. LEXIS at *27 (holding that because the plaintiff was only able to

specifically identify one third party, that was "the only relationship that conceivably can support her tortious interference claim").

Likewise, plaintiff's failure to assert in any way that Gallaudet had any knowledge about her prospective business interests is fatal to her claim. Finally, she alleges that her employment opportunities "disappeared" because of "the false information about her that was spread in the public domain" -- thus, plaintiff does not allege that Gallaudet acted in any way to intentionally interfere with her alleged prospective business interests.

In summary, because Gallaudet cannot interfere with its own business relation and because the Complaint is deficient in its allegations to establish the elements of this claim, this cause of action must be dismissed.

## VIII.   PLAINTIFF CANNOT ESTABLISH A BREACH OF CONTRACT.

Plaintiff's breach of contract claim rests on her assertion that Gallaudet's nondiscrimination policy is a contractual agreement. Comp. at ¶ 58. It has been held by the District of Columbia Court of Appeals that:

> [T]he terms of an employer's "personnel or policy manual may be sufficient to raise a jury question as to whether the manual creates contractual rights for the employee. However, employers can effectively disclaim any implied contractual obligation arising from such provisions. The legal effect of such a disclaimer is, in the first instance, a question for the court to decide.

*Boulton v. Institute of Int'l Educ.*, 808 A.2d 499, 505 (D.C. 2002) (quotation and citation omitted).

The policy referenced in paragraph 7 of the Complaint -- Section 3.01 EEO/Affirmative Action -- is found in Gallaudet's Administration & Operations Manual ("Manual"). The Introduction to the Manual explicitly states:

262150.1

> The Administration and Operations Manual is a resource document; it is in no way a contract of employment and should not be relied upon as such.

*See* Exhibit 4 (Manual Introduction).  Moreover, in Section 4.32 of the Manual, Gallaudet expressly states:  "The University does not have a contract of employment with any of its staff employees."  *See* Exhibit 5 (Section 4.32 Termination).

As held by the District of Columbia Court of Appeals, such language is "sufficient explicit to preclude the creation of implied contractual obligations as a matter of law."  *Boulton*, 808 A.2d at 505.  Accordingly, plaintiff's breach of contract claim based on a policy found in the Manual must be dismissed as a matter of law.

## CONCLUSION

For the reasons stated herein, Defendant Gallaudet respectfully requests that this Court grants its Motion to Dismiss, and dismiss the Complaint in this matter in its entirety.

May 29, 2007                            Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP


_____/s/_____
Robert B. Wallace (D.C. Bar No. 108571)
Laura N. Steel (D.C. Bar No. 367174)
Yoora Pak (D.C. Bar. No. 467007)
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, D.C. 20005
(202) 626-7660 (telephone)
(202) 628-3606 (facsimile)

***Attorneys for Defendant Gallaudet University***



LEXSEE 2007 U.S. DIST. LEXIS 22046



Cited
As of: May 29, 2007

**ARMINDA VALLES-HALL, Plaintiff, v. CENTER FOR NONPROFIT ADVANCEMENT, Defendant.**

**Civil Action No. 06-806 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2007 U.S. Dist. LEXIS 22046*

**March 12, 2007, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant former employer in the Superior Court for the District of Columbia alleging race discrimination and retaliation under *42 U.S.C.S. § 1981* and the District of Columbia Human Rights Act, D.C. Code § 2-1401 et seq. After removal by the employer, the employer moved for summary judgment.

**OVERVIEW:** The employer did know the employee had accepted another job when it locked her out of the offices, and the employee was unaware she had been locked out. Thus, nothing showed it played a role in the employee's resignation; the alleged "constructive discharge" was not an adverse employment action. Being threatened with termination for excessive sick leave was not an adverse employment action. Nothing showed other employees received more favorable treatment in evaluations or raises and the employee raised no factual issue as to whether each co-worker reported the interactions before the evaluation. The employee's competence on one project was irrelevant to the supervisor's belief that the employee reacted disrespectfully to another person's appointment to the project. Nothing rebutted the assertions of misusing compensatory time or funds. The supervisor's "cultural thing" comment was a stray remark, not direct evidence of discrimination. No causation was shown for the retaliation claim; nothing showed that the supervisor knew of the employee's complaint to a director prior to litigation and a handbook authorized the supervisor to request a doctor's note for excessive absences.

**OUTCOME:** The employer's motion for summary judgment was granted in its entirety.

**COUNSEL:** [*1] For ARMINDA VALLES-HALL, Plaintiff: Dhamian A. Blue, LEAD ATTORNEY, Washington, DC; Donald M. Temple, LEAD ATTORNEY, TEMPLE LAW OFFICE, Washington, DC.

For CENTER FOR NONPROFIT ADVANCEMENT, Defendant: Charles Henry Fleischer, LEAD ATTORNEY, OPPENHEIMER, FLEISCHER & QUIGGLE, P.C., Bethesda, MD.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

**MEMORANDUM OPINION**

(March 12, 2007)

Pending before the Court is Defendants' Motion for Summary Judgment. Plaintiff's Complaint and First Amended Complaint include claims pursuant to both *42 U.S.C. § 1981* and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401 *et seq.* ("DCHRA"), alleging that Defendant, the Center for Nonprofit Advancement ("CNA"), discriminated against Plaintiff on the basis of "racial, ethnic, and national origin considerations," First Am. Compl. (hereinafter "Am. Compl.") PP 73-78; Compl. PP 31-35, and that CNA retaliated against

Plaintiff because "she was engaged in statutorily protected expression concerning the vindication of her civil rights," Am. Compl. PP 68-72; Compl. PP 41-44. In addition to these claims, Plaintiff's Complaint [*2] includes claims for Sexual Orientation/Preference discrimination under the DCHRA (Count II), Constructive Discharge (Count IV), Negligent Infliction of Emotional Distress (Count V), and Negligent Supervision (Count VI); however, Plaintiff has not opposed Defendant's Motion for Summary Judgment as to these Counts, and the Court shall therefore dismiss them as abandoned. Defendant has moved for summary judgment as to all Counts included in Plaintiff's Complaint and First Amended Complaint. Upon a searching consideration of the filings currently before the Court, the attached exhibits, the relevant case law, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment in its entirety.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)). The local rules for summary judgment "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 322 U.S. App. D.C. 35, 101 F.3d 145, 150 (D.C. Cir. 1996).* [*3] "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA, 205 U.S. App. D.C. 224, 637 F.2d 770, 773 (D.C. Cir. 1980)).* "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quoting *Twist v. Meese, 272 U.S. App. D.C. 204, 854 F.2d 1421, 1425 (D.C. Cir. 1988)).*

The Court further notes that Plaintiff has already been given an extra chance to comply with Local Civil Rule 56.1. On January 30, 2007, the Court found that Plaintiff's original "Statement of Material Facts" failed to comply with Local Civil Rules 7(h) and 56.1, and with this Court's May 4, 2006 Order, which advised Plaintiff that "[t]he Court strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not [*4] in conformity with these rules." *Valles-Hall v. Cent. for Nonprofit Advancement,* Civil Action No. 06-806, Order (D.D.C. May 4, 2006 (citing *Burke v. Gould, 351 U.S. App. D.C. 1, 286 F.3d 513, 519 (D.C. Cir. 2002));*

*Valles-Hall,* Order (D.D.C. Jan. 30, 2007). Advising Plaintiff that the purpose of Rule 56.1 is to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Jackson, 101 F.3d at 151,* the Court struck Plaintiff's Opposition in its entirety and, in the interest of justice, gave Plaintiff another opportunity to file a Statement of Material Facts in Dispute/Not in Dispute that complied fully with Local Civil Rules 7(h) and 56.1.

Despite the Court's clear admonition regarding the requirements of Local Civil Rules 7(h) and 56.1, Plaintiff's more recent Genuine Statement of Material Facts in Dispute ("Plaintiff's Statement") still fails to comply with Local Civil Rules 7(h) and 56.1. As Defendant points out in its Supplemental Reply, the numbered paragraphs in Plaintiff's Statement bear no relationship at all to the [*5] numbered paragraphs in Defendant's Statement of Material Facts Not in Dispute (hereinafter "Defendant's Statement"). As a result, it is extremely difficult for the Court to parse from Plaintiff's Statement those specific facts that Plaintiff considers in dispute. *See Gibson v. Office of the Architect of the Capitol, Civ. No. 00-2424(CKK), 2002 U.S. Dist. LEXIS 27602, 2002 WL 32713321, *1 n.1 (D.D.C. Nov. 19, 2002), aff'd No. 05-5031, 2003 U.S. App. LEXIS 13519, 2003 WL 21538073 (D.C. Cir. July 2, 2003).* In addition, as Defendant also notes, Plaintiff fails to cite specific record support for a number of assertions included in her Statement, even though Defendant's initial Reply Memorandum highlighted this shortcoming. Def's Supp. Reply at 2-3. Indeed, Plaintiff repeatedly cites portions of her deposition transcript in support of her assertions, but fails to actually provide the Court with the particular pages to which she cites. Plaintiff did not correct these omissions in her revised Opposition and Statement, and as a result, the Court is unable to determine whether she has simply incorrectly cited her deposition or whether she instead lacks factual support for her assertions. Nevertheless, as Plaintiff [*6] has already been given an opportunity to revise her Opposition and Statement, the Court has decided not to correct Plaintiff's errors for her by soliciting additional record evidence that Plaintiff has failed to provide. Finally, the Court notes that Plaintiff's failure to comply with Local Civil Rule 56.1 has significantly prejudiced Defendant, who has been required to file additional memoranda in response to Plaintiff's filings, and who has faced the unnecessarily difficult task of meaningfully responding to Plaintiff's improper filings.

Pursuant to Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is con-

troverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1; 7(h). In accordance with this Rule, the Court has treated as admitted all facts alleged by Defendant in its Statement and not specifically contradicted by Plaintiff in her Statement. The Court has also considered the facts adduced by Plaintiff in her Statement, to the extent that they are supported by record evidence, and cites directly to [*7] the record, where appropriate, to provide additional information not covered in either of the parties' statements.

*A. The Parties*

Plaintiff, Arminda Valles-Hall, identifies herself as a heterosexual Mexican-American woman, and describes her racial identity as either Latino or Hispanic. *See* Pl.'s Stmt. P 1; Compl. PP 3, 33. n1 In March 2003, Plaintiff applied for the position of Director of Education at Defendant the Center for Nonprofit Advancement ("CNA"). n2 Def.'s Stmt. P 12; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 51:8-20. Plaintiff was interviewed by CNA's Executive Director, Betsy Johnson, who was solely responsible for the decision to offer Plaintiff the position with a starting salary of $ 52,000 per year. Def.'s Stmt. PP 5, 13; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 51:8-52:15; Def.'s Ex. 2 (4/2/03 Offer Letter from Johnson to Valles-Hall). Plaintiff accepted Ms. Johnson's offer and began working at CNA on April 21, 2003. Def.'s Stmt. P 14; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 41:7-10. n3 Plaintiff was an at-will employee of CNA from April 21, 2003 to February 14, 2005. Def.'s Stmt. P 14; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 41:11-16.

n1 Plaintiff also identifies herself as "a woman of color," *see* Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 52:16-53:14.

[*8]

n2 CNA was formerly known as the Washington Council of Agencies, and is referred to throughout the record by that name, and also as "WCA," the "Center," and "CNA." For ease of reference, the Court shall refer to Defendant as CNA.

n3 As Director of Education, Plaintiff's responsibilities included assessing the educational and technical assistance needs of CNA's members; developing educational offerings to meet those needs by working with staff members and speakers; developing and implementing registration procedures and an evaluation system for educational offerings; marketing educational offerings; handling on-site logistics; and calendaring and managing the use of CNA's conference room, including overseeing the security of the conference room. Def.'s Stmt. P 16; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 53:15-54:14; 64:7-65:11; Def.'s Ex. 3 (Director of Education Job Description); Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 39:9-23; 107:21-108:3.

CNA is a tax-exempt, District of Columbia nonprofit corporation headquartered in the District of Columbia. Def.'s Stmt. P 1; Def.'s Ex. 23 (1/12/06 Johnson [*9] Dep.) at 11:6-11. CNA was founded in 1979 and serves the nonprofit community in the Washington, DC metropolitan area through education, advocacy, nonprofit community building and group purchasing. Def.'s Stmt. P 2; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 11:11-12:9. CNA is governed by a Board of Directors, which is chaired by its President. At all times relevant to this matter, Mary Ann de Barbieri served as President of CNA. Def.'s Stmt. P 4; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 20:109-22:11. CNA's paid staff is headed by Ms. Johnson, who has served as CNA's Executive Director since 1988. Def.'s Stmt. P 5; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 12:12-14:1. CNA has a Personnel Handbook, which each employee is required to read, and acknowledge having read, upon being hired. Def.'s Stmt. PP 6, 8; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 55:8-14; Def.'s Ex. 4 (WCA Personnel Handbook); Def.'s Ex. 5 (4/28/03 Valles-Hall Handbook Acknowledgment Form); Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 77:16-78:16). In addition to containing provisions relating to equal employment and non-discrimination, use of compensatory time, sick leave, workplace behavior, and discipline, the Personnel Handbook [*10] notes that specific types of misconduct may lead to corrective action or dismissal. Def.'s Stmt. PP 6-7; Def.'s Ex. 4 (WCA Personnel Handbook). These include "[c]onduct, including speech . . . that is abusive to or disrespectful of [CNA]'s directors [or] employees . . .;" "[f]ailure to conduct yourself in a professional and cooperative manner while carrying out your duties;" and "[n]eglect of duty." *Id.*

Just prior to Plaintiff's resignation in February 2005, the CNA Board had 13 directors -- six African-Americans, six whites, and one Latino -- and CNA had a staff of 13 people - six African-Americans, six whites, and one Latina. Def.'s Stmt. PP 56-57; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) PP 18-19. Although Plaintiff asserts that CNA's "management staff at the time of her hiring was predominantly white and gay," Pl.'s Stmt. P 4, she does not provide record support for this statement, or indicate whom she considers included in the term "management staff."

*B. Plaintiff's Performance as Director of Education Through Her June 2003 Evaluation*

CNA, acting through Johnson, evaluates employees and considers salary increases annually, in late June or early July. [*11] Def.'s Stmt. P 9; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 31:12-32:3. CNA's evaluation form rates employees on 13 criteria, using a 5-point scale, where "1" is unsatisfactory, "2" is marginal, "3" is satisfactory, "4" is above average, and "5" is outstanding. Def.'s Stmt. P 9; Pl.'s Stmt. P 3; Def.'s Ex. 6 (6/26/03 Valles-Hall Personnel Review Form, introduced as Ex. 8 at 1/4/06 Valles-Hall Dep.).

Johnson normally does not do a formal evaluation for employees who have worked at CNA for fewer than six months; however, at Plaintiff's request, Johnson agreed to evaluate Plaintiff during CNA's June/July 2003 evaluation cycle, despite the fact that Plaintiff had been at CNA for only two months. Def.'s Stmt. P 18; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 7. In Plaintiff's June 2003 evaluation, she received a "5" on the eight criteria on which she was evaluated - "Attitude," "Initiative," "Open Mindedness," "Inter-personal Communication," "Self Confidence," "Assertiveness," "Work Habits," and "Quality/Quantity." Def.'s Ex. 6 (6/26/03 Valles-Hall Personnel Review Form). Johnson did not evaluate Plaintiff on the other five criteria listed on the evaluation form because they were inapplicable [*12] to Plaintiff. Def.'s Stmt. P 19; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 61:4-18.

The CNA Board of Directors approves a ceiling for awarding raises to employees coincident with their annual performance evaluations; however, Johnson determines the amount of individual raises. Def.'s Stmt. P 10; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 9:7-10:7. Coincident with Plaintiff's June 2003 evaluation, Johnson raised Plaintiff's salary by $ 8,000 from $ 52,000 to $ 60,000 per year, making Plaintiff the third highest paid employee at CNA. Def.'s Stmt. P 20; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 60:8-21; Def.'s Ex. 6 (6/26/03 Valles-Hall Personnel Review Form); Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 8. Plaintiff admitted in her deposition that she does not know how other CNA employees were evaluated in 2003, and that she does not know whether or the extent to which they received raises. Def.'s Stmt. P 21; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 62:4-63:3. However, Johnson avers that in June 2003, she gave a white female CNA employee who worked in a management position comparable to Plaintiff's an overall rating of "2" (marginal) and no raise, based primarily on a history of verbal [*13] abuse towards other staff. Def.'s Stmt. P 22; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 9.

*C. Plaintiff's Performance Between June 2003 and June 2004*

Plaintiff asserts that "up to and including" the date of her June 2003 performance evaluation, she "had not had any adverse interaction with any of Defendant's employees." Pl.'s Stmt. P 6 (citing Pl.'s Ex. C (6/26/03 Valles-Hall Personnel Review Form)). However, according to Plaintiff, during late 2003 and early 2004, "her close association with [CNA's female, African-American Director of Public Policy and Advocacy, Lisa Ransom] made her the subject of increased bias on the part of Johnson." Pl.'s Stmt. P 12; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 82:15-21. n4 Plaintiff further asserts that in April 2004, she complained to Tim Kime, Vice-Chairman of the CNA Board of Directors, that Ransom "was being treated in a discriminatory way and that [Plaintiff] was in the cross-hairs of that," citing as evidence of Johnson's alleged bias her decision to strip Plaintiff of her responsibilities regarding a CNA program known as the Washington Post Award for Excellence in Nonprofit Management (the "Post Award"), discussed in greater [*14] detail below. Pl.'s Stmt. P 13; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 82:22-84:22. However, Plaintiff does not dispute CNA's assertion that "Johnson . . . did not know about [Plaintiff's conversations with Mr. Kime] prior to this litigation." Def.'s Reply at 8 (citing Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 22:16-21). As such, even if Plaintiff in fact complained to Mr. Kime during April 2004 regarding a perceived bias on the part of Johnson, it is uncontroverted that Johnson was unaware of such complaints at the time. Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 22:16-21).

n4 In her Complaint, Plaintiff alleges that she and Ransom worked jointly on CNA's annual business meeting held on December 3, 2003 and on an outreach conference to be held in Prince George's County. Compl. PP 8-10. Plaintiff further alleges that the conference was highly successful, but that following the conference, CNA terminated Ransom because she was not a "good fit" for the organization. *Id.* PP 11-13. However, Plaintiff's Statement, which includes incomplete sentences and cites to pages of Plaintiff's deposition transcript not provided to the Court, *see* Pl.'s Stmt. PP 7-11, does not clearly explain why Plaintiff believes her association with Ransom made her the subject of increased bias on the part of Johnson. *See* Pl.'s Stmt. PP 7-11. As Plaintiff has failed to provide the pages of her deposition to which she cites, despite being given the opportunity to remedy this shortcoming in her revised Opposition, the Court is unable to determine whether Plaintiff has simply incorrectly cited her

deposition or whether no record support in fact exists for Plaintiff's assertions.

[*15]

For its part, CNA points to a number of incidents of which Johnson became aware prior to Plaintiff's next performance evaluation in July 2004. n5 These include:

> n5 CNA's Statement describes a number of additional incidents, on which CNA does not assert Johnson relied in conducting Plaintiff's July 2004 evaluation. As these incidents therefore appear to be of no factual significance, the Court shall simply note them briefly at this point. First, Johnson testified during her deposition that in late 2003 or early 2004, Michael Freedman, CNA's long-time treasurer, complained to Johnson regarding Plaintiff's management of the Post Award, a CNA program. Def.'s Stmt. P 23c; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 89:12-90:19. However, as Plaintiff correctly notes in her Opposition, Johnson's testimony regarding Freedman's complaint is inadmissible hearsay, which could not be considered even if CNA asserted that it was factually significant. Pl.'s Opp'n 21. Second, CNA asserts, and Plaintiff does not dispute, that in March 2004 she submitted a budget for her educational programs directly to a board member without Johnson's knowledge or consent. Def.'s Stmt. P 23d; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 10. Third, in June 2004, Jeff Kost, CNA's Deputy Director for External Affairs, noticed that the CNA conference room was not secure and sent Plaintiff an e-mail to that effect. Def.'s Stmt. P 23j; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 105:15-19; Def.'s Ex. 10 (7/2/04 e-mail from Valles-Hall to Kost replying to 6/30/04 e-mail from Kost). Plaintiff does not dispute that she responded to Kost's e-mail with an e-mail stating "[i]n past person-to-person communications and, most recently, in your June 30 email to Lee and me, you have chosen to communicate in an offensive tone, displaying a lack of professional control, courtesy and regard." Def.'s Ex. 10 (7/2/04 e-mail from Valles-Hall to Kost). Finally, Plaintiff does not address CNA's assertions that prior to Plaintiff's July 2004 evaluation, Johnson became aware that, unlike most other CNA employees, Plaintiff routinely worked with her office door shut; that Plaintiff had little interaction with other CNA staff members; that Plaintiff refused to keep Johnson informed of her activities unless weekly meetings were scheduled; that Plaintiff frequently missed

staff meetings; and that as a result of Plaintiff's failure to schedule her time efficiently, she and another staff member worked all night on at least one occasion to meet a deadline. Def.'s Stmt. P 23k; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 112:21-113:15; 181:19-182:23; 210:5-17; Def.'s Ex. 23 (2/23/06 Johnson Dep.) at 59:3-15; Def.'s Ex. 25 (2/23/06 Kost Dep.) at 13:4-16; 24:17-25:22; Def.'s Ex. 28 (2/28/06 Mendoza Dep.) at 18:16-20:22.

[*16]

*1. Compensatory Time*

During the fall of 2003, Plaintiff assigned herself compensatory time without approval from Johnson, in violation of CNA's Personnel Handbook. Def.'s Stmt. P 23a; Def.'s Ex. 24 (Def.'s Ans. to Interrogs. # 18(a)). Plaintiff does not deny misusing compensatory time, but rather asserts that her "alleged misuse of compensatory time" was "neither intentional nor a problem prior to the initiation of this lawsuit." Pl.'s Stmt. P 38. Plaintiff also disputes CNA's assertion that Johnson counseled her about the matter. *Id.* P 39.

*2. Mendoza Complaint*

In October 2003, CNA's Office Manager, Barbara Mendoza, left a message for Plaintiff regarding the security of the CNA conference room. Def.'s Stmt. P 23b; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 52:2-53:12. n6 CNA asserts that Plaintiff criticized Mendoza for leaving the message, calling Mendoza "unprofessional." Def.'s Stmt. P 23b; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 53:13-55:8. During her deposition in this matter, Mendoza testified that Plaintiff called her unprofessional, Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 53:13-55:8; however, Plaintiff denies calling Mendoza unprofessional, Pl.'s Stmt. [*17] P 33; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 122:7-13). As a result, a factual dispute exists as to whether Plaintiff, in fact, called Mendoza unprofessional. Nevertheless, during her deposition Mendoza testified that she reported the interaction to Johnson, including telling Johnson that Plaintiff had called Mendoza unprofessional. Def.'s Stmt. P 23b; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 55:9-56:22; 75:2-9. Likewise, Johnson testified during her deposition that Mendoza reported to her that Plaintiff called Mendoza unprofessional. Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 133:6-21. As such, while Plaintiff disputes calling Mendoza unprofessional, she cannot controvert the evidence that Mendoza reported as much to Johnson. n7

n6 According to CNA, on a number of occasions, unauthorized persons have gained entrance to CNA's interior office space, and the management of CNA's office building has warned of thefts in other suites in the building. Def.'s Stmt. P 11; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 52:4-53:1; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 132:2-10.

n7 In her Statement, Plaintiff also asserts that "Mendoza was not penalized in her performance evaluation for any negative interaction with [Plaintiff]," and cites to "Exhibit    , filed under seal." Plaintiff states that pursuant to an agreement between the parties to keep employee records confidential, copies of Mendoza and Kost's performance evaluations will be filed under seal. It appears, however, that Plaintiff may never have actually filed those evaluations with the Court. Her list of exhibits submitted in support of her Opposition includes no reference to either evaluation, nor does CNA make any reference to either exhibit in its Motion for Summary Judgment or Reply. Moreover, the Court notes that the docket in this matter does not indicate that either evaluation was ever filed under seal, and that the Clerk's office has no record of any such filing.

[*18]

Plaintiff further asserts that the Mendoza incident is insignificant because "Johnson, after discussing the alleged incident with Mendoza, said that she did not think it . . . was a problem." Pl.'s Stmt. P 35 (citing Pl.'s Ex. F (1/12/06 Johnson Dep. at 136)). Plaintiff accurately reports Johnson's deposition testimony, but fails to note that in her deposition, Johnson continued to explain that the Mendoza incident was the first involving Plaintiff to come to Johnson's attention, and that Johnson eventually came to consider the Mendoza incident problematic "[a]fter there were a series of complaints." Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 135:19-137:6. As such, Plaintiff's attempt to downplay the Mendoza incident does not undercut the evidence that Mendoza reported to Johnson that Plaintiff called Mendoza unprofessional.

### 3. Workshop Funds

In January 2004, Plaintiff was responsible for collecting fees charged by CNA for a workshop, and for turning the fees over to CNA's bookkeeper for deposit. Def.'s Stmt. P 23e; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 107:21-109:9. In February, during a routine audit of CNA's finances, Plaintiff was found to have receipts from the workshop [*19]  still in her possession and to have borrowed cash from the receipts to purchase lunch.

*Id.* As a result, CNA received a "management letter" from its auditor criticizing CNA for poor handling of funds. *Id.* Plaintiff does not dispute these facts, but asserts that, like her misuse of compensatory time, her "withholding of corporate funds was neither intentional nor a problem prior to the initiation of this lawsuit." Pl.'s Stmt. P 38 (citing Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 108). Plaintiff's attempt to downplay the incident, however, raises no factual issue as to whether Plaintiff improperly retained CNA funds and used them for personal purposes.

### 4. Kost Conference Room Incident

In February 2004, Plaintiff had a disagreement with Kost about the use of CNA's conference room, after which Plaintiff claimed Kost was disrespectful towards her and demanded that he apologize. Def.'s Stmt. P 23f; Def.'s Ex. 25 (1/12/06 Kost Dep.) at 12:8-15:22; Pl.'s Stmt. P 23. Plaintiff claims that "Kost testified that he never met with Johnson, nor did he communicate via e-mail or telephone with her to specifically complaint about [Plaintiff]." Pl.'s Stmt. P 24 (citing Pl.'s Ex. G [*20]  (2/23/06 Kost Dep.) at 26-27). However, Plaintiff's assertion obscures the fact that while Kost testified that he did not speak with Johnson *specifically* to complain about Plaintiff, he also testified that he reported the conference room incident to Johnson and that he considered Plaintiff's behavior confrontational. Def.'s Ex. 25 (1/12/06 Kost Dep.) at 20:10-15; Pl.'s Ex. G (2/23/06 Kost Dep.) at 14:21-16:10; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 109:18-23; 112:10-18. Johnson investigated the incident involving Plaintiff and Kost, "but could find no evidence that [Kost] had been disrespectful," finding instead that "[Plaintiff] had been inflexible in her position and unnecessarily confrontational." Def.'s Stmt. P 23f; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 126:2-7. Although Plaintiff takes issue with "Johnson's alleged inquiry into the matter," Pl.'s Stmt. P 26, neither Plaintiff's justifications of her behavior nor her dissatisfaction with Johnson's inquiry into the incident raises a factual question as to whether the incident actually occurred and was reported to Johnson by Kost.

### 5. Baird Incident

In February 2004, CNA employee Jeremy Baird questioned an African-American [*21]  visitor, who was unaccompanied in CNA's office, concerning her presence at CNA. Def.'s Stmt. P 23g; Def.'s Ex. 30 (4/5/06 Baird Dep.) at 16:16-17:21; 45:17-47:20. Plaintiff does not dispute that she did not witness the incident, but nevertheless encouraged the visitor to make a written complaint. Def.'s Stmt. P 23g; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 224:8-12. CNA does not indicate that Johnson relied on the Baird incident in conducting Plaintiff's

July 2004 evaluation and any dispute regarding the facts of the incident are therefore immaterial. Def.'s Mot. for Summ. J. at 21-22. However, Plaintiff maintains that, in connection with her July 2004 evaluation, Johnson told Plaintiff that Baird had complained about Plaintiff's involvement in the incident, and that Johnson has since "recanted and changed her story about Baird's negative comments, saying that Baird never complained about [Plaintiff]." Pl.'s Stmt. P 25 (citing Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 118:21-122:6). Indeed, Plaintiff asserts, "Baird testified that he never complained to anyone about [Plaintiff]." Pl.'s Stmt. P 25 (citing Pl.'s Ex. I (4/5/06 Baird Dep.) at 15:12-14).

While Johnson did testify at [*22] her deposition that Baird did not complain to her *electronically* about Plaintiff, Plaintiff provides no evidence that Johnson altogether denied receiving a complaint from Baird, rather than that Johnson was aware of the incident. Pl.'s Ex. F (1/12/06 Johnson Dep.) at 108:23-109:5. Moreover, Plaintiff's detailed notes of the meeting during which she alleges Johnson told her that Baird complained about her do not substantiate Plaintiff's claim. *See* Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting with Johnson). Instead, Plaintiff's notes indicate that Johnson discussed the incident with Plaintiff, telling Plaintiff that she believed Plaintiff had "offended" Baird, *see id.* at 4, that Johnson believed Plaintiff had inappropriately insinuated that Baird treated the African-American visitor poorly, and that Johnson believed Plaintiff had not made any attempt to diffuse the situation, *id.* at 6-7. Plaintiff's assertion that Johnson told Plaintiff that Baird complained about her, and that Johnson has since "recanted and changed her story about Baird's negative comments," Pl.'s Stmt. P 25, is thus unsupported by anything other than Plaintiff's own testimony to that effect.

[*23] 6. *Sanow Incident*

Among other things, CNA ran a program known as the Washington Post Award for Excellence in Nonprofit Management (the "Post Award"), which was created and managed by CNA employee Susan Sanow for ten years. Def.'s Stmt. P 23c; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 63:12-64:11. Sanow resigned from CNA in November 2003, and upon Sanow's resignation, Johnson assigned management of the Post Award to Plaintiff. Def.'s Stmt. P 23c; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 66:12-18. Sanow continued, however, to serve as a consultant on the Post Award. Def.'s Stmt. P 23h; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 66:22-67:4; Pl.'s Stmt. P 28. In March 2004, Sanow sent Plaintiff an e-mail in which she raised concerns regarding the late delivery of applicant materials and inconsistencies within the materials, reminded Plaintiff of upcoming critical deadlines, and offered Plaintiff help if necessary. Def.'s Stmt. P 23h;

Def.'s Ex. 7 (3/23/04 e-mail from Sanow to Valles-Hall). At the end of her e-mail, Sanow stated, "I know this e-mail is a bit negative, but I ask these questions out of concern and commitment to this program" Def.'s Ex. 7 (3/23/04 e-mail from Sanow to [*24] Valles-Hall). Plaintiff responded to Sanow's e-mail with her own e-mail, stating "Yes, the tone is negative and unnecessarily so." Def.'s Ex. 8 (3/24/04 e-mail from Valles-Hall to Sanow). Johnson was copied on both Sanow's initial e-mail and Plaintiff's response e-mail. Def.'s Ex. 7 (3/23/04 e-mail from Sanow to Valles-Hall) and Ex. 8 (3/24/04 e-mail from Valles-Hall to Sanow).

Plaintiff attempts to downplay this interaction by contrasting Johnson's deposition testimony that she found Plaintiff's use of the words "and unnecessarily so" to be "angry and defensive," Pl.'s Stmt. P 31 (citing Pl.'s Ex. F (1/12/06 Johnson Dep.) at 205:2-207:12, with Sanow's deposition testimony that she was not offended by Plaintiff's response e-mail, *Id.* P 30 (citing Pl.'s Ex. J (2/28/06 Sanow Dep.) at 34:21-35:4. Whether or not Sanow was "offended" by Plaintiff's e-mail, however, does not undercut Sanow's testimony that she reported the interaction to Johnson because "in addition to this e-mail, [she] also received a phone call from [Plaintiff] berating me and [she] felt the double whammy of phone call and e-mail was uncalled for." Pl.'s Ex. J (2/28/06 Sanow Dep.) at 35:10-16.

7. *Plaintiff's* [*25] *Post Award Complaint*

In April 2004, Sanow's employer offered to allow Sanow to manage the Post Award without cost to CNA. Def.'s Stmt. P 23i; Def.'s Ex. 29 (2/28/06 Sanow Dep.) at 40:21-41:1. CNA asserts that Johnson accepted the offer because it amounted to a substantial gift in kind, because Sanow was very experienced in managing the Post Award, and because Johnson was not satisfied with Plaintiff's management of the Post Award to that point. Def.'s Stmt. P 23i; Pl.'s Ex. F (1/12/06 Johnson Dep.) at 165:6-21. Plaintiff complained to Johnson about the decision to strip Plaintiff of responsibility for managing the Post Award, and sent Johnson a memo detailing her concerns with the manner in which the Post Award management issue was handled. Def.'s Stmt. P 23i, Def.'s Ex. 9 (5/11/04 memo from Valles-Hall to Johnson re: Issues of Concern & Discussion). Johnson testified in her deposition that when she tried to explain the Post Award management decision to Plaintiff, Plaintiff accused Johnson of "intentionally being disrespectful or thoughtless . . . I had the distinct impression that she thought I had intentionally ruined her reputation." Pl.'s Ex. F (1/12/06 Johnson Dep.) at 136: [*26] 19-137:6. Johnson further testified that this conversation was the first time that Plaintiff spoke to her in a disrespectful manner. *Id.* at 137:9-11. Plaintiff does not dispute CNA's account of

these events, but rather argues that CNA's assertion that Plaintiff "was incompetent in her handling of the Washington Post Award [is] . . . unsubstantiated," because Sanow testified that she continued to maintain confidence in Plaintiff's ability to manage the award. Pl.'s Opp'n at 21 (citing Sanow Dep. at 42-43). n8 Sanow testimony that she maintained confidence in Plaintiff's ability to run the Post Award, however, is entirely irrelevant to whether Johnson made a legitimate business decision regarding management of the Post Award.

n8 Plaintiff cites to Sanow's deposition transcript in support of her argument that she was qualified to manage the Post Award, but fails to provide the pages to which she cites in either her original opposition or her revised Opposition. Pl.'s Ex. J (2/28/06 Sanow Dep.). CNA includes page 42 of Sanow's deposition transcript in support of its Motion for Summary Judgment, *see* Def.'s Ex. 29 (2/28/06 Sanow Dep.) at 42; however the Court is unable to discern whether Sanow testified further in this respect and so relies on the transcript pages it has been provided.

[*27]

*D. Plaintiff's July 2004 Evaluation and Subsequent Complaints*

*1. Plaintiff's July 2004 Evaluation*

Johnson's annual evaluation of Plaintiff took place over the course of two days, July 7 and July 8, 2004. Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel Review Form); Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 110:2-21. Johnson gave Plaintiff a "5" (outstanding) on five of 13 criteria ("Self Confidence;" "Job-Knowledge;" "Quality/Quantity;" "Decision Making;" and "Motivating"); a "4" (above average) on three criteria ("Initiative;" "Planning;" and "Leadership"); and a "3" (satisfactory) on five criteria ("Attitude;" "Open Mindedness;" "Interpersonal Communication;" "Assertiveness;" and "Work Habits"). Def.'s Stmt. P 26; Pl.'s Stmt. P 14; Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel Review Form). Johnson included a number of handwritten comments on Plaintiff's Personnel Review Form, including "responds with inflammatory remarks;" "needs work on staff;" "in conflicts in the office; reactions need work;" and "you need to work harder at solving problems with colleagues and refrain from telling them your judgement of them." Pl.'s Stmt. P 14; Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel [*28] Review Form).

Coincident with Plaintiff's July 2004 evaluation, Johnson raised Plaintiff's salary from $ 60,000 per year to $ 61,800 per year, a 3% increase. Def.'s Stmt. P 27; Def.'s Ex. 11 (7/7/04 Valles-Hall Personnel Review Form). At that salary, Plaintiff continued to be the third highest paid CNA employee, after Johnson and Kost. Def.'s Stmt. P 27; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 11. Plaintiff asserts that "[b]ased upon Defendant's negative evaluation, Johnson gave Plaintiff a 3% [sic] rather than the higher percentage paid to all other management staff." Pl.'s Stmt. P 15. Plaintiff provides no support for her suggestion that other CNA management received larger raises, and indeed, during her deposition, admitted that she does not know how other CNA employees were evaluated in 2004 and whether or the extent to which they received raises. Def.'s Stmt. P 35; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 31:19-32:13; 129:21-130:3.

*2. August 6, 2004 Meeting Between Plaintiff and Johnson*

Plaintiff was unhappy with her July 2004 evaluation, "attributed the negative characterizations about her . . . to her involvement and association with Ransom and requested [*29] a meeting with Johnson to discuss her concerns." Pl.'s Stmt. P 17; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 254:8-256:6. Plaintiff documented her concerns in an August 4, 2004 memorandum to Johnson, in which she "request[ed] a correction of my evaluation and a corresponding retroactive adjustment of salary commensurate with the quality and quantity of my work . . . ." Def.'s Ex. 12 (8/4/04 Memo from Valles-Hall to Johnson re: July 2004 Evaluation). Plaintiff asserted that her July 2004 evaluation was "markedly different from my first evaluation in June 2003" and that she was "concerned that the basis of all scores rated less than 5 on my most recent evaluation were based on biased subjective impressions and on false and completely unfounded and undocumented charges discussed for the first time in my evaluation." *Id.* Plaintiff stated that she was "not being treated equitably," that she was "being evaluated differently and more critically than [her] colleagues and peers," and that she had "suffered financially and reputationally, having been given a 3% salary increase when 5% is the base minimum standard." *Id.* Furthermore, Plaintiff stated, "I believe my style of communication [*30] is viewed unfortunately as aggressive and 'inflammatory.' These are stereotyped characterizations that are often used when women and people of color are self-confident, intelligent and assertive." *Id.*

Johnson met with Plaintiff on August 6, 2004 to discuss Plaintiff's complaint. Def.'s Stmt. P 29; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 255:8-256:6; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting with Johnson). During that meeting, Johnson expressed to Plaintiff that, while she did not initially believe individual complaints to be prob-

lematic, over time she observed a pattern of Plaintiff reacting quickly and negatively in her interactions with co-workers. Def.'s Stmt. P 29; Def.'s Ex. 23 (2/23/06 Johnson Dep.) at 44:2-19; Def.'s Ex. 18 (Pl's Notes of 8/6/04 meeting) at 2-3. Plaintiff asserts that during that meeting, Johnson initially told Plaintiff that 13 out of 14 CNA employees had complained about Plaintiff, but that when pressed about the quantity and substance of these complaints, Johnson revealed that only five employees had complained -- Kost, Baird, Sanow, Mendoza, and Johnson herself -- and described the incidents discussed above. Pl.'s Stmt. PP 20-37; Pl.'s Ex. A (1/4/06 Valles-Hall [*31] Dep.) at 113:15-124:16; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 4. Plaintiff's detailed notes of the August 6, 2004 meeting indicate that Johnson told Plaintiff that she had "offended" Kost, Baird, Sanow, Mendoza, and Johnson herself. Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 4. In addition, Plaintiff's notes reflect that Johnson raised the issues of Plaintiff's misuse of compensatory time, missed staff meetings, use of CNA funds for personal purposes, and failure to keep Johnson updated about her work. Id. at 1-2, 6. Johnson also appears to have mentioned to Plaintiff that 5% was not a base minimum standard for raises for 2004, but rather a ceiling, id. at 2, and reminded Plaintiff that Plaintiff did not know how other CNA employees were evaluated, id. at 8.

During the course of the August 6, 2004 meeting, Johnson told Plaintiff that "[i]f making judgments about people and telling them is a cultural thing, then maybe we should tell the staff it's a cultural thing and they should buck up and take it." Def.'s Stmt. P 30; Pl.'s Stmt. P 37; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 262:5-22; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 199:14-201:12; Def.'s [*32] Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 2, 4. Johnson continued to tell Plaintiff that she considered Plaintiff's behavior not to be "a cultural thing" but rather to be "verbal abuse." Id. n9 Johnson suggested to Plaintiff that Plaintiff sit down with or e-mail those CNA employees that Plaintiff had offended and apologize to them. Pl.'s Stmt. P 37; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 125:11-126:1; Def.'s Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 7. In addition, Johnson told Plaintiff that she expected her employees to "leave their shit at home." Pl.'s Stmt. P 37; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 113:1-2; Def's Ex. 18 (Pl.'s Notes of 8/6/04 meeting) at 9.

n9 Defendant notes, and Plaintiff does not contest, that other than the "cultural thing" remark and an e-mail that Johnson sent Plaintiff on May 5, 2004 wishing her a happy *cinco de mayo*, "Johnson has never made any reference in the workplace, directly or indirectly, to [Plaintiff's] ancestry, race or color" or to Plaintiff's sexual orientation. Def.'s Stmt. PP 31-32; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 297:15-300:20. Defendant further notes, and Plaintiff does not contest, that other than these two incidents, "Johnson has never made a derogatory reference to race, color, national origin or sexual orientation to [Plaintiff], in [Plaintiff's] presence, or in the presence of any other [CNA] employee," nor has any other "employee of [CNA] ever made a derogatory reference to race, color, national origin or sexual orientation in Johnson's presence." Def.'s Stmt. PP 33-34; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 297:15-300:20.

[*33]

### 3. Plaintiff's August 2004 Complaints to OHR and de Barbieri

On August 9, 2004, Plaintiff filed a charge of discrimination with the District of Columbia Office of Human Rights ("OHR"), alleging discrimination on the basis of race and national origin. Pl.'s Stmt. P 42; Def.'s Stmt. 36. However, Johnson did not learn of Plaintiff's OHR charge until December 2004, when CNA was served with notice of the charge. Def.'s Stmt. P 37; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 151:13-18; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 127:2-8.

On August 16, 2004, Plaintiff sent an e-mail to Mary Ann de Barbieri, then CNA's President, in which she stated "I am writing to formally complain about my most recent evaluation, conducted on July 7-8, 2004. The scores and process are unfounded and biased on the basis of race, national origin and, possibly, retaliation. I am very disturbed by the manner in which I am being treated and request an investigation consistent with company policy." Def.'s Stmt P 38; Pl.'s Stmt. P 43; Def.'s Ex. 13 (8/16/04 e-mail from Valles-Hall to de Barbieri re; Formal Complaint & Request for Investigation). Following Plaintiff's complaint, de Barbieri tried to schedule [*34] an interview with Plaintiff, but was unable to do so until October 19, 2004 because of Plaintiff's resistance. Def.'s Ex. 14 (de Barbieri Draft Report on Investigation of Personnel Complaint by Plaintiff) at 1; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 147:3-13. In connection with her investigation, de Barbieri conducted a two-hour interview with Plaintiff, which was held offsite at Plaintiff's request, and also interviewed Johnson and five other CNA employees, including Kost, Baird, and Mendoza. Def.'s Stmt. P 39; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 147:14-148:19; Def.'s Ex. 14 (de Barbieri Draft Report) at 2-4; Def.'s Ex. 27 (2/28/06 de Barbieri Dep.) at 65:2-66:2.

Following her investigation, de Barbieri prepared an undated draft Report summarizing her investigation. Def.'s Stmt. P 40; Def.'s Ex. 14 (de Barbieri Draft Report). In her draft report, de Barbieri concluded that Plaintiff experienced the same evaluation process as other CNA employees and that there was no "evidence that [Plaintiff's] evaluation was racially or ethnically biased," but rather that Plaintiff's "difficulties are a result of her approach to her staff colleagues." *Id.* Finally, de Barbieri stated [*35] "I see no evidence that [Plaintiff's] 2004 evaluation scores were a retaliation, as they appear to be based upon a valid assessment of her performance during the past year by her supervisor." *Id.* In a letter to Plaintiff dated December 6, 2004, de Barbieri indicated that she had considered Plaintiff's response to de Barbieri's draft report and found that Plaintiff's response was unrelated to Plaintiff's initial August 16, 2004 complaint. *See* Def.'s Ex. 15 (12/6/04 Letter from de Barbieri to Plaintiff). As a result, de Barbieri decided to conclude her investigation and submit her draft report as final. *Id.*

Plaintiff criticizes de Barbieri's investigation, focusing on de Barbieri's decision that certain issues were irrelevant to Plaintiff's complaint. Pl.'s Stmt. P 47. Plaintiff takes issue with de Barbieri's decision not to investigate the truthfulness of the various CNA employee complaints underlying Plaintiff's July 2004 evaluation, *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 136-37), not to review the performance evaluations of "similarly situated white employees," *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 110-11), and not to investigate [*36] an observation made by an unidentified African-American female former CNA employee that "[t]here is an issue with race," *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 100-01). However, as de Barbieri emphasized in her deposition, her investigation was focused on Plaintiff's actual claim - that her July 2004 evaluation had been biased on the basis of race or national origin or constituted retaliation - and her conclusions were limited to that complaint. Def.'s Ex. 27 (2/28/06 de Barbieri Dep.) at 113:6-21; 126:4-20. Moreover, de Barbieri and Johnson each invited Plaintiff, in writing, to supplement her August 16, 2004 complaint if she believed she had experienced other instances of discrimination. *See* Def.'s Ex. 15 (12/6/04 Letter from de Barbieri to Valles-Hall); Def.'s Ex. 16 (11/4/04 e-mail from Johnson to Valles-Hall re: Note from Doctor & Request for Clarification). Plaintiff did not take advantage of these offers. Def.'s Stmt. P 41.

Plaintiff's criticism of de Barbieri's investigation thus appears unfounded, because de Barbieri's investigation appropriately addressed Plaintiff's August 16, 2004 complaint that her July 2004 evaluation had been biased on the basis [*37] of race or national origin or constituted retaliation. In response to that complaint (as op-posed to other complaints that Plaintiff now raises but failed to assert at the time of the investigation), de Barbieri reasonably limited her investigation to confirming that CNA employees had, in fact, complained to Johnson about Plaintiff, and ensuring that Plaintiff received the same evaluation process (as opposed to results) as other CNA employees. Def.'s Ex. 14 (de Barbieri Draft Report) at 1-4. Furthermore, de Barbieri's conclusions actually reflect the record before the Court. There is no dispute that Plaintiff's co-workers complained to Johnson about Plaintiff and, because Plaintiff presents absolutely no evidence that her evaluation process differed from that of other CNA employees, her claim to this effect is nothing more than a bald assertion.

### E. Issues Arising During Late 2004 and Early 2005

The catalogue for CNA's Fall 2004 course offerings was not completed and mailed until the end of October 2004. Def.'s Stmt. P 43; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 212:7-213:17; 216:9-23; Def.'s Ex. 29 (2/28/06 Sanow Dep.) at 56.20-58:12. By the time the catalogue was mailed, [*38] the dates for many courses had already passed and other courses had to be cancelled as a result of low registration. *Id.* Plaintiff does not dispute that the Fall 2004 catalogue was her responsibility, and does not assert that she was given responsibility for the catalogue as the result of a retaliatory animus. Instead, Plaintiff argues that "neither Defendant nor any of its employees ever set a deadline for publication," Pl.'s Stmt. P 40 (citing Def.'s Ex. F (1/12/06 Johnson Dep.) at 212). Plaintiff further asserts that "any perceived tardiness is reasonably excused by Defendant's unilateral decision to cut [Plaintiff's] support staff in September 2004." *Id.* (citing Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 166. Plaintiff's justifications and excuses fail, however, to raise a factual issue as to whether in fact the Fall 2004 catalogue (for which Plaintiff was solely responsible) was mailed so late that courses had to be skipped or cancelled.

Also in the fall of 2004, Plaintiff worked only 12 out of 29 scheduled workdays during the six-week period from September 20 to October 30, 2004. Def.'s Stmt. P 44; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 12. Plaintiff does not dispute [*39] this fact, asserting that in September 2004 she "began to suffer from physical ailments caused by work-induced stress," that "[l]ater that month, she also began to see a licensed clinical social worker," and that she "was required to miss days from work to address her work related illness." Pl.'s Stmt. P 44; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 35:5-38:16. Plaintiff also does not dispute that in October 2004, Johnson counseled Plaintiff about her poor attendance and requested that Plaintiff provide a note from her doctor regarding her absences. Def.'s Stmt. P 45; Def.'s Ex. 1

(1/4/06 Valles-Hall Dep.) at 192:17-194:15. In fact, in an e-mail Plaintiff sent to Johnson, Plaintiff confirmed that Johnson first requested a doctor's note on October 19, 2004. Def.'s Ex. 16 (11/4/04 e-mail from Johnson to Valles-Hall replying to 11/4/04 e-mail from Valles-Hall to Johnson).

On November 3, 2004, having not received a note from Plaintiff's doctor, Johnson wrote Plaintiff a memorandum stating that Plaintiff's "poor attendance record over the past two months has caused serious disruption to the work of [CNA]." Def.'s Ex. 17 (11/3/04 Memo from Johnson to Valles-Hall). Johnson noted that [*40] Plaintiff had failed to provide the requested doctor's statement, and informed Plaintiff that "to consider your prior absences as excused, I must have such a statement by close of business on Thursday, November 4. Failure to provide a statement will result in disciplinary action." *Id.* Johnson further informed Plaintiff that:

> According to our payroll records, you have exhausted your sick leave and you have 7.34 days of annual leave remaining. While I have agreed that future absences may be charged against annual leave, I cannot allow you to continue missing work on such a frequent basis. Should your absences continue at the current, unacceptable rate, I will have no choice but to make other arrangements to assure that the work assigned to you is properly completed. These arrangements may include hiring a permanent replacement for your position.

*Id.* n10 Plaintiff provided a note from her doctor on November 4, 2004, which stated "Pt. is undergoing treatment for medical condition & needs periodic followup & assessment." Def.'s Ex. 19 (10/24/04 note from Dr. Manish Upadhyay).

n10 In her deposition, Plaintiff stated that she did not believe that she had exhausted her sick leave at the time that Johnson counseled Plaintiff about her attendance. Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 193:4-12. However, according to the CNA Personnel Handbook, employees are granted 10 days per year of sick leave, *see* Def.'s Ex. 4 (WCA Personnel Handbook) at 8, and Plaintiff does not contest that between September 20 and October 30, 2004 she worked only 12 of 29 scheduled workdays, Def.'s Stmt. P 44; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 12.

[*41]

Plaintiff asserts that "Johnson's letter [of November 4, 2004] was uncharacteristic, particularly as the office manager [Mendoza] had never known of another instance in which an employee's job would be threatened for their use of sick leave." Pl.'s Stmt. P 46 (citing Pl.'s Ex. M (2/28/06 Mendoza Dep.) at 25). However, the CNA Personnel Handbook specifically states that "[i]f an employee takes more than a week of sick leave at a time, the Executive Director may require a Doctor's note." Def.'s Ex. 4 (WCA Personnel Handbook) at 8. It therefore appears that Johnson was authorized to request a doctor's note from Plaintiff, and Plaintiff fails to identify any similarly situated CNA who was not required by Johnson to provide a doctor's note.

In January 2005, Plaintiff initially refused to follow Johnson and Sanow's instruction to post CNA's spring course offerings on the CNA website. Def.'s Stmt. P 48; Pl.'s Stmt. P 41; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 196:14-197:22. Plaintiff had performed this duty several times before, *id.*; nevertheless, in January 2005, Plaintiff informed Johnson and Sanow that "she was overloaded with work and could not continue to do other people's [*42] work" and that "the website responsibility fell within the job description of the newly-hired communications director," Pl.'s Stmt. P 41; Pl.'s Ex. A (1/4/06 Valles-Hall Dep.) at 208:13-209:12; Pl.'s Ex. J (2/28/06 Sanow Dep.) at 61:3-63:18. Plaintiff correctly asserts that Sanow "agreed that website responsibility was not in [Plaintiff's] job description." Pl.'s Stmt. P 41 (citing Pl.'s Ex. J (2/28/06 Sanow Dep.) at 62). However, Sanow also testified that she believed it was Plaintiff's responsibility to post the offerings in January 2005 and that Plaintiff had performed the task in the past. Pl.'s Ex. J (2/28/06 Sanow Dep.) at 62:22-63:12. Plaintiff eventually put the course materials online. *Id.* at 64:2-4; Pl.'s Stmt. P 41. Significantly, while Plaintiff maintains that posting the course offerings on the website in January 2005 was not her responsibility, she does not claim that Johnson and Sanow's insistence that Plaintiff post the offerings on the website represented a form of retaliation.

Finally, in connection with her retaliation claims, Plaintiff vaguely asserts that CNA altered her job duties so as to impose more arduous tasks upon her. *See* Pl.'s Opp'n at 30-31. However, [*43] this vague claim is entirely devoid of specification - Plaintiff does not state how her duties were allegedly altered, when they were allegedly altered, or by whom. The Court therefore declines to speculate as to what additional work Plaintiff refers to or which protected activity she believes engendered this alleged retaliation. n11

n11 Moreover, the Court notes that, other than being asked to post the course offerings on the CNA website in January 2005, Plaintiff does not identify any instance in which she was given work that fell outside the auspices of her job responsibilities. Furthermore, with respect to posting the course offerings on the website, as discussed above, Plaintiff does not dispute that she had performed this task before.

*F. February 2005 Mediation and Plaintiff's Resignation*

Plaintiff was actively job hunting in the fall of 2004. Def.'s Stmt. P 42; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 13:11-12. On February 1, 2005, Plaintiff received and accepted an offer from her current employer, [*44] Society of Research Administrators International ("SRAI"), with a planned start date of March 1, 2005. Def.'s Stmt. P 49; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 14:9-21. CNA does not indicate that it was aware that Plaintiff had accepted employment with SRAI on February 1, 2005 or that she planned to start working for SRAI on March 1, 2005. Rather, CNA asserts that in "early February 2005 Johnson decided to fire [Plaintiff] for insubordination, poor performance, and unacceptable workplace behavior," but postponed doing so pending mediation of Plaintiff's OHR complaint in hopes that CNA and Plaintiff could reach a resolution that would involve Plaintiff's voluntary resignation. Def.'s Stmt. P 50; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 188:16-189:12; 198:5-13; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) PP 13-14.

On February 11, 2005, the parties participated in an unsuccessful mandatory mediation of Plaintiff's OHR complaint. Def.'s Stmt. P 51; Pl.'s Stmt. 48; Def.'s Ex. 22 (2/11/05 Mediation and Confidentiality Agreement). Following the mediation, late in the afternoon of Friday, February 11, 2005, Johnson arranged to bar Plaintiff's access to CNA's office during the February [*45] 12-13 weekend and to bar Plaintiff's remote access to CNA's computer network. Def.'s Stmt. P 52; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff. P 15); Pl.'s Stmt. P 49. These steps were taken in preparation for firing Plaintiff. *Id.* During Plaintiff's deposition, she testified that she attempted to gain access to the CNA office on Saturday, February 12, 2005 and that on Sunday, February 13, 2005, she asked a co-worker if she could follow her into the CNA office because Plaintiff's "key fob didn't seem to be working." Pl.'s Ex. A (2/16/06 Valles-Hall Dep.) at 286:8-17; 292:13-20. Significantly, however, Plaintiff does not assert that she was -- nor does she appear to have been - aware that she had actually been locked out of the CNA office.

On Monday, February 14, 2005, Plaintiff submitted a letter resigning her employment with CNA to Johnson, prior to being fired. Def.'s Stmt. P 53; Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 293:12-294:1. Plaintiff's resignation letter states that she is resigning her position at CNA, effective immediately, because "the collective impact of the professional indignities I have suffered leave me no choice but to resign." Def.'s Ex. 21 (2/14/05 Letter [*46] from Valles-Hall to Johnson) at 3. Plaintiff's resignation letter states "I have been judged differently and more harshly than my white counterparts, subjected to aggressive retaliatory action when I complained about this treatment and forced to do the work of others under the threat of job loss." *Id.* at 1. In support of this assertion, Plaintiff describes what she views as discriminatory and disrespectful treatment on the part of Johnson, focusing on her July 2004 evaluation. *Id.* at 1-3. n12 Plaintiff does not, however, mention that she had been locked out of the CNA offices over the February 12-13 weekend, or indicate any awareness of that fact.

n12 Plaintiff's resignation letter also states that she was retaliated against for "reporting information regarding possible financial irregularities related to the late depositing of 403(b) contributions." Def.'s Ex. 21 (2/14/05 Letter from Valles-Hall to Johnson) at 2. Plaintiff included an allegation to this effect in Count III (Retaliation) of her Complaint. Compl. P 43. However, as Plaintiff makes no mention of such allegations in her Opposition to Defendant's Motion for Summary Judgment or Statement of Facts and the record contains no evidence regarding these allegations, the Court assumes she has abandoned this claim.

[*47]

Plaintiff does mention the lockout in a separate e-mail to Johnson, also dated February 14, 2005 and time-stamped 9:55 p.m.. Def.'s Ex. 20 (2/14/05 e-mail from Valles-Hall to Johnson). Plaintiff's e-mail notes that her key fob was deactivated, a security code was placed on her phone to prevent her from retrieving messages, and "in an effort to publicly humiliate me, the building management was given a letter written by [CNA] that informed building security that I was not to be allowed to enter the building under any circumstances" along with a 4" x 6" color photograph of Plaintiff, both of which were posted at the security desk in the building's lobby. *Id.* Nevertheless, Plaintiff's e-mail specifically states "I was not informed that these measures were put into effect." *Id.* Furthermore, during her deposition, Plaintiff testified that she did not see the letter and her picture hanging at the security desk until she left the office after resigning

on February 14, 2005. Def.'s Ex. 1 (2/16/06 Valles-Hall Dep.) at 292:1-6. It is therefore clear from the record evidence that, when she resigned her employment with CNA on February 14, 2005, Plaintiff was unaware that she had been [*48] locked out of the CNA office over the February 12-13 weekend.

In her deposition, Plaintiff testified that she began working for SRAI as planned on March 1, 2005, at a higher salary and with better benefits than the salary and benefits she had been receiving at CNA. Def.'s Stmt. P 54; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 15:8-17:16. On April 4, 2005, Johnson hired an African-American female who appears to be heterosexual as CNA's Manager of Education, and assigned her a number of Plaintiff's former responsibilities. Def.'s Stmt. P 55; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 17. The remainder of Plaintiff's responsibilities were assigned to Sanow, who was re-hired by CNA effective January 3, 2005, and appointed Director of Programs. *Id.;* Def.'s Stmt. P 47.

*G. Procedural History*

On July 28, 2005, Plaintiff voluntarily withdrew her OHR charge and OHR subsequently closed the administrative proceeding with no findings. Def.'s Mot. for Summ. J. at 2. Plaintiff filed her six-Count Complaint in this case in the Superior Court for the District of Columbia on September 8, 2005. *Id.* CNA answered Plaintiff's Complaint on November 16, 2005. Def.'s Notice of Removal Att. [*49] 3 (Def.'s Ans. to Pl.'s Compl.). Plaintiff's Complaint did not include a demand for a jury trial, and on March 31, 2006, Plaintiff moved to amend her Complaint to add two counts under *42 U.S.C. § 1981*, and also moved for a jury trial. Def.'s Mot. for Summ. J. at 3. By Order docketed April 27, 2006, the Superior Court granted Plaintiff's Motion for Leave to Amend Complaint, but denied her Motion for Jury Trial as untimely in light of the fact that discovery had closed. Def.'s Mot. for Summ. J. at 3; Def.'s Notice of Removal Att. 5 (4/27/06 Superior Court Order). n13 Also on April 27, 2006, the Superior Court granted Defendant's request to file an Amended Answer to Plaintiff's Complaint. Def.'s Mot. for Summ. J.

> n13 The Court notes that, as a result of the April 27, 2006 Superior Court Order, if this case proceeded to trial, Plaintiff's claims would be resolved by bench trial.

Plaintiff's First Amended Complaint was deemed filed on April 27, 2006, and included two additional claims pursuant [*50] to *42 U.S.C. § 1981*. Based on these additional claims, CNA removed this case from Superior Court to this Court on May 2, 2006. Def.'s Mot.

for Summ. J. at 3; Def.'s Notice of Removal at 3. Thereafter, CNA filed its Motion for Summary Judgment on May 25, 2006. On January 30, 2007, the Court struck Plaintiff's initial Opposition in its entirety, finding that Plaintiff's original "Statement of Material Facts" failed to a comply with Local Civil Rules 7(h) and 56.1. *Valles-Hall v. Cent. for Nonprofit Advancement,* Civil Action No. 06-806 (D.D.C. Jan. 30, 2007). Plaintiff filed a revised Opposition to Defendant's Motion for Summary Judgment, and a correspondingly revised Genuine Statement of Material Facts in Dispute on February 13, 2007. On February 16, 2007, CNA filed a Supplemental Reply, in which it responded to Plaintiff's Genuine Statement of Material Facts in Dispute and indicated a desire to adopt by reference the arguments made in its initial Reply Memorandum.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that [*51] the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c); Tao v. Freeh, 307 U.S. App. D.C. 185, 27 F.3d 635, 638 (D.C. Cir. 1994).* Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id. at 324* (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary [*52] judgment. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251, 106 S. Ct. 2505* (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or

is not sufficiently probative, summary judgment may be granted." *Liberty Lobby, 477 U.S. at 249-50, 106 S. Ct. 2505* (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996)*. The adverse party must do more than simply "show [*53] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id. at 587, 106 S. Ct. 1348* (citing *Fed. R. Civ. P. 56(e)*) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001), aff'd, 356 U.S. App. D.C. 109, 328 F.3d 647 (D.C. Cir. 2003)* (quoting *Calhoun v. Johnson, No. 95-2397, 1998 U.S. Dist. LEXIS 22376, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998)* (internal citation omitted), *aff'd, [*54] No. 99-5126, 1999 U.S. App. LEXIS 25165, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003)* (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall, 276 F. Supp. 2d at 47* (quoting *Celotex Corp., 477 U.S. at 327*). Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr., 325 U.S. App. D.C. 255, 116 F.3d 876, 879 (D.C. Cir. 1997)* (internal quotations omitted), *overturned on other grounds, 332 U.S. App. D.C. 256, 156 F.3d 1284 (D.C. Cir. 1998)* (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment in which the non-moving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment [*55] as a matter of law.

### III: DISCUSSION

Plaintiff's Complaint includes six Counts: race discrimination under the DCHRA (Count I); sexual orienta-

tion discrimination under the DCHRA (Count II); retaliation under the DCHRA (Count III); constructive discharge (Count IV); negligent infliction of emotional distress (Count V); and negligent supervision (Count VI). Plaintiff's First Amended Complaint adds two claims: retaliation under *42 U.S.C. § 1981* (Count VII) and disparate treatment discrimination under *42 U.S.C. § 1981* (Count VIII). CNA moved for summary judgment on all eight of Plaintiff's claims; however, Plaintiff's Opposition addresses only her claims of race discrimination and retaliation. CNA's Reply (filed before the Court struck Plaintiff's initial opposition) highlighted Plaintiff's failure to address CNA's motion for summary judgment as to her claims for sexual orientation discrimination, constructive discharge, negligent infliction of emotional distress, and negligent supervision. Def.'s Reply at 4. As Plaintiff failed to address this shortcoming in her revised Opposition., it appears the claims she raised in Counts II, IV, [*56] V, and VI are abandoned and shall be dismissed. The Court therefore shall not address Defendant's Motion for Summary Judgment with respect to those claims, but will only address Plaintiff's claims for race discrimination and retaliation, each of which is brought pursuant to both *42 U.S.C. § 1981* and the DCHRA.

### A. Plaintiff's Discrimination Claims

#### 1. Proper Standards

Pursuant to *42 U.S.C. § 1981*, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." *42 U.S.C. § 1981(a)*. As amended by the Civil Rights Act of 1991, "*§ 1981*'s prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Express, 511 U.S. 298, 302, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994)*. For its part, the DCHRA makes it unlawful for an employer to "fail or refuse to hire, or to discharge, any individual; or otherwise discriminate against any [*57] individual, with respect to his compensation, terms, conditions, or privileges of employment . . ." based upon, *inter alia,* the individual's "race, color [or] national origin." *D.C. Code § 2-1402.11 (a)*.

"The burdens of persuasion and production for claims raised under *§ 1981* or under the [DCHRA] are identical to those for claims alleging discriminatory treatment in violation of Title VII" of the Civil Rights Act of 1964." *Mungin v. Katten Muchin & Zavis, 325 U.S. App. D.C. 373, 116 F.3d 1549, 1553 (D.C. Cir. 1997)*. To prove a violation of *§ 1981* or the DCHRA, Plaintiff must demonstrate by a preponderance of the

evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* (internal quotation marks and citation omitted). Furthermore, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* [*58] *Brady v. Livingood, 456 F. Supp. 2d 1, 6 (D.D.C. 2006); see also Mitchell v. DCX, Inc., 274 F. Supp. 2d 33, 45 (D.D.C. 2003)* (citing *Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), superseded in part by* The Civil Rights Act of 1991); *Carter v. George Washington Univ., 363 U.S. App. D.C. 287, 387 F.3d 872, 878 (D.C. Cir. 2004)* (*McDonnell Douglas* framework applies to claims brought pursuant to *§ 1981*). "While courts have not precisely defined what constitutes 'direct evidence,' it is clear that 'at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself.'" *Brady, 456 F. Supp. 2d at 6* (citing *Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996)* (citing *Price Waterhouse v. Hopkins, 490 U.S. 228, 251-52, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)* (plurality op.), *superseded in part by* The Civil Rights Act of 1991; *id. at 277-78, 109 S. Ct. 1775* (O'Connor, [*59] J., concurring))). Although they may be probative of discrimination, "stray remarks do not satisfy a plaintiff's burden of proving discrimination by direct evidence." *Brady, 456 F. Supp. 2d at 6* (citing *Ayala-Gerena, 95 F.3d at 96* (citing *Price Waterhouse, 490 U.S. at 277-78, 109 S. Ct. 1775* (O'Connor, J., concurring))).

Here, although Plaintiff emphasizes Johnson's "cultural thing" comment as "evidencing a hostility towards [Plaintiff] and her cultural identity," Plaintiff does not attempt to argue that Johnson's comment constitutes direct evidence of discrimination. Pl.'s Opp'n at 23-24. Nor could Plaintiff succeed with such an argument. When viewed in context, Johnson's "cultural thing" comment appears to be an uninformed and insensitive statement regarding Plaintiff's ethnicity or national origin, but not an intentionally discriminatory statement. At most, Johnson's "cultural thing" comment is a stray remark that, although probative of discrimination, cannot serve as direct evidence of discrimination. *See Price Waterhouse, 490 U.S. at 277-78, 109 S. Ct. 1775* (O'Connor, J., concurring).

Thus, in the absence [*60] of direct evidence, it is necessary to employ the *McDonnell Douglas* tripartite

burden-shifting framework. *Cones v. Shalala, 339 U.S. App. D.C. 299, 199 F.3d 512, 516 (D.C. Cir. 2000)* (citing *McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. 1817).* n14 It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr., 318 U.S. App. D.C. 186, 86 F.3d 1180, 1183 (D.C. Cir. 1996)* (internal citation and quotation marks omitted).

N14 The *McDonnell Douglas* framework also applies to Plaintiff's claims under the DCHRA. *See Perkins v. District of Columbia, 769 F. Supp. 11, 14 n.3 (D.D.C. 1991)* (noting that the "*McDonnell Douglas* approach has been adopted by courts reviewing [DCHRA] claims of employment discrimination"). Because the same analysis applies to Plaintiff's *§ 1981* claims and DCHRA claims, the Court will refer from this point on to her claim under *§ 1981* only.

[*61]

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. 1817.* If she succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible evidence supporting its claim. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine, 450 U.S. at 254, 101 S. Ct. 1089; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)* ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with [*62] the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp., 356 U.S. App. D.C. 109, 328 F.3d 647, 651 (D.C. Cir. 2003), cert. denied, 540 U.S. 881, 124 S. Ct. 325, 157 L. Ed. 2d 146 (2003); see also Burdine, 450 U.S. at 253, 101 S. Ct. 1089.*

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (internal citations and quotation

marks omitted). At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine, 450 U.S. at 256, 101 S. Ct. 1089.* Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id. at 256, 101 S. Ct. 1089; see also Reeves, 530 U.S. at 143, 120 S. Ct. 2097.* "Proof that the defendant's [*63] explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves, 530 U.S. at 147, 120 S. Ct. 2097* (citing *St. Mary's Honor Ctr., 590 U.S. at 517, 113 S. Ct. 2742*) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka, 156 F.3d at 1290* ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves, 530 U.S. at 148, 120 S. Ct. 2097.* "[The trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id. at 143, 120 S. Ct. 2097* (quoting *Burdine, 450 U.S. at 255 n.10, 101 S. Ct. 1089*). The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka, 156 F.3d at 1289.* However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fannie Mae, 326 U.S. App. D.C. 224, 119 F.3d 23, 27-28 (D.C. Cir. 1997).* [*65] "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he has suffered discrimination." *Aka, 156 F.3d at 1290.*

### 2. Application of the McDonnell Douglas Analysis

#### a. Plaintiff's Prima Facie Case

Plaintiff claims disparate treatment discrimination, and thus makes out a prima facie case "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007)* (quoting *George v. Leavitt, 366 U.S. App. D.C. 11, 407 F.3d 405, 412 (D.C. Cir. 2005); see also Stella v. Mineta, 350 U.S. App. D.C. 300, 284 F.3d 135, 145 (D.C. Cir. 2002).* CNA does not dispute that Plaintiff has met the first element of her prima facie case. Plaintiff variously describes herself as Mexican-American, Latina, Hispanic, and a "woman of color." Pl.'s Stmt. P 1; Compl. PP 3, 33; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 52:16-53:14. All of these descriptions place Plaintiff within [*66] a protected class under the DCHRA, *see D.C. Code § 2-1402.11 (a);* and, while the scope of *§ 1981* is limited to race discrimination, the Supreme Court has held that *§ 1981* reaches national origin discrimination that is based on racial or ethnic considerations associated with the national origin in question. *St. Francis College v. Al-Khazraji, 481 U.S. 604, 613, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987).*

CNA vigorously disputes, however, whether Plaintiff can show that she suffered an adverse employment action. In her Opposition, Plaintiff identifies three possible adverse employment actions (1) her termination and/or constructive termination by CNA, Pl.'s Opp'n at 9-11; (2) Johnson's alleged threat to terminate Plaintiff for her use of sick leave and Johnson's demand that Plaintiff produce a doctor's note, *id. at 12-13,* and (3) Plaintiff's July 2004 evaluation, which she describes as "negative" and claims was used to deny her the raise to which she was entitled, *id. at 11-12.* The Court shall address each possible adverse employment action in turn.

Plaintiff asserts that CNA constructively discharged her when it locked her [*67] out of the CNA offices over the weekend of February 12-13, 2005, and contends that "Defendant's termination of [Plaintiff] is among the

most-egregious 'adverse employment actions' prohibited by § 1981." Pl.'s Opp'n at 9. For its part, CNA argues that the lockout cannot constitute a constructive discharge because, according to Plaintiff's own testimony, she had been searching for new employment since the Fall of 2004 and, by February 11, 2005 had already accepted employment with SRAI to begin on March 1, 2005. Def.'s Mot. for Summ. J. at 16; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 13:11-12; 14:9-21. In response, Plaintiff notes that "[n]o evidence in the record indicates that at the time of Defendant's action, that [sic] Defendant knew that Plaintiff had accepted a full-time position with a new employer." Pl.'s Opp'n at 10.

Whether or not CNA was aware at the time of the lockout that Plaintiff had accepted new employment is of no consequence, however, because Plaintiff has proffered no evidence to show that the lockout played a role in her resignation on February 14, 2005. n15 A resignation is actionable as a constructive discharge when "the working conditions become so intolerable [*68]  that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).* Thus, constructive discharge "can be regarded as an aggravated case of . . . hostile work environment." *Id. at 146, 124 S. Ct. 2342.* Moreover, in addition to demonstrating intentional discrimination, the plaintiff must establish the presence of "aggravating factors" that drove her to quit. *Dashnaw v. Pena, 304 U.S. App. D.C. 247, 12 F.3d 1112, 1115 (D.C. Cir. 1994), superseded in part by 29 U.S.C. § 633a(d).* While Plaintiff's Complaint alleges that CNA "deliberately made Plaintiff's working conditions intolerable," Compl. P 47, Plaintiff fails to substantiate this allegation in either her Complaint or her Opposition to CNA's Motion for Summary Judgment. Instead, Plaintiff focuses solely on the February 12-13 lockout. However, Plaintiff's resignation letter contains no mention of the lockout, Def.'s Ex. 21 (2/14/05 Letter from Valles-Hall to Johnson), and her resignation e-mail specifically states "I was not informed that these measures were put [*69]  into effect," Def.'s Ex. 20 (2/14/05 e-mail from Valles-Hall to Johnson). As Plaintiff has proffered no evidence that she was aware of the lockout when she submitted her resignation letter on February 14, 2005, she cannot argue that she - or that a reasonable person in her position would have - felt compelled to resign as a result of the lockout. Plaintiff's "constructive discharge" thus fails to constitute an adverse employment action.

n15 The Court nevertheless notes that Plaintiff's acceptance of another job at the time of her resignation suggests that she was not compelled to resign her employment at CNA as a result of

the lockout. *See Taylor v. FDIC, 328 U.S. App. D.C. 52, 132 F.3d 753, 766 (D.C. Cir. 1997)* ("A constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign. It does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive") (internal citations and quotation omitted).

[*70]

Plaintiff also asserts that CNA "took adverse employment action against [Plaintiff] when Johnson threatened to terminate [Plaintiff] for her use of sick leave, and discriminatorily required her to produce evidence of illness while similarly situated white employees were not required to do the same." Pl.'s Opp'n at 12. As an initial matter, Plaintiff does not point specifically to any "similarly situated white employees" who "were not required to do the same," and in any event, the Court concludes that Johnson's alleged threat does not rise to the level of an adverse employment action.

Plaintiff correctly notes, citing *Forkkio v. Powell, 353 U.S. App. D.C. 301, 306 F.3d 1127 (D.C. Cir. 2002),* that actions short of an outright firing can be adverse within the context of employment discrimination. *Id. at 1130.* However, as *Forkkio* also explains, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id. at 1131* (citing *Brown v. Brody, 339 U.S. App. D.C. 233, 199 F.3d 446, 457 (D.C. Cir. 1999)).* [*71]  Mere threats of termination do not rise to the level of an adverse employment action because they result in no materially adverse consequences or objectively tangible harm. *See Cromwell v. Washington Metro. Area Transit Auth., Civil Action No. 97-2257, 2006 U.S. Dist. LEXIS 62796, 2006 WL 2568009, at * 7 (D.D.C. Sept. 5, 2006)* (supervisor's threat to terminate plaintiff due to alleged insufficiency of medical documentation did not constitute adverse employment action). Plaintiff does not assert that Johnson carried through with her alleged threat of termination and her mere threat, in and of itself, is not an adverse employment action.

Here, Plaintiff argues that "Johnson's conduct rose above the level of a simple threat" because, by demanding that Plaintiff furnish a doctor's note, Johnson deprived Plaintiff of "a significant employment benefit -- the right, conferred upon [Plaintiff] by Defendant's employee handbook, to take sick leave up to the authorized amount." Pl.'s Opp'n at 13. Plaintiff's argument fails, however, because, as discussed above, the CNA Person-

nel Handbook grants employees 10 days per year of sick leave and specifically states that "[i]f an employee takes more than a [*72] week of sick leave at a time, the Executive Director may require a Doctor's note," Def.'s Ex. 4 (WCA Personnel Handbook) at 8. Plaintiff does not contest that between September 20 and October 30, 2004 she worked only 12 of 29 scheduled workdays. Def.'s Stmt. P 44; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) P 12. As a result, Plaintiff's claim that Johnson deprived Plaintiff of a right conferred upon her by CNA's Personnel Handbook is entirely without merit.

Finally, CNA argues that Plaintiff's July 2004 evaluation does not constitute an adverse employment action because the evaluation was not negative at all (Plaintiff received an average of a "4", above average), because another CNA employee was denied a raise in 2003 for abusive behavior similar to Plaintiff's, and because an evaluation, standing alone, is not an adverse employment action. Def.'s Mot. for Summ. J. at 12-14. For her part, Plaintiff argues that her July 2004 evaluation constitutes an adverse employment action because Johnson used it "to give [Plaintiff] a 3 percent raise rather than the 5 percent raise that her job performance warranted." Pl.'s Opp'n at 12. n16

n16 Plaintiff also asserts that her July 2004 evaluation constitutes an adverse employment action because CNA cites the contents of the evaluation as legitimate non-discriminatory reasons for terminating Plaintiff. Pl.'s Opp'n at 12. However, as discussed above, CNA did not terminate Plaintiff, Plaintiff resigned her employment with CNA.

[*73]

CNA is correct that a "thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions," *Brown, 199 F.3d at 458*, and that "in most circumstances performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions," *Russell v. Principi, 347 U.S. App. D.C. 222, 257 F.3d 815, 819 (D.C. Cir. 2001)*. However, in *Russell v. Principi*, the D.C. Circuit established that where a performance evaluation is accompanied by a lower bonus, the combination may constitute an adverse employment action because the "bonus is a tangible, quantifiable award" that has "a more direct, measurable, and immediate effect." *Id.* Here, Plaintiff asserts that her July 2004 evaluation provided Plaintiff "the ammunition to deny her a maximum salary increase" - the 5% raise that Johnson was authorized by the Board to give. Pl.'s Opp'n at 12. CNA does not dispute this assertion in its Reply memorandum, and CNA's own Statement of Material

Facts states that "[c]oincident with her July 2004 evaluation of [Plaintiff], Johnson raised [Plaintiff's] salary from $ 60,000 to $ 61,800 per [*74] year, a 3% increase." Def.'s Stmt. P 27. As a result, to the extent that Plaintiff's July 2004 evaluation resulted in Johnson's decision to give Plaintiff only a 3% raise rather than a full 5% raise, the July 2004 evaluation meets Plaintiff's burden of demonstrating an adverse employment action.

Plaintiff is also required to meet the third element of her prima facie case, by showing that "the unfavorable action gives rise to an inference of discrimination." *Czekalski*, Slip Op. at 6; *George, 407 F.3d at 412; Stella, 284 F.3d at 145*. Plaintiff frames her discrimination claims in terms of disparate treatment discrimination, alleging that she was treated differently than her white co-workers with respect to her July 2004 evaluation. Traditionally, to meet the third prong of a prima facie case of disparate treatment discrimination, a plaintiff was required to demonstrate "that she was treated differently from similarly situated employees who are not part of the protected class." *Czekalski*, Slip Op. at 9. Plaintiff cannot make such a showing because she altogether fails to identify any other CNA employee who received more favorable treatment in [*75] terms of their 2004 evaluation or raise. In fact, Plaintiff admitted at her deposition that she does not know how other CNA employees were evaluated in 2004 and whether or the extent to which they received raises. Def.'s Stmt. P 35; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 31:19-32:13; 129:21-130:3.

The Court notes that recently in the contexts of discharges, reassignments, and failures to promote, the D.C. Circuit has emphasized that a plaintiff may also meet the third prong of a prima facie case of disparate treatment discrimination by showing, for instance, that "the discharge was not attributable to the two [most] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Czekalski*, Slip Op. at 9; *George, 407 F.3d at 412; Stella, 284 F.3d 145-146*. Plaintiff, who bears the burden of establishing a prima facie case of disparate treatment discrimination, makes no argument as to how this alternative method would apply to her July 2004 evaluation and raise. However, "[t]he burden of establishing a prima facie case of disparate treatment is not [*76] onerous," *Burdine, 450 U.S. at 253, 101 S. Ct. 1089*, and because the *McDonnell Douglas* model of the *prima facie* case is not "rigid, mechanized, or ritualistic," its requirements can vary depending on the factual context. *See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. As a result, and in light of the approach taken in the D.C. Circuit's recent disparate treatment discrimination decisions, the Court shall assume, *arguendo,*

that Plaintiff can establish a prima facie case, and proceed with the *McDonnell Douglas* analysis.

### b. CNA's Proffered Legitimate, Non-Discriminatory Reasons

In response to Plaintiff's claim of disparate treatment discrimination, CNA asserts that it "can readily show legitimate, non-pretextual reasons for its treatment of [Plaintiff]." Def.'s Mot. for Summ. J. at 21. CNA asserts that Plaintiff's conduct failed to live up to the standards of civility set in the CNA Personnel Handbook, which warns that "[c]onduct, including speech, that . . . is abusive to or disrespectful of [CNA's] directors [or] employees" and "[n]eglect of duty" may lead to corrective [*77] action or dismissal. *See* Def.'s Ex. 4 (WCA Personnel Handbook) at 10. Specifically, CNA points to Plaintiff's frequently unpleasant interactions with her co-workers (including Mendoza, Kost, and Sanow) and with Johnson herself, misuse of compensatory time, withholding and misuse of CNA funds, lateness in mailing the Fall 2004 catalogue, and insubordination regarding posting courses on the CNA website in January 2005. Def.'s Mot. for Summ. J. at 21-22. CNA has thus succeeded in meeting its burden of production under the *McDonnell Douglas* test by offering legitimate, non-discriminatory reasons both for the scores Plaintiff received in her July 2004 evaluation, as well as for CNA's overall treatment of Plaintiff.

### c. Evidence of Pretext or Discrimination Vel Non

Given these legitimate non-discriminatory reasons identified by CNA, Plaintiff now must seize the "opportunity to discredit the employer's explanation," *Aka, 156 F.3d at 1288*, by demonstrating that the proffered reasons are a mere pretext for discrimination, *see Paquin, 119 F.3d at 26-27*. As always, Plaintiff retains the "ultimate burden of persuading the court that she has been [*78] the victim of intentional discrimination.' *Burdine, 450 U.S. at 256, 101 S. Ct. 1089*. However, "one way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false." *Czekalski,* Slip Op. at 10 (citations omitted). CNA proffers a host of legitimate, non-discriminatory reasons for its "treatment" of Plaintiff, only some which occurred before Plaintiff's July 2004 evaluation. The Court shall therefore first consider Plaintiff's efforts to demonstrate pretext as to events occurring before July 2004, before turning to those additional reasons proffered by CNA that arose after Plaintiff's July 2004 evaluation but before her resignation in February 2005.

CNA asserts that Plaintiff's unpleasant interactions with three co-workers (Mendoza, Kost, and Sanow) and

with Johnson herself violated the civility standard set forth in the CNA Personnel Handbook. Plaintiff questions CNA's account of each of these interactions, but ultimately fails to demonstrate pretext as to any because she cannot raise a factual issue as to whether each co-worker [*79] reported the interaction to Johnson prior to Plaintiff's July 2004 evaluation. First, as discussed above, Plaintiff denies calling Mendoza "unprofessional," and asserts that Johnson did not consider the incident involving Plaintiff and Mendoza to be a problem at the time. Pl.'s Opp'n at 18. However, even if a factual dispute exists as to whether Plaintiff, in fact, called Mendoza unprofessional, the evidence is uncontroverted that Mendoza reported as much to Johnson prior to Plaintiff's July 2004 evaluation. Def.'s Stmt. P 23b; Def.'s Ex. 28 (3/20/06 Mendoza Dep.) at 55:9-56:22; 75:2-9; 79:11-19; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 133:6-21. As a result, Plaintiff fails to demonstrate pretext as to Johnson's claim that she relied on Mendoza's complaint in connection with Plaintiff's July 2004 evaluation.

With respect to the Kost incident involving the CNA conference room, Plaintiff correctly asserts that Kost testified that he "neither met with Johnson, nor communicated via e-mail or telephone with her to *specifically* complain about [Plaintiff]." Pl.'s Opp'n at 19 (emphasis added). Nevertheless, Kost did testify that he reported the incident to Johnson and that he considered [*80] Plaintiff's behavior confrontational. Def.'s Ex. 25 (1/12/06 Kost Dep.) at 20:10-15; Pl.'s Ex. G (2/23/06 Kost Dep.) at 14:21-16:10; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 109:18-23; 112:10-18. Plaintiff thus fails to raise a factual issue as to whether the incident occurred or whether Kost reported it to Johnson. Plaintiff also attempts, but fails, to undercut CNA's reliance on the Sanow incident by contrasting Johnson's testimony that she considered Plaintiff's response e-mail to Sanow to be "angry and defensive" with Sanow's testimony that she was not offended by Plaintiff's response e-mail. Pl.'s Opp'n at 20-21. As noted above, Sanow also testified that she reported the interaction to Johnson after also receiving a critical phone call from Plaintiff. Pl.'s Ex. J (2/28/06 Sanow Dep.) at 35:10-16. Sanow's testimony that she was not offended by Plaintiff's e-mail therefore fails to raise a factual issue as to whether Sanow, in fact, complained to Johnson. n17 Finally, in response to Johnson's assertion that she found Plaintiff's response to the reassignment of the Post Award to be disrespectful, Plaintiff argues that she was, in fact, qualified to manage the Post Award. *See* Pl. [*81] 's Opp'n at 21-22. However, Plaintiff's competence in managing the award is entirely irrelevant to whether Johnson believed Plaintiff reacted to the change in management in a disrespectful manner.

n17 The Court notes that in conducting her investigation, de Barbieri spoke with Mendoza and Kost, who confirmed that they had made complaints to Johnson about Plaintiff. *See* Def.'s Ex. 14 (de Barbieri draft Report) at 4.

In assessing whether Plaintiff can show pretext, "[w]hether Plaintiff believes [her co-workers'] complaints were justified is irrelevant, as the issue is whether [Johnson] received the complaints and believed that plaintiff's performance was deficient." *Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 10 (D.D.C. 2000), aff'd, 353 U.S. App. D.C. 205, 298 F.3d 989 (D.C. Cir. 2002)* (citing *Vasilevsky v. Reno, 31 F. Supp. 2d 143, 151 (D.D.C. 1998)* ("An employer is entitled to rely on his own perception of an employee's work performance.")). As a result, Plaintiff's [*82] quibbling over the details of the underlying incidents and whether or not each employee would describe their conversation with Johnson as a "complaint" cannot prove pretext as to CNA's assertion that Plaintiff was involved in a number of unpleasant interactions with her co-workers, as well as with Johnson herself, each of which Johnson was aware of prior to Plaintiff's July 2004 evaluation. n18 Plaintiff is likewise unable to rebut CNA's assertions that Plaintiff misused compensatory time and withheld and misused CNA funds. As discussed above, although Plaintiff contends that neither action was "intentional or a problem prior to the initiation of this lawsuit," Pl.'s Opp'n at 24, Plaintiff does not deny misusing compensatory time or withholding and misusing CNA funds. As a result, Plaintiff fails to demonstrate pretext as to CNA's assertion that Johnson was aware of these issues at the time of Plaintiff's July 2004 evaluation. n19

n18 Nor does Plaintiff demonstrate pretext in this respect by claiming that, during the August 6, 2004 meeting regarding Plaintiff's evaluation, Johnson initially told Plaintiff that 13 of her 14 co-workers had complained about Plaintiff, but when pressed to provide details of these complaints, admitted that only five (5) employees had actually complained - Kost, Baird, Sanow, Mendoza, and Johnson herself. Pl.'s Opp'n at 22. CNA proffers only Mendoza, Kost, Sanow and Johnson's complaints as legitimate, non-discriminatory reasons for Plaintiff's July 2004 evaluation, and Plaintiff fails to raise a factual issue as to whether any of those complaints were made. As such, it is of no significance to Defendant's Motion for Summary Judgment whether Johnson at one point in time insinuated that other complaints existed.

[*83]

n19 CNA's Statement of Material Facts also describes a number of other issues that arose prior to Plaintiff's July 2004 evaluation, but on which CNA does not assert Johnson relied in conducting the evaluation. These include Freedman's complaint, the Baird incident, Plaintiff's submission of a budget directly to a CNA board member, Plaintiff's e-mail to Kost, and the other miscellaneous matters. *See* Def.'s Stmt. PP 23c, 23j, and 23k. As noted above, because CNA does not proffer these incidents as legitimate, non-discriminatory reasons for Plaintiff's July 2004 evaluation, they are of no factual or legal significance. In addition, CNA identifies two issues regarding Plaintiff's performance that arose after her July 2004 evaluation, but which CNA asserts are legitimate, non-discriminatory reasons for its "treatment" of Plaintiff. These include Plaintiff's tardiness in publishing the Fall 2004 catalogue and alleged insubordination regarding posting the course offerings on the CNA website in January 2005. *See* Def.'s Mot. for Summ. J at 22. These events are of no legal consequence, however, because they clearly did not play a role in Plaintiff's July 2004 evaluation, which the Court has already determined to be the sole adverse employment action at issue.

[*84]

In response to each of CNA's proffered legitimate, non-discriminatory reasons, Plaintiff offers explanations and justifications for her behavior, or attempts to downplay the incidents at issue. However, "Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for plaintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decision maker which is relevant." *Waterhouse, 124 F. Supp. 2d at 7* (internal citation and quotation omitted). As such, Plaintiff's explanations and justifications, unsupported by factual evidence, are insufficient to demonstrate that the legitimate, non-discriminatory reasons that CNA offers for Plaintiff's July 2004 are mere pretext for a racial animus.

The Court therefore turns to considering the "ultimate question of discrimination *vel non.*" *Aikens, 460 U.S. at 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403.* As always, Plaintiff retains the "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine, 450 U.S. at 256, 101 S. Ct. 1089.* At this point,

a court reviewing summary judgment [*85] looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).

*Carter, 363 U.S. App. D.C. 287, 387 F.3d 872, 878 (D.C. Cir. 2004)* (internal citations and quotation marks omitted).

As discussed above, Plaintiff's prima facie case is extremely thin. Plaintiff establishes one adverse employment action - her July 2004 evaluation which coincided with Johnson's decision to give Plaintiff a 3% raise rather than the 5% that Johnson was authorized to give -- and, while Plaintiff frames her discrimination claims in terms of disparate treatment, she completely fails to identify any similarly situated individual who was treated differently with respect to their July 2004 evaluation and raise.

In attempting to rebut CNA's proffered legitimate, non-discriminatory reasons, Plaintiff does not adduce additional [*86] evidence from which a reasonable fact-finder could infer intentional discrimination on the part of CNA. With respect to the Kost incident, Plaintiff asserts that she "unquestionably was racially offended by the incident because she had never observed Kost interact with his fellow white colleagues in a similar hostile manner," Pl.'s Opp'n at 18-20, but offers no evidence, other than her own speculation, that Kost's behavior was motivated by a racial animus. In any event, evidence of a discriminatory animus on Kost's part, alone, would not constitute evidence of discrimination on the part of CNA because Kost did not play a role in evaluating Plaintiff. *See Hall v. Giant Food, 336 U.S. App. D.C. 63, 175 F.3d 1074, 1079-80 (D.C. Cir. 1999); Holbrook v. Reno, 339 U.S. App. D.C. 4, 196 F.3d 255, 260-61 (D.C. Cir. 1999)* (citing *Hall* for the proposition that "a supervisor's discriminatory remarks could not be considered evidence of discrimination because the decision to dismiss the employee was made not by the supervisor, but by the company's [other personnel].").

Furthermore, Plaintiff asserts that "Johnson admits that she factored [Plaintiff's] purported single negative interaction with Kost [*87] negatively into her performance evaluation of [Plaintiff], but declined to make any

reference to Kost's adverse negative and disrespectful conduct in Kost's evaluation," and that this "shows a clear different treatment of two similar employees based upon the same specific incident." Pl.'s Opp'n at 20 (citing Pl.'s Ex. F (1/12/06 Johnson Dep.) at 149, 161). This assertion is unsupported by the evidence, however, because Plaintiff's own July 2004 evaluation does not include any explicit reference to the Kost incident, or to any other incidents involving Plaintiff and her co-workers. *See* Pl.'s Ex. E (7/7/04 Valles-Hall Personnel Review Form). As such, Johnson's "factoring" of the Kost incident into Plaintiff's July 2004 evaluation - discussing it orally with Plaintiff but not specifically mentioning the incident in Plaintiff's written evaluation - actually appears to mirror Johnson's testimony that, while she did not include an explicit reference to the incident in Kost's evaluation, she was "sure" she factored the incident into Kost's evaluation. *See* Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 126:2-19. n20

> n20 The Court further notes that Plaintiff makes no attempt to show that she and Kost are similarly situated, which would require her to "demonstrate that all of the relevant aspects of their employment situation are nearly identical." *Childs-Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60, 73 (D.D.C. 2005)* (citing *Phillips v. Holladay Prop. Servs., 937 F. Supp. 32, 37 (D.D.C. 1996), aff'd Phillips v. Holladay Corp., No. 96-7202, 1997 U.S. App. LEXIS 19033, 1997 WL 411695 (D.C. Cir. Jun. 19, 1997)); Neuren v. Adduci, Mastriani, Meeks & Schill, 310 U.S. App. D.C. 82, 43 F.3d 1507, 1513-14 (D.C. Cir. 1995)), aff'd 187 Fed. Appx. 1, 2006 WL 1878891 (D.C. Cir. Jun. 27, 2006)).*

[*88]

In connection with the Sanow incident, Plaintiff asserts that Johnson's conclusion that Plaintiff's response to Sanow's e-mail was "angry and defensive" demonstrates "Johnson's application of a double-standard and stereotyping of [Plaintiff]." Pl.'s Opp'n at 20. Again, however, Plaintiff provides only her own speculation that Johnson's reaction to the incident demonstrated racial bias, and fails to rebut the record evidence demonstrating that Sanow reported the combination of Plaintiff's reply e-mail and follow-up phone call to Johnson. Pl.'s Ex. J (2/28/06 Sanow Dep.) at 35:10-16.

As Plaintiff's attempts to rebut CNA's proffered legitimate, non-discriminatory reasons fail to reveal any further evidence from which a reasonable fact-finder could infer intentional discrimination on the part of CNA, the Court next considers "'any further evidence of discrimination that may be available to the plaintiff,' as

well as 'any contrary evidence that may be available to the employer.'" *Czekalski,* Slip Op. at 13 (citing *Aka,, 156 F.3d at 1289*). In her Opposition, Plaintiff maintains that Johnson's "cultural thing" comment reveals her bias against Plaintiff, "evidenc[es] [*89] a hostility towards [Plaintiff] and her cultural identity," and demonstrates that Johnson exaggerated Plaintiff's performance problems. Pl.'s Opp'n at 23-24. As discussed above, although Johnson's "cultural thing" comment is a stray remark that does not suffice as direct evidence of discrimination, it clearly ascribes negative characteristics to Plaintiff's ethnicity or national origin and thus is probative of a discriminatory animus. However, when viewed in context and in light of Johnson's explanation of her remark at her deposition, Johnson's "cultural thing" comment appears to be an uninformed and insensitive statement rather than an intentionally discriminatory statement. *See* Def.'s Ex. 18 (Pl.'s notes of 8/6/04 meeting with Johnson) at 4; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 199:14-201:16.

Plaintiff also asserts that CNA's "faux investigation conducted by Mary Ann de Barbieri, chairperson of the Board of Directors, is further evidence of . . . [CNA's] management sanctioning of this discrimination." Pl.'s Opp'n at 26. In support of this argument, Plaintiff points to de Barbieri's admissions during her deposition that she did not investigate the truthfulness of the [*90] various complaints on which Johnson purportedly based Plaintiff's July 2004 evaluation, *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 136-37), and did not review the performance evaluations of "similarly situated white employees," *id.* (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 110-11). n21 However, as discussed above, Plaintiff's August 16, 2004 complaint to de Barbieri only asserted that "[t]he scores and process [for her July 2004 evaluation were] unfounded and biased on the basis of race, national origin and possibly, retaliation," Def.'s Ex. 13 (8/16/04 e-mail from Valles-Hall to de Barbieri), and Plaintiff did not supplement this complaint when invited to do so by de Barbieri and Johnson. As such, the relevant inquiry for de Barbieri's investigation was whether Plaintiff's co-workers had, in fact, made the complaints on which Johnson based Plaintiff's July 2004 evaluation, and whether Plaintiff experienced the same evaluation process as other CNA employees, facts that de Barbieri confirmed in her investigation. Def.'s Ex. 14 (de Barbieri Draft Report) at 1-4.

n21 Plaintiff also asserts that de Barbieri did not investigate an observation allegedly made by an unidentified African-American female former CNA employee that "[t]here is an issue with race." Pl.'s Opp'n at 26 (citing Pl.'s Ex. N (2/28/06 de Barbieri Dep.) at 100-01). However, as Plaintiff fails to identify this CNA employee or

indicate the context in which the observation was allegedly made, the Court lacks any basis on which to determine whether de Barbieri's decision not to investigate the observation is indicative of a racial animus.

[*91]

For its part, CNA asserts that it is entitled to a "same actor inference" because Johnson, who allegedly took discriminatory action against Plaintiff in the form of her July 2004 evaluation, also interviewed Plaintiff, hired her, and gave her substantial raises. Def.'s Mot. for Summ. J. at 17. While CNA describes this inference as precluding a fact-finder from finding discrimination, Plaintiff correctly notes that the same actor inference is just that, an inference, which "cannot immunize [defendant] from liability for subsequent discrimination," *Czekalski,* Slip Op. at 15. Nevertheless, in considering the ultimate question of discrimination *vel non,* the Court finds persuasive the fact that Johnson hired Plaintiff, gave her a perfect evaluation, and raised her salary to make her the third highest-paid CNA employee, all within the fourteen months before Plaintiff's July 2004 evaluation. *See Waterhouse, 124 F. Supp. 2d at 12-13* (citing "same actor inference" cases from the Second, Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits).

CNA also argues that because Plaintiff describes herself as a "woman of color" the fact that she was replaced by an [*92] African-American woman - whom CNA describes as someone within Plaintiff's protected class - cuts strongly against any inference of discrimination. Def.'s Mot. for Summ. J. at 17-18. Plaintiff's Opposition correctly notes that, despite describing herself as a "woman of color," because she identifies herself as Latino or Hispanic, Plaintiff is not a member of the same protected class as an African-American. Pl.'s Opp'n at 8 (citing *Dancy v. Am. Red Cross, 972 F. Supp. 1, 3-4 (D.D.C. 1997)*). Nevertheless, as the D.C. Circuit points to "evidence of a strong record in equal opportunity employment" as an example of "contrary evidence that may be available to the employer" *Aka, 156 F.3d at 1289,* the Court notes that just prior to Plaintiff's resignation in February 2005, the CNA Board had 13 directors - six African-Americans, six whites, and one Latino - and that CNA had a staff of 13 people - six African-Americans, six whites, and one Latina. Def.'s Stmt. PP 56-57; Def.'s Ex. 26 (4/11/06 Johnson Supp. Aff.) PP 18-19.

In sum, Plaintiff would seek to have this Court conclude that she was subject to disparate treatment discrimination on the basis of her race [*93] based on (1) the fact that she received a lower, but still positive, evaluation and a coincidentally lower raise in July 2004 than in June 2003; (2) her unfounded assertion that she

was treated differently from her white co-workers with respect to her July 2004 evaluation; (3) her claims that Johnson and de Barbieri failed to properly investigate the truth of the incidents underlying Plaintiff's July 2004 evaluation; and (4) Johnson's "cultural thing" comment. While it is clear that Plaintiff is unhappy with her professional experience at CNA, courts "have consistently declined to serve as a super-personnel department that re-examines an entity's business decisions." *Holcomb v. Powell, 369 U.S. App. D.C. 122, 433 F.3d 889, 897 (D.C. Cir. 2006)* (internal citation and quotation marks omitted); *see also Forman v. Small, 350 U.S. App. D.C. 24, 271 F.3d 285, 291 (D.C. Cir. 2001)* (stating that "consistent with the courts' reluctance to became involved in micromanagement of everyday employment decisions, the question before the court is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly."). Plaintiff has proffered a weak prima facie [*94] case, has failed to rebut CNA's legitimate, non-discriminatory reasons for her July 2004 evaluation, and has failed to adduce any additional evidence of a discriminatory intent on the part of CNA. Based on the totality of the evidence before the Court, a fact-finder could not reasonably conclude that CNA subjected Plaintiff to disparate treatment on the basis of her race. As such, the Court shall grant Defendants' Motion for Summary Judgment with respect to Counts I and VIII of Plaintiff's Amended Complaint.

*B. Plaintiff's Retaliation Claims*

Plaintiff's Complaint asserts a claim of retaliation under the DCHRA, alleging that Plaintiff complained to Johnson "about the disrespectful behavior she encountered from her coworkers" and that Johnson "thereafter, retaliated against Plaintiff in several aspects." Compl. PP 41-44. Plaintiff's Amended Complaint, which asserts a claim of retaliation under *§ 1981*, is more specific, alleging that Plaintiff engaged in statutorily protected activity when she raised incidents of disparate treatment to Johnson and de Barbieri and filed a grievance with the OHR, and that CNA retaliated against Plaintiff by lowering her performance evaluations, [*95] ignoring her claims of disparate treatment, increasing work demands on her, threatening to terminate her regarding her use of sick leave, and constructively discharging her. Am. Compl. PP 68-72. The Court shall only address Plaintiff's claim pursuant to *§ 1981* because that claim encompasses the protected activities and retaliatory actions alleged in Plaintiff's claim under the DCHRA.

"Like claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am. Univ., 331 U.S. App. D.C. 416, 151 F.3d 1090, 1094 (D.C. Cir. 1998)* (citing *McKenna v. Weinberger, 234 U.S. App. D.C. 297, 729*

*F.2d 783, 790 (D.C. Cir. 1984)).* n22 To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) a reasonable employee would have found the challenged action so materially adverse that he would have been dissuaded from making or supporting a charge of discrimination; and (3) a causal connection exists between the protected activity and the challenged action. *Rochon v. Gonzales, 370 U.S. App. D.C. 74, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006).* "An activity is 'protected' for the purposes [*96] of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'" *Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 91 (D.D.C 2006)* (quoting *Coleman v. Potomac Elec. Power Co., 422 F. Supp. 2d 209, 212-13 (D.D.C 2006)).* However, the "alleged discriminatory treatment . . . cannot be generic; rather, the plaintiff must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation." *Id.* (citing *Broderick v. Donaldson, 369 U.S. App. D.C. 374, 437 F.3d 1226, 1232 (D.C. Cir. 2006)).* Thus, "to be actionable under *§ 1981*, the retaliation must have been in response to the claimant's assertion of rights that were protected by *§ 1981*." *Hawkins, 163 F.3d at 693.*

> n22 It does not appear that the D.C. Circuit has ever clearly decided that claims of retaliation are actionable under *§ 1981. See Carney, 151 F.3d at 1094-95* (assuming without deciding that plaintiff could pursue retaliation claim under *§ 1981*). However, the Court notes that the Civil Rights Act of 1991 added a subsection to *§ 1981* defining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," *42 U.S.C. § 1981(b); see also Rivers, 511 U.S. at 300, 114 S. Ct. 1510,* and that "in the aftermath of the 1991 Act, a number of courts have concluded that certain retaliatory discharge claims are actionable under *§ 1981*," *Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir. 1998).*

[*97]

Furthermore, the Supreme Court recently clarified in *Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 165 L. Ed. 2d 345,* that, because Title VII's retaliation and discrimination provisions are not "coterminous," *id. at 2414,* the anti-retaliation provision of Title VII is "not limited to discriminatory actions that affect the terms and conditions of employment," *id. at*

2412-13. In so doing, however, the Supreme Court emphasized that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id. at 2414.* Moreover, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id. at 2415.* It is therefore "important to separate significant from trivial harms," *id.,* and to recognize that "the significance of any given act of retaliation will often depend upon the particular circumstances," *id. at 2415-16.*

Here, Plaintiff points to five separate instances [*98] in which she "lodged formal complaints of discrimination or otherwise participated in protected speech." Pl.'s Opp'n at 27. These include: (1) Plaintiff's conversations with CNA Vice-Chairman Tim Kime in 2004, during which Plaintiff alleges she told Kime that Ransom was being treated in a discriminatory way and that Plaintiff was caught in the cross-hairs; (2) Plaintiff's August 4, 2004 letter to Johnson complaining that she believed her July 2004 evaluation and raise to be the result of disparate treatment; (3) the charge of discrimination that Plaintiff filed with the OHR on August 9, 2004; (4) Plaintiff's August 16, 2004 e-mail to de Barbieri asserting that Plaintiff's July 2004 evaluation was unfounded and biased and requesting an investigation; and (5) Plaintiff's participation in the mediation of her OHR complaint on February 11, 2005. Pl.'s Opp'n at 27-29.

Plaintiff also asserts that five separate actions taken by CNA amount to materially adverse actions under the standard announced in *Burlington.* Pl.'s Opp'n at 30. These include: (1) penalizing Plaintiff in her July 2004 evaluation "for conduct relative to internal disputes and job performance for which her white [*99] counterparts were not penalized;" (2) subjecting Plaintiff to a different standard than her white counterparts and threatening Plaintiff with termination for taking medical leave during the Fall of 2004; (3) refusing to conduct a meaningful investigation into Plaintiff's allegations of racial bias (presumably in connection with the de Barbieri investigation in the Fall of 2004); (4) at some unspecified time and in an unspecified manner, altering Plaintiff's job duties so as to impose more arduous tasks upon her; and (5) constructively discharging Plaintiff during the weekend of February 12-13, 2005 by locking her out of the CNA building and denying her remote access to CNA's computer system and voicemail. Pl.'s Opp'n at 30-31.

Plaintiff fails, however, to establish a prima facie case of retaliation, either because she cannot demonstrate a materially adverse action, or because she fails to identify the requisite causal connection between her protected activity and CNA's allegedly retaliatory actions. First, Plaintiff asserts that her April 2004 complaint to Kime

that her co-worker, Ransom, was being treated in a discriminatory manner was followed closely in time by her July 2004 evaluation [*100] and 3% raise. Pl.'s Opp'n at 31-32. As the Court concluded above, the combination of Plaintiff's July 2004 evaluation and raise would constitute a materially adverse action; nevertheless, Plaintiff fails to rebut CNA's assertion that Johnson did not know of Plaintiff's complaint to Kime prior to this litigation. Def.'s Reply at 8; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 22:16-21. As such, Plaintiff fails to establish the requisite causal connection between her protected activity and the materially adverse action. *See Carney,* 151 F.3d at 1095 ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse [] action took place shortly after that activity.") (citing *Mitchell,* 759 F.2d at 86). n23

n23 Plaintiff also asserts that, in addition to complaining to Kime regarding the Post Award management change, by the time of her July 2004 evaluation, Plaintiff had complained to Johnson regarding the Kost incident and Baird's offensive conduct towards the African-American volunteer. Pl.'s Opp'n at 31-32. However, Plaintiff's complaints regarding these incidents do not constitute protected activity because Plaintiff has not shown that it was objectively reasonable for her to believe that she was opposing an employment practice that was violative of either the DCHRA or *§ 1981. See Welzel v. Bernstein,* 436 F. Supp. 2d 110, 120-21 (D.D.C. 2006). As discussed above, Plaintiff offers nothing other than her own speculation that either Kost or Baird's behavior was motivated by a racial animus. Moreover, even if Kost or Baird acted in a racially offensive manner, Plaintiff could not reasonably believe that stray remarks or isolated actions on the part of non-decisionmakers constituted unlawful employment discrimination. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271-272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (plaintiff's complaints not protected activity where "[n]o reasonable person could have believed that the single incident [in question] violated Title VII's standard.").

[*101]

Plaintiff asserts that her next three protected activities - her August 2004 complaints to Johnson, OHR, and de Barbieri regarding her July 2004 evaluation n24 - were followed shortly by Johnson's November 2004 inquiry into Plaintiff's absences due to alleged illness and demand for a doctor's note, practices to which, Plaintiff

asserts, no other CNA employee was subjected. Pl.'s Op-p'n at 32. However, as discussed above, Plaintiff does not identify any other CNA employee who was treated differently with respect to medical leave, and Johnson was entirely authorized under the CNA Personnel Handbook to request that Plaintiff provide a doctor's note regarding her excessive absences. Moreover, even if Plaintiff is correct that Johnson threatened to terminate Plaintiff for her use of sick leave, that threat was not carried out, and did not produce an injury or harm. As such, it does not constitute a materially adverse action. *See Burlington, 126 S. Ct. at 2414-15* ("[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

n24 Johnson was obviously aware of Plaintiff's August 2004 complaint to Johnson herself, and was also aware of Plaintiff's August 2004 complaint to de Barbieri because de Barbieri interviewed Johnson during the Fall of 2004 in connection with her investigation of Plaintiff's complaint. However, as noted above, Plaintiff does not contest CNA's assertion that Johnson did not learn of Plaintiff's OHR charge until December 2004, when CNA was served with notice of the charge. Def.'s Stmt. P 37; Def.'s Ex. 1 (1/4/06 Valles-Hall Dep.) at 151:13-18; Def.'s Ex. 23 (1/12/06 Johnson Dep.) at 127:2-8. As a result, Plaintiff cannot demonstrate that any actions Johnson took prior to December 2004 were in retaliation for Plaintiff's filing of her OHR complaint.

[*102]

Plaintiff also identifies as materially adverse actions CNA's alleged refusal to meaningfully investigate Plaintiff's claims of racial bias with respect to her July 2004 evaluation and CNA's alleged tasking of Plaintiff with more arduous duties. However, as discussed above, Plaintiff fails to provide any specification as to her allegedly altered job duties, or to demonstrate that de Barbieri's investigation was insufficient with regards to Plaintiff's actual complaint. Moreover, Plaintiff makes no attempt to link either of these alleged materially adverse actions to any of Plaintiff's protected activities, and the Court declines to engage in speculation as to what causal connections Plaintiff believes exist.

Finally, Plaintiff asserts that CNA retaliated against her immediately following the February 11, 2005 mediation by locking her out of the CNA offices and denying her remote access to CNA's computer system and voice-mail during the February 12-13 weekend. However, as discussed above, Plaintiff has proffered no evidence that she was aware of the lockout and, in fact, the evidence

demonstrates that she did not learn that she had been purposefully locked out until after she resigned [*103] her employment with CNA on February 14, 2005. As Plaintiff appears to have been entirely unaware of the lockout, she cannot claim that she suffered an injury or harm as a result, and therefore cannot demonstrate a materially adverse action on the part of CNA. n25

n25 Plaintiff emphasizes that CNA employees testified that they were instructed to lock Plaintiff out of the CNA building over the February 12-13 weekend because the mediation had gone poorly. *See* Pl.'s Opp'n at 32-33. However, as Plaintiff cannot demonstrate that the February 12-13 lockout constituted a materially adverse action, her emphasis on the causal connection between the mediation and the lockout is of no legal consequence.

The Court therefore concludes that Plaintiff cannot establish a prima facie case of retaliation. Moreover, even if the Court were to assume, *arguendo*, that Plaintiff could make out a prima facie case of retaliation, Plaintiff could not avoid summary judgment on her retaliation claims for the same reasons that are [*104] fatal to her discrimination claims. Plaintiff fails to demonstrate that CNA's legitimate, non-retaliatory reasons for its treatment of Plaintiff are pretext, nor does she proffer additional evidence from which a reasonable fact-finder could infer a retaliatory motive on the part of CNA. In sum, as with her discrimination claims, Plaintiff cannot bear her "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine, 450 U.S. at 256, 101 S. Ct. 1089*. As no reasonable trier of fact could conclude that CNA retaliated against Plaintiff for any of her complaints alleging race discrimination with respect to her assignments or evaluations, Counts III and VII of Plaintiff's Complaint and Amended Complaint cannot survive Defendants' Motion for Summary Judgment.

**IV: CONCLUSION**

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary Judgment in its entirety. An appropriate Order accompanies this Memorandum Opinion.

Date: March 12, 2007

COLLEEN KOLLAR-KOTELLY

United States District Judge

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 12th day [*105] of March, 2007, hereby

**ORDERED** that [9] Defendant's Motion for Summary Judgment is GRANTED in its entirety; it is also

**ORDERED** that the instant case is DISMISSED in its entirety.

**SO ORDERED.**

*This is a final, appealable order.*

COLLEEN KOLLAR-KOTELLY

United States District Judge

LEXSEE 2006 US DIST LEXIS 13022





Analysis
As of: May 29, 2007

**PAMELA JOHNSON, Plaintiff, v. DONG MOON JOO, THE WASHINGTON TIMES CORP., and NEWS WORLD COMMUNICATIONS, INC., Defendants.**

**Civil Action No. 01-0004 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 13022*

**March 12, 2006, Decided**
**March 12, 2006, Filed**

**PRIOR HISTORY:** *Johnson v. Wash. Times Corp., 208 F.R.D. 16, 2002 U.S. Dist. LEXIS 10885 (D.D.C., 2002)*

**COUNSEL:** [*1] For PAMELA JOHNSON, Plaintiff: Michael Gerard Kane, David Robert Cashdan, CASHDAN & KANE, PLLC, Washington, DC.

For DONG MOON JOO, THE WASHINGTON TIMES CORP., NEWS WORLD COMMUNICATIONS, INC., Defendants: Allen Vern Farber, GARDNER CARTON & DOUGLAS, LLP, Washington, DC.

For THE HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF WORLD CHRISTIANITY, Movant: Frederick Wilson Chockley, BAKER & HOSTETLER, L.L.P., Washington, DC.

For THE UNIFICATION CHURCH INTERNATIONAL, INC., Movant: Stephen Craig Leckar, BUTERA & ANDREWS, Washington, DC.

For JAMES BORER, LES REDDIN, Movants: Allen Vern Farber, GARDNER CARTON & DOUGLAS, LLP, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

**MEMORANDUM OPINION**

(March 12, 2006)

Plaintiff, a former employee in The Washington Times' Department of Human Resources, brings the above-captioned action against Defendant News World Communications, Inc. ("Defendant"), n1 pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.*, as amended ("Title VII"), alleging, *inter alia*, that she was subjected to (1) discrimination based on her [*2] race, African-American, and her religion, on the basis that she was not a member of the Holy Spirit Association for the Unification of World Christianity ("The Unification Church"); and (2) retaliation for her prior use of the Equal Employment Opportunity ("EEO") process. *See generally* Compl. Plaintiff's action centers around two events: (1) the March 1998 decision by Defendant to provide her with a raise of only 3%, which she contends was insufficient when compared to her similarly-situated co-workers; and (2) the October 1998 decision by Defendant to terminate Plaintiff's employment due to numerous alleged breaches of confidentiality and failure to cooperate in the ensuing investigation -- justifications that she contends are a pretext for invidious discrimination. In response, Defendant asserts that it has articulated legitimate, non-discriminatory reasons for its decisions, and Plaintiff has failed to adduce evidence indicating that the stated reasons are merely a pretext for discrimination.

n1 Pursuant to *Federal Rule of Civil Procedure 41(a)*, Plaintiff stipulated to the dismissal with prejudice of Defendants Dong Moo Joo and The Washington Times Corporation on October

4, 2004. *See* 10/4/04 Written Stipulation of Dismissal at 1 (Docket Entry # 113). Accordingly, News World Communications, Inc., is the only remaining defendant in this action.

[*3]

Currently before the Court are Defendant's Motion for Summary Judgment, Plaintiff's Opposition, and Defendant's Response. Upon a searching examination of the parties' filings, the attached exhibits, the relevant case law, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment.

## I: BACKGROUND

### A. Johnson is Hired by The Washington Times

Defendant News World Communications, Inc., has operated and published The Washington Times newspaper since 1982. *See* Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) P 4. News World Communications and The Washington Times have some connection to The Unification Church; for instance, the founder of the Washington Times, the Reverend Dr. Sun Myung Moon, is also the spiritual leader of the Unification Church, while the current President of News World Communications, Dong Moon Joo, is a longtime member of The Unification Church. *See* Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 93:15-94:19; *id.*, Ex. 8 (9/26/01 Joo Dep.) at 4:17-6:10, 78:5-78:11. Moreover, Unification Church documents identify The Washington Times as a "Department" of The Unification Church, and recognize News World Communications' Chief [*4] Operating Officer, Keith Cooperrider, as a "Contact Person." *See id.*, Ex. 21 (Unification Church Departments/Contact Persons Document); *id.*, Ex. 4 (9/26/01 Edwards Dep.) at 15:2-3. However, while The Washington Times has some ties to The Unification Church, only approximately 17% of News World Communications employees were members of The Unification Church during the time period relevant to this suit -- October 1998. *See* Pl.'s Opp'n, Ex. 19 (Spreadsheet Based on 10/1998 Staff Directory) (based on member lists and testimony, estimating that 110 of the 645 News World Communications employees listed in the staff directory were members of The Unification Church).

Plaintiff Pamela T. Johnson, nie Pamela L. Tippins, is an African-American female who is not and has never been a member of The Unification Church. *See* Pl.'s Opp'n, Ex. 1 (Johnson Aff.) PP 3-4; *id.*, Ex. 62 (Pl.'s 4/24/98 EEOC Charge) P III (identifying herself as a Protestant); *id.*, Ex. 63 (Pl.'s 11/17/98 Amended EEOC Charge) P III. Plaintiff submitted an Application for Employment to Defendant in July 1989, seeking a "Personnel Assistant" position with The Washington Times. *See* Def.'s Stmt. of Mat. [*5] Facts Not in Dispute ("Def.'s Stmt.") P 1; Pl.'s

Stmt. of Mat. Facts in Dispute Revised Per the Court's July 11, 2005 Order ("Pl.'s Resp.") P 1. n2 In the "Special Skills and Qualifications" portion of her Application for Employment, Plaintiff noted that she has "an absolute understanding of confidentiality requirements imposed by statutory and regulatory constraints." Def.'s Stmt. PP 2-3; Pl.'s Resp. PP 2-3. Plaintiff listed confidentiality as a "special skill and qualification" on her application because she recognized the importance of confidentiality in a company's Department of Human Resources. Def.'s Stmt. P 4; Pl.'s Resp. P 4. Following an interview process, Plaintiff was hired as a Personnel Assistant in the Human Resources Department of The Washington Times effective August 23, 1989. Def.'s Stmt. P 5; Pl.'s Resp. P 5. On Plaintiff's "Confidential Employee History" maintained by Defendant, "confidentiality" is listed as one of Plaintiff's "special skills or training" valued by the company. Def.'s Stmt. P 6; Pl.'s Resp. P 6.

n2 The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)). As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Contrary to Local Civil Rule 56.1, Plaintiff, in initially responding to Defendants' Statement of Material Facts Not in Dispute, failed to provide "a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." LCvR 56.1 (emphasis added). Rather than admitting, denying, or denying-in-part/ admitting-in-part each statement set out by Defendant in corresponding numbered paragraphs and supporting each response through citations to the record, as required by Local Civil Rule 56.1 and this Court's July 24, 2004 Scheduling and Procedures Order, Plaintiff's initial Statement (1) peppered her filing with argument, speculation, conjecture, and assumptions that -- while possibly proper in her accompanying Opposition -- were not proper in the context of Plaintiff's Response to Defendant's Statement; and (2) frequently provided responses to Defendant's Statement that were entirely devoid of direct citations to the evidence adduced during dis-

covery. Accordingly, through a July 11, 2005 Minute Order, the Court granted-in-part Defendant's Motion to Strike, and gave Plaintiff leave to re-file a new Statement of Material Facts and Opposition to Defendant's Motion for Summary Judgment. *See Johnson v. Joo*, Civ. No. 01-0004 (D.D.C. July 11, 2005) (Minute Order striking Plaintiff's Statement of Material Facts but denying Defendant's motion to deem all facts admitted).

On September 30, 2005, Plaintiff submitted a new Opposition and accompanying Statement of Material Facts in Dispute, which represents a substantial improvement over the previous Statement. However, taking issue with certain responses, Defendant filed another Motion to Strike on October 14, 2005, to which Plaintiff has filed an Opposition, and Defendant has filed a Reply. Specifically, Defendant takes issue with Plaintiff's Responses PP 60, 73, 138, 139, 141-144, 146, 147, 150-155, 157-163, 165, 166, 181, 182, 184, 186, 187, 190, 192-198, and 203-205. *See* Pl.'s Second Mot. to Strike at 5. In response to these specific Statements, which revolve around the testimony of James A. Borer, Plaintiff contends that the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*, forecloses the Court from considering or crediting the testimony of "an interested witness" at the summary judgment stage of an employment discrimination dispute. *See, e.g.*, Pl.'s Resp. P 60.

As has been held by other Circuits, Plaintiff is guilty of "over-reading" *Reeves. See, e.g., Almond v. ABB Indus. Sys., Inc., 56 Fed. Appx. 672, 675 (6th Cir. 2003)* ("this interpretation of the summary judgment standard both over-reads *Reeves* and leads to absurd consequences"); *Traylor v. Brown, 295 F.3d 783, 791 (7th Cir. 2002)* ("consistent with plaintiff's ultimate burden of proof under *McDonnell Douglas*, a plaintiff cannot avoid summary judgment by merely claiming a jury could disbelieve the employer's reason"); *Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 898 (5th Cir. 2002)* (noting that this erroneous interpretation would essentially eliminate the plaintiff's burden to show that an employer's explanation is pretextual). While these responses provided by Plaintiff are ill-advised and the purpose of Rule 56.1 was to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Jackson v. Finnegan,*

*101 F.3d 145, 151, 322 U.S. App. D.C. 35*, the Court shall not strike Plaintiff's new Statement. Rather, the Court shall work around any issues by carefully parsing the record and both sets of "Material Facts Not in Dispute" and citing directly to the record whenever necessary during its outlining of the background of this dispute. Accordingly, the Court shall deny Defendant's Second Motion to Strike.

[*6]

### B. The Scope and Attendant Obligations of Plaintiff's Employment

Less than one (1) month after her employment began with The Washington Times, Plaintiff received the company's "Employee Handbook." Def.'s Stmt. P 7; Pl.'s Resp. P 7. As specified in the "Acknowledgment" that she signed upon receiving the Handbook, Plaintiff agreed to become familiar with the contents of the Handbook, and understood that she had a right and the ability to ask her supervisor or a representative of the Human Resources Department for further information on any subject in the Handbook. Def.'s Stmt. P 8; Pl.'s Resp. P 8. While employed at The Washington Times, Plaintiff was familiar with the Handbook and knew that she was to conduct herself consistent with the Handbook. Def.'s Stmt. P 9; Pl.'s Resp. P 9. Through the Handbook and the knowledge she gained while serving in The Washington Times' Human Resources Department, Plaintiff was aware that the company had a policy against discrimination on any basis, including race, religion, gender, or otherwise, and was familiar with the grievance/complaint procedure described in the Handbook. Def.'s Stmt. PP 10-11; Pl.'s Resp. PP 10-11. Indeed, Plaintiff as part [*7] of her responsibilities in the Human Resources Department -- participated in instructing employees to submit grievances if they believed they were subject to any type of discrimination. Def.'s Stmt. P 12; Pl.'s Resp. P 12. During Plaintiff's time at The Washington Times, one of her Department's responsibilities was to ensure that there was no discrimination at the newspaper, and the offices themselves contained posters describing applicable EEOC policies. Def.'s Stmt. PP 13-14; Pl.'s Resp. PP 13-14. Plaintiff was aware that the Human Resources Department would conduct an investigation of a complaint of discrimination, and others within her Department believed that complaints of discrimination were taken seriously, looked into, and investigated thoroughly. Def.'s Stmt. PP 15-16; Pl.'s Resp. PP 15-16.

In the Human Resources Department, Plaintiff's obligations included, *inter alia*, confidentiality, candor, and cooperation. Confidentiality was seen as a critical obligation, as many of the documents located within the department constituted "confidential personnel informa-

tion." Def.'s Stmt. PP 32 35; Pl.'s Resp. PP 32, 35. Employees such as Plaintiff within the Human Resources Department [*8] had a duty to maintain the confidentiality of confidential Human Resources Department records. Def.'s Stmt. PP 33, 38 (Plaintiff agrees that having access to confidential documents and information is a position of trust); Pl.'s Resp. PP 33, 38. Employees within the Human Resources Department, including Plaintiff, were not authorized to mail out or otherwise distribute personnel records unless authorized by the Director of the Human Resources Department. Def.'s Stmt. P 34; Pl.'s Resp. P 34. One of Plaintiff's duties included maintaining the confidentiality of the Human Resources Department. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 256:12-21. Of all the actions that a Human Resources Department employee could do that would result in discipline, violation of the obligation of confidentiality was considered to be the most reprehensible; if an employee in the Department gave someone outside of the Department confidential documents or otherwise breached confidentiality, that employee had committed an offense meriting termination. Def.'s Stmt. PP 37, 39, 46-47 (in her handwritten notes as part of the orientation process, Plaintiff noted that disclosure of confidential information [*9] would lead to discharge); Pl.'s Resp. PP 37, 39, 46-47. Indeed, Plaintiff herself testified that she had no doubt that breach of The Washington Times' confidentiality provisions or her violation of confidentiality could lead to the termination of her employment with the company. Def.'s Stmt. P 40; Pl.'s Resp. P 40.

With respect to candor and cooperation, The Washington Times had the right to expect that Plaintiff, in her positions with the Human Resources Department, would provide accurate information to it about any personnel issue or investigation about which it inquired. Def.'s Stmt. P 41; Pl.'s Resp. P 41. As part of her personnel functions, Plaintiff provided employment verifications periodically to requesting banks, mortgage companies, and others. Def.'s Stmt. P 42; Pl.'s Resp. P 42. In issuing such verifications, Plaintiff was aware that accuracy was essential and that only correct information should be provided. Def.'s Stmt. P 43; Pl.'s Resp. P 43. Similar to a breach of confidentiality, Plaintiff was aware that if an employee in the Human Resources intentionally provided inaccurate information in an employment verification, that action constituted grounds for discipline, [*10] including termination. Def.'s Stmt. P 44; Pl.'s Resp. P 44.

*C. Plaintiff's Positions, Duties, and Raises at The Washington Times*

Plaintiff progressed through the ranks of The Washington Times' Human Resources Department, with her title changing from "Personnel Assistant" to "Records Assistant" as of January 1990, to "Human Resources Assistant" as of August 19, 1991, and to "Human Resources Information System Specialist" ("HRIS Specialist") as of September 30, 1991. Def.'s Stmt. P 17; Pl.'s Resp. P 17. In November 1997, at the request of her supervisor James A. Borer, Plaintiff prepared an updated job description of the HRIS Specialist position, and again noted that the "major responsibilities" of the position included "maintaining confidential status of all company information." Def.'s Stmt. PP 18-19; Pl.'s Resp. PP 18-19. Plaintiff remained an HRIS Specialist at The Washington Times until October 29, 1998, when she was terminated by Borer and her employment at the newspaper ended. Def.'s Stmt. P 20; Pl.'s Resp. P 20.

Upon the commencement of her employment with The Washington Times in August 1989, Plaintiff was paid $ 8.66 per hour. Def.'s Stmt. P 21; Pl.'s Resp. P 21. However, [*11] Plaintiff was given numerous raises during her eight-year tenure with the newspaper:

| Date | New Rate | Percentage Increase |
|------|----------|---------------------|
| August 23, 1989 | $ 8.66/ hour | |
| January 15, 1990 | $ 9.62/ hour | 11.08% |
| Janu | $ | 3.95 |

2006 U.S. Dist. LEXIS 13022, *

| Date | New Rate | Percentage Increase |
|------|----------|---------------------|
| ary 15, 1991 | 10.00/hour | % |
| August 19, 1991 | $461.54/week | 15.39% |
| November 1, 1992 | $507.70/week | 10.00% |
| August 19, 1993 | $527.28/week | 3.85% |
| August 23, 1994 | $543.10/week | 3.00% |
| August 19, 1995 | $553.96/week | 2.03% |
| August 19, 1996 | $570.58/week | 3.00% |
| August 19, 1997 | $587.70/week | 3.02% |
| February 27, 1998 | $14.70/hour | |
| March 23, 1998 | $15.14/hour | 3.05% |

*See* Def.'s Stmt. P 22; Pl.'s Resp. P 22 (making some corrections that the Court has used). During the course of her employment, Plaintiffs salary increased by 74.8%

(not adjusted for inflation). Def.'s Stmt. P 23; Pl.'s Resp. P 23.

*D. The Human Resources Department and Other Employees*

Geoffrey Edwards was the General Manager of The Washington Times from October 1994 until the end of 1999/early 2000. Def.'s Stmt. P 48; Pl.'s Resp. P 48 (not contesting that this was Edwards' undisputed testimony). Edwards had experience running newspapers from 1965 to 1999, and ran all aspects of the [*12] newspaper except the editorial and financial parts of the paper. Def.'s Stmt. PP 49-50; Pl.'s Resp. PP 49-50 (not contesting that this was Edwards' undisputed testimony). Edwards was not -- and has never been -- a member of The Unification Church. Def.'s Stmt. P 51; Pl.'s Resp. P 51. Ronald Clarke was the Manager of Safety, Security, and Workers Compensation at The Washington Times from 1989 until after 1998. Def.'s Stmt. P 58; Pl.'s Resp. P 58. Clarke was responsible for managing the Security Department, among other things. Def.'s Stmt. P 59; Pl.'s Resp. P 59. Clarke testified that he was not -- and has never been -- a member of The Unification Church. Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 138-39.

By late 1996, The Washington Times' Human Resources Department consisted of John Martin, who was then Legal Counsel and Director of the Human Resources Department; James Borer, who was Deputy Legal Counsel and Martin's Assistant; Plaintiff, who was the HRIS Specialist; Sherrie D. Palmer, who was then the Employment Specialist; Les Reddin, who was the Benefits Specialist; and Sheletha Howard, who was the Secretary. Def.'s Stmt. P 52; Pl.'s Resp. P 52 (agreeing on the [*13] listing of personnel and their job titles). Martin is a white male who is not apparently a member of The Unification Church; n3 Borer is a white male who has testified that he is a member of both the Catholic Church and The Unification Church; Palmer is an African-American female who is not a member of The Unification Church; Reddin is a white male who testified that he is a member of The Unification Church; and Howard is an African-American female who is not a member of The Unification Church. Id. n4 Plaintiff was and remains friends with Palmer. Def.'s Stmt. P 57; Pl.'s Resp. P 57.

n3 Borer has stated that he did not believe that Martin was a member of The Unification Church, see Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) P 11, and Plaintiff has introduced no evidence suggesting that Martin was a member. A review of The Unification Church membership lists attached by Plaintiff shows that these lists do not contain Martin. See Pl.'s Opp'n, Exs. 19-23. Accordingly, the only evidence in the record indicates that Martin was not a Unification Church member.

n4 According to Borer, Defendant neither obtained any information from employees about their religious affiliation, membership, or beliefs, if any, nor did it maintain any records reflecting such information. See Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) P 10. According to Defendant, the information as to religious affiliation and/or membership described above is based on the testimony elicited during depositions taken by Plaintiff of individual employees of which Plaintiff inquired as to that employee's religious affiliation. Id. Plaintiff does not dispute Defendant's contention that it did not maintain such records. See Pl.'s Resp. P 52. However, Plaintiff contends that Defendant -- or, at the very least, Borer -- knew that Reddin was a member of The Unification Church and would have known by the date of Plaintiff's April 1998 EEOC Charge that she was not a member. Id. Plaintiff also contends that Borer could have located such information with ease, given that he maintained a Unification Church membership directory in his home and attended church regularly. Id.

[*14]

E. Changes Within the Human Resources Department and the Struggle for Raises

In the Fall of 1996, Ms. Howard -- the Human Resources Department's secretary -- left her job on an emergency, unexpected basis. Def.'s Stmt. P 61; Pl.'s Resp. P 61. Initially, Howard was out on a leave of absence; however, her employment with The Washington Times was terminated in January 1997 as a result of her absence without explanation for three (3) consecutive days after she was to have returned. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 122:13-123:2. Following her termination, Howard filed a lawsuit alleging wrongful discrimination with the District of Columbia Office of Human Rights in 1997. Def.'s Stmt. P 66; Pl.'s Resp. P 66. That same year, 1997, John Martin, who had been Legal Counsel and Director of Human Resources at The Washington Times, left the newspaper to pursue other opportunities. Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) P 2. James A. Borer, formerly Deputy Legal Counsel and Martin's Assistant, succeeded Martin and became the company's Legal Counsel and Director of Human Resources. Id.

By 1998, the other members of The Washington Times' Department of Human [*15] Resources -- Reddin, Palmer, and Plaintiff -- began indicating dissatisfaction with their salaries and requesting corresponding raises. Beginning in January 1998, Reddin began threatening resignation, contending that "the Employment Specialist position [Palmer's position] has been reduced

to a mere clerical job" while his position as Benefits Specialist "has been increased from clerical to managerial without any corresponding increase in compensation to make the increased aggravation attractive to endure." Def.'s Mot. for Summ. J., Ex. 15 (1/19/98 Reddin Memo to Dong Moon Joo) at 1. In three separate "memos," Reddin set forth his view that he was underpaid based on his duties and responsibilities, and that he should be paid more based on what he believed to be the market for employees similarly-situated with corresponding duties and responsibilities. See id., Ex. 15 (1/19/98 Reddin Memo to Dong Moon Joo); id., Ex. 16 (2/12/98 Reddin Memo to Edwards); id., Ex. 17 (3/4/98 Reddin Memo to Dong Moon Joo) (announcing resignation effective 3/18/98). On January 16, 1998, Reddin prepared and submitted an extensive, highly detailed "Job Description" setting forth that which he [*16] considered to be the duties and responsibilities of the Benefits Specialist. See Pl.'s Resp. P 70 (contending that "Defendant provides no record evidence that the attached Job Description was prepared by Mr. Reddin. . . ."); but see Def.'s Mot. for Summ. J., Ex. 18 (1/16/98 Reddin Job Description) ("Prepared by: Les Don Reddin"); id., Ex. 1 (Borer Aff.) P 12 ("That which is attached hereto to [sic] the Statement as Exhibit 18 is a true and accurate copy of a proposed job description submitted by Les Reddin to me in response to my request that he prepare and provide such a job description.").

In these documents, Reddin claimed responsibility for, among other things, benefit plans pertaining to sick schemes, cafeteria schemes, pension plans, and 401(k) plans. Def.'s Stmt. P 71; Pl.'s Resp. P 71 (citing Plaintiff's deposition testimony indicating that she would often answer employee questions about these areas because the Department was short of staffing). Reddin also noted that he was the Benefit Specialist responsible for administering a budget for benefits of roughly $ 3 million. Def.'s Stmt. P 72; Pl.'s Resp. P 72 (noting again Plaintiff's role). General Manager Edwards [*17] reviewed Reddin's arguments for a raise and, based on Reddin's duties and responsibilities, came to the conclusion that Reddin's salary should be increased. See Def.'s Mot. for Summ. J., Ex. 12 (9/26/01 Edwards Dep.) at 34:10-18, 35:3-10. Edwards relayed this conclusion to the President of The Washington Times, Dong Moon Joo, and convinced Joo of the merits of Reddin's request. Id. at 34:34:10-35:2. Borer also reviewed Reddin's request, and concluded that Reddin's "responsibilities seemed quite large to me. And he seemed to be handling them well." Id., Ex. 9 (7/10/01 Borer Dep.) at 227:5-7. As such, he requested that Palmer, in her capacity as Employment Specialist, provide him with a compensation survey. Id. at 227:7-13. Palmer eventually provided Borer with such a survey, though the information provided was put out by the Washington Personnel Association and was several years

old at the time. Id. at 227:14-228:4. Upon "looking at [Reddin's] duties and tasks and responsibilities and consulting with the employment specialist and the survey," Borer also recommended that Reddin receive a raise. Id. at 227:9-13.

Reddin's salary request was partially met with [*18] a raise in early February 1998; however, the raise fell below Reddin's expectations and he again threatened resignation. See id., Ex. 16 (2/12/98 Reddin Memo to Edwards). In response to this second request for a raise, Edwards agreed with Reddin's request, id., Ex. 12 (9/26/01 Edwards Dep.) at 45:14-15 (Edwards recalls his support for Reddin's second request, but notes that he cannot remember if he spoke to Joo regarding this request). Edwards determined an appropriate additional raise for Reddin based on his "experience of what other people were making" in The Washington Times" who were "in responsible administrative positions." Id. at 47:11-23. Ultimately, Reddin's second request was granted as well, and -- through his two 1998 raises -- his salary was increased from $ 29,790, see id., Ex. 15 (1/19/98 Reddin Memo to Joo), to $ 38,500, Def.'s Stmt. P 81; Pl.'s Resp. P 81; see also Def.'s Mot. for Summ. J., Ex. 22 (Personnel Action Form for Les Reddin) (noting new salary of $ 38,500 effective 3/23/98, which was a raise of $ 72.53/week, an 11% increase). During depositions in this case, Plaintiff herself agreed that $ 38,500 was a fair salary for an employee, a [*19] Benefits Specialist such as Reddin, who administered a multi-million dollar benefits program. Def.'s Stmt. P 82; Pl.'s Resp. P 82.

Following Reddin's raises, Plaintiff and Palmer submitted a joint Memorandum to Joo requesting "Salary Adjustments." Def.'s Stmt. P 83; Pl.'s Resp. P 83; Def.'s Mot. for Summ. J., Ex. 19 (3/12/98 Johnson & Palmer Memo to Joo). Noting their increased responsibilities in the Human Resources Department over the previous years, Plaintiff and Palmer noted: "Our last hope is a promotion or this raise; Employment Specialist $ 40,520.86 and HRIS Specialist $ 35,657.87, which is well below market value of Employment Specialist $ 65,000 and HRIS Specialist $ 39,000 (1996 survey) for similar positions in similar size companies." Def.'s Mot. for Summ. J., Ex. 19 (3/12/98 Johnson & Palmer Memo to Joo). Joo responded to Plaintiff and Palmer through a Memorandum dated March 17, 1998, in which he suggested that they address the issue with their supervision, Borer, and with Edwards. Def.'s Stmt. PP 84-85; Pl.'s Resp. PP 84-85. Plaintiff and Palmer then drafted a March 18, 1998 Memorandum to both Edwards and Borer regarding "Salary Adjustments," in which they noted Joo's [*20] request to communicate with them and contended that, due to their salary level, "our motivation has declined, especially since the cost of living is on the

rise and we are not making enough to cover the basics for our families." Pl.'s Opp'n, Ex. 59 (3/18/98 Johnson & Palmer Memo to Edwards & Borer). Throughout the years prior to this request, Plaintiff had regularly received complimentary performance evaluations, and her most recent review stated, "Pam's work continues to be accurate, thorough and completed in a dependable fashion." *Id.*, Ex. 16 (Johnson's 1997 Performance Evaluation); *see also id.*, Exs. 11-16 (1990, 1992, 1994, 1995, and 1996 Johnson Performance Evaluations).

After consulting with Borer, The Washington Times gave Palmer a raise, effective March 23, 1998, of $ 72.53 per week. Def.'s Stmt. P 86; Pl.'s Resp. P 86. This increase constituted a raise of 11% over her base salary, and brought Palmer's salary to $ 38,500. *Id.* The terms, effective date, percentage increase, and final salary provided to Palmer were identical to the terms, effective date, percentage increase, and final salary provided to Reddin. *Compare* Def.'s Mot. for Summ. J., Ex. 21 (Personnel [*21] Action Form for Sherrie Palmer) *with id.*, Ex. 22 (Personnel Action Form for Les Reddin); *see also* Def.'s Stmt. P 89; Pl.'s Resp. P 89. Like Reddin, Palmer was entitled to receive an additional $ 1,500.00 in reimbursement for tuition for educational pursuits, bringing her total increase to 15% over her prior year's base salary. *Id.*; *see also* Def.'s Stmt. PP 87, 89; Pl.'s Resp. PP 87, 89. Joo signed off on the raise for Palmer, just as he had signed off on the raises for Reddin. Def.'s Stmt. P 88; Pl.'s Resp. P 88.

With respect to Plaintiff, Edwards and Borer conferred, with Edwards initially noting that he was not planning on providing Plaintiff a raise. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 237:15-19. However, Borer "wanted something for her" because he "wanted something for everybody" in the Human Resources Department. *Id.* at 237:19-20. Accordingly, Borer advocated for a 3% raise for Plaintiff, "which was 3 percent more than anybody else [he] knew of had in mind." *Id.* at 237:9-14. Edwards then agreed that "the 3 percent -- if [Plaintiff] got 3 percent, it was adequate . . . because that's the sort of semi-cost of living arrangement. [*22]" *Id.*, Ex. 12 (9/26/01 Edwards Dep.) at 57:13-22. According to Edwards, Borer -- the Director of Human Resources -- was the individual responsible for the raise provided to Plaintiff. *Id.* at 57:8-12; *see also* Def.'s Mot. for Summ. J., Ex. 23 (Johnson's 9/20/03 Test. Before Mag. Judge Facciola) at 60-61 (admitting that Borer was responsible for determining her raise). While this raise was less than the raises provided to Reddin and Palmer, Borer felt that "it did not appear to be logical that they would all have the same expectations since they worked three different jobs, so I didn't draw parallels." *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 238:1-6.

No one kept Plaintiff from marketing herself and finding out if she could get a position outside The Washington Times making more money, and Edwards told both Johnson and Palmer that if they did not think they were being paid fairly, they could both market themselves and look for another job. Def.'s Stmt. P 98; Pl.'s Resp. P 98. Taking up Edwards' suggestion, Palmer submitted a notice of resignation on June 12, 1998, with her resignation effective as of June 19, 1998. Def.'s Stmt. P 99; Pl.'s Resp. P 99.

*F. Plaintiff Files* [*23] *an EEOC Charge and Questions Commence Regarding Use of Confidential Information*

Unlike Palmer, Plaintiff -- who was unhappy with her raise -- chose not to resign from The Washington Times. Rather, on April 24, 1998, Plaintiff filed a charge with the EEOC. Def.'s Stmt. P 24; Pl.'s Resp. P 24. Before filing the charge, Plaintiff never made a written complaint of discrimination to anyone at The Washington Times, and that included not making a written complaint to Palmer, who was then the Employment Specialist; to Borer, the Human Resources Director; or to Edwards, the General Manager. Def.'s Stmt. P 25; Pl.'s Resp. P 25. Moreover, prior to the filing of the EEOC charge, Plaintiff never made any oral complaint to the Human Resources Department. Def.'s Stmt. P 26; Pl.'s Resp. P 26. Plaintiff's April 24, 1998 EEOC Charge contended that:

> For the past few years, I have been performing many duties beyond my job title. I found that a Caucasian coworker has been giving a substantial increase after he threatened to resign from the company.
>
> The Respondent has given no reason for the increase of a Caucasian male coworker's salary. In addition, the Respondent has stated that there [*24] is not enough money in the budget for my pay increase request.
>
> I believe that I have been discriminated against because of my race (Black) and my religion (Protestant) in violation of the Civil Rights Act of 1964 as amended.

Pl.'s Opp'n, Ex. 62 (4/24/98 Johnson EEOC Charge) at 1. Plaintiff listed the "earliest" "date discrimination took place" as February 1, 1998 on her charge. *Id.*

Around the time of Plaintiff's EEOC filing, Ronald Clarke -- responsible for managing The Washington

Times' security department -- was called to the Human Resources Office "because there was a complaint made by Mr. Reddin that someone had tampered with his computer." Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 37:9-13. While Clarke was there, Reddin relayed his concerns that someone "had gone into his computer," though he did not identify any potential suspects. *Id.* at 90:13-18. Borer also received Reddin's report that someone without authorization had accessed his computer. Def.'s Stmt. P 102; Pl.'s Resp. P 102. Borer considered the possibility that either Plaintiff or Palmer was the individual responsible for the unauthorized access, but rather than question them, he [*25] simply increased security in the office by placing an alarm on Reddin's door. Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 76:6-17.

Questions regarding confidential information and access to Reddin's computer intensified after Plaintiff submitted the three (3) memoranda that Reddin had drafted in early 1998 advocating for her raise as part of the supporting documentation for her EEOC Charge. Def.'s Stmt. P 104; Pl.'s Resp. P 104. Plaintiff received these documents from Palmer, who admitted to Plaintiff that she had copied them from Reddin's computer. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 144:1-145:9; *id.*, Ex. 7 (7/23/01 Palmer Dep.) at 94:7-95:21. Palmer also obtained Borer's performance evaluation, which she submitted to the EEOC. *Id.*, Ex. 3 (6/25/01 Johnson Dep.) at 145:5-9.

As such, Plaintiff knew about the unauthorized access by Palmer -- which occurred prior to her June 1998 resignation -- and did not report it. Def.'s Stmt. P 107; Pl.'s Resp. P 107. Plaintiff was aware that it was not proper for one employee to go into another employee's computer and pull out personnel information such as Reddin's three letters. Def.'s Stmt. P 108; Pl. [*26] 's Resp. P 108. Plaintiff was also aware that it was not proper for employees to have unauthorized access to documents or to fail to report such a violation of newspaper policy. Def.'s Stmt. PP 109-110; Pl.'s Resp. P 109-110. Plaintiff was cognizant of the fact that going into another employee's computer and pulling out personnel information, like Reddin's three memoranda, could well be a firing offense. Def.'s Stmt. P 111; Pl.'s Resp. P 111. Indeed, Plaintiff herself during the deposition process admitted that she should have, but did not, report to anyone at The Washington Times that Palmer had violated her obligations and the company's policy by her unauthorized access to Reddin's computer. Def.'s Stmt. P 112; Pl.'s Resp. P 112. In part, Plaintiff chose not to report Palmer because she was friends with Palmer. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 147:3-19.

*G. Tensions Rise in the Human Resources Department as Plaintiff's Behavior Raises the Ire of Her Co-Workers*

Throughout 1998, Plaintiff failed to cooperate on occasion with her supervisor, Borer, and in internal investigations. Plaintiff was aware that Borer, as her supervisor, could ask her for information, [*27] by making such requests in writing, by email, by note, or through a secretary if he wanted to and it was her responsibility to provide accurate information to him. Def.'s Stmt. P 116; Pl.'s Resp. P 116. On occasion throughout 1998, Borer sent a secretary to Plaintiff in order to request information from her; on each occasion, Plaintiff responded, "I don't know." Def.'s Stmt. P 117; Pl.'s Resp. P 117. Plaintiff knew when she responded to the secretary's inquiry seeking information about the Human Resources Department on Borer's behalf, she actually knew the answer but refused to provide it. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 138:9-21. Plaintiff took this course despite knowing that the secretary came at Borer's request to obtain information for him, and despite her obligation to cooperate to serve the best interest of The Washington Times. Def.'s Stmt. PP 119-120; Pl.'s Resp. PP 119-120.

During the Summer and early Fall of 1998, the relationship between Plaintiff and Reddin also apparently began deteriorating. On September 17, 1998, Reddin complained to Borer about Plaintiff's conduct. Among other things, Reddin [*28] told Borer that Johnson had told him to "shut up" on more than one occasion, and had told him to get out of an office where he typically worked. Def.'s Stmt. P 122; Pl.'s Resp. P 122 (not contesting that Reddin made these accusations). On October 5, 1998, Reddin reported another complaint to Borer, wherein he reported, among other things, that while speaking on the telephone, Johnson had used the "f-word" when speaking with someone about the incident which had occurred between Reddin and Plaintiff earlier in September. Def.'s Stmt. P 123; Pl.'s Resp. P 123. By a memo dated October 5, 1998, Borer requested that Plaintiff meet with him to discuss Reddin's complaint or that she respond to him substantively in writing. Def.'s Stmt. P 124; Pl.'s Resp. P 124. Such an interview or request for a writing was typical of the investigative process at the Human Resources Department. *See* Def.'s Mot. for Summ. J., Ex. 7 (7/23/01 Palmer Dep.) at 207:17-208:9. Plaintiff never responded substantively in writing to the complaint. Def.'s Stmt. P 125; Pl.'s Resp. P 125. After some reluctance and apparently an initial refusal to meet, Plaintiff ultimately met with Borer. Def.'s Mot. for Summ. J., [*29] 3 (6/25/01 Johnson Dep.) at 177:1-11. In her deposition, Plaintiff admitted that she had in fact told Reddin to "shut up" on two occasions and had

told him to get out of an area where he works from time to time. Def.'s Stmt. P 127; Pl.'s Resp. P 127.

*H. The Human Resources Department's Guarantee of Confidentiality is Rocked by Disclosures in Sheletha Howard's Discrimination Case*

Following Sheletha Howard's termination in January 1997, Howard -- the former Human Resources Department secretary -- filed a lawsuit in the United States District Court for the District of Columbia alleging discrimination in violation of Title VII of the 1964 Civil Rights Act as amended. Def.'s Stmt. P 128; Pl.'s Resp. P 128. Defendant deposed Howard on October 8 and October 28, 1998 as part of that litigation. Def.'s Stmt. P 129; Pl.'s Resp. P 129. On October 8, 1998, Howard, who was represented by counsel, testified under oath in her deposition that: (1) she was the secretary in the Human Resources Department at The Washington Times and her title never changed; Def.'s Stmt. P 130; Pl.'s Resp. P 130; (2) her starting salary was $ 9.62 per hour, which translated to approximately $ 20,000 per year, and [*30] her ending salary was $ 10.40 per hour, which translated to approximately $ 21,000-$ 22,000 per annum, *see* Def.'s Mot. for Summ. J., Ex. 28 (10/8/98 Howard Dep.) at 27:12-28:1; (3) she was friends with both Plaintiff and Palmer, *see* Pl.'s Opp'n, Ex. 10 (10/8/98 Howard Dep.) at 53:10-15 (also identifying Reddin and Borer as her friends); (4) after she was fired from The Washington Times, she told both Plaintiff and Palmer about her termination, Def.'s Stmt. P 130; Pl.'s Resp. P 130; and (5) Plaintiff and Palmer each knew from Howard personally in early 1997 that she had filed a complaint with the District of Columbia Office of Human Rights, Def.'s Stmt. P 130; Pl.'s Resp. P 130.

In support of her EEOC Charge, Howard submitted certain documents to the District of Columbia Office of Human Rights, which were confidential leave of absence documents from The Washington Times' Human Resources Department personnel records. Def.'s Stmt. PP 131-132; Pl.'s Resp. PP 131-132. Borer was "shocked" on the first day of Howard's deposition to see these confidential "leave of absence" files from Plaintiff's office, especially because the abrupt, unplanned nature of Howard's departure in the [*31] Fall of 1996 would have meant that Howard herself could not have accessed the documents while at The Washington Times with an eye to litigation. Def.'s Stmt. PP 63, 133; Pl.'s Resp. PP 63, 133. Following Howard's testimony on October 8, 1998, Borer thought that if he was going to do his job properly, he had to keep his eyes open in the whole office -- everyone's offices -- and figure out how confidential material was being disclosed by the Human Resources Department. Def.'s Stmt. P 134; Pl.'s Resp. P 134.

After the completion of Howard's testimony on October 8, 1998, Borer returned to the Human Resources Department's offices, where he found a "Post-It" note that appeared to have been inadvertently left on the counter close to the leave of absence files; the "Post-It" note "had a few things on it about leave of absence files." Def.'s Stmt. PP 135-136; Pl.'s Resp. P 135-136; Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 62:3-23. On October 9, 1998, Clarke -- The Washington Times' head of security -- came to the Human Resources Department at Borer's request to investigate the possible unauthorized release of or access to confidential information. Def.'s Stmt. P 137; Pl.'s Resp. [*32] P 137. At that time, Borer wanted Clarke to witness Borer opening and accessing Plaintiff's computer. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 47:3-48:3; *id.*, Ex. 31 (Clarke's 10/12/98 Confidential Memorandum to Investigative File) (summarizing these events). With Clarke present, Borer accessed Plaintiff's computer and found two files that merited further attention; one was entitled "OUR CASE," with a screen listing date of October 8, 1998, while the other was entitled "LES REDDIN ANGRIER," with a screen listing date of September 17, 1998. *Id.* The "OUR CASE" summary had in it confidential information about Borer, including his personnel evaluation by the previous Director of the Human Resources Department (Martin), which had come from his personnel file. Def.'s Stmt. P 140; Pl.'s Resp. P 140.

Borer told Clarke that he was concerned that someone had -- without authorization -- accessed and copied his personnel file. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 45:2-20; *id.*, Ex. 31 (Clarke's 10/12/98 Confidential Memorandum to Investigative File) (summarizing these events). Clarke also inspected Borer's personnel file, and observed [*33] that documents in it appeared to have been tampered with given the fact that a staple had obviously been removed and then replaced in a different location on Borer's personnel evaluation. *See* Def.'s Mot. for Summ. J., Ex. 14(7/12/01 Clarke Dep.) at 46:10-18; *id.*, Ex. 31 (Clarke's 10/12/98 Confidential Memorandum to Investigative File) (summarizing these events). Based on what Borer had shown him and what they had uncovered, Clarke became "concerned that there was a release of confidential information. That's -- that's just unethical and strictly prohibited." *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 64:3-14.

On another occasion around the same time period, Borer became concerned that someone had been in his office and he kept legal files, and he grew concerned that it could have been Plaintiff. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 70:5-10. Borer believed that someone had been in his office and file

cabinet because one file cabinet had been locked; Borer did not have the key to this file cabinet, and therefore it had been kept unlocked previously. *Id.* at 70:11-21. According to Borer, he had to have security come and drill [*34] open the lock so that he could get into his own file cabinet. *Id.* at 70:22-71:15; *but see* Pl.'s Opp'n, Ex. 5 (7/12/01 Clarke Dep.) at 84:8-15 (testifying that Borer did not contact him personally about this incident, and noting that he was unaware if anyone on his staff had been contacted and drilled the lock). While Borer once again consider Plaintiff a potential suspect in this incident, he did not question her personally about it at the time and only contacted security. *Id.* at 71:2-15.

### *I. Further Concerns About Possible Disclosure of Confidential Information*

During this same time period, Joyce Teague, who was an employee at the newspaper in the mailroom, had filed a claim against her employer and her supervisor, David Coleman. Def.'s Stmt. P 149; Pl.'s Resp. P 149; Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 16:22-17:1 (noting that Teague works in the mailroom). Borer believed that Plaintiff was friends with Teague, given that he thought they often went to lunch together. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 16:9-20. On October 21, 1998, Borer had been out of the office for the day at a conference, and returned back to his [*35] office around 6:00 p.m. *Id.*, Ex. 1 (Borer Aff.) P 17. Upon his return, Borer noticed that there were many staples on the staple remover at Plaintiff's desk and many used staples in her trash, which caused him to wonder whether Plaintiff had been copying documents such as those he had seen at Howard's deposition on October 9, 1998. *Id.*, Ex. 14 (7/12/01 Clarke Dep.) at 46:2-18; Pl.'s Resp. P 151 (noting that Plaintiff's desk was in a shared and public office space). Borer found a torn-up note in Plaintiff's trash basket; after he pieced the note together, he could observe that the note was entitled "Specialist" and appeared to him to be in Plaintiff's handwriting. *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 17:19-18:10; *id.*, Ex. 32 (Copy of the "Specialist" Note). To Borer, the "Specialist" note, which contained the name, address, and telephone number of Teague's attorney, appeared to be notes of communications between Teague or her attorney and Plaintiff concerning confidential information being sought from Plaintiff relating to Teague's case or claims against The Washington Times. *Id.* To Borer, the "Specialist" note appeared to contain a list of action items for Plaintiff [*36] to do, including retrieving documents such as Coleman's personnel file and evaluation. *Id.* In the event that an employee such as Plaintiff had received an inquiry from a workman compensation claimant's counsel, the proper step would have been for the employee to refer the counsel to Clarke's counsel -- not conduct their own search. *Id.*, Ex. 14 (7/12/01 Clarke Dep.) at 25:10-26:11; Pl.'s Resp. P 156 (agreeing with Clarke's assessment, but noting that "it also would have been appropriate for Johnson to gather documents in connection with a workman compensation claim for Mr. Clarke's office").

On another occasion in the same timeframe, Borer visited Plaintiff's office and saw Coleman's personnel information file on her computer screen. *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 13:7-16:8. When Borer questioned Plaintiff as to why Coleman's personnel file was on her screen, Plaintiff replied that a credit agency had called regarding Coleman; however, given the fact that it was only 9:15 a.m. at the time of this conversation and Plaintiff could not recall which credit bureau had called, Borer found Plaintiff's explanation unreasonable and unpersuasive. *Id.* Borer also found in Plaintiff's [*37] trash items regarding Coleman's personnel file at a later point. *Id.* at 65:1-10. Additionally, Borer discovered on Plaintiff's calendar a note apparently referencing Teague and indicating that perhaps she had gone to lunch with Teague on the same day that Borer had gone to a meeting regarding the Teague case -- October 16, 1998. *Id.*, Ex. 1 (Borer Aff.) P 30; *id.*, Ex. 34 (10/16/98 Calendar Entry from Plaintiff's Calendar) (with note, "Lunch -- JT"). Finally, around the same time, Borer found and pieced together from Plaintiff's trash basket a printout stating: "STARTED COLLECTING ITEMS TO SHOW JIM BORER IS DOING LEGAL WORK AS OCTOBER 16, 1998." *Id.*, Ex. 33 (Note re: Borer's Legal Work); *d.*, Ex. 1 (Borer Aff.) P 24; *id.*, Ex. 9 (7/10/01 Borer Dep.) at 69:1-22. Based upon these findings and the inferences flowing from them, Borer believed that confidential information was being released from Plaintiff's office. *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 17-18.

Borer's concerns were heightened on October 23, 1998, when Keith Cooperrider, The Washington Times' Chief Financial Officer, heard that someone in the Human Resources Department had -- without authority -- disclosed [*38] to a new hire (a transfer from another position) a former employee's salary, which resulted in the new hire's request for a greater salary than had been offered by the paper. *Id.*, Ex. 1 (Borer Aff.) P 25; *id.*, Ex. 9 (7/10/01 Borer Dep.) at 89:6-13; *id.*, Ex. 35 (10/27/98 Borer Memorandum to File re: "PRF: Confidentiality; Johnson; Sharpe") at 1-4 (recounting his conversations with Cooperrider, his preliminary investigation with the new hire, and concluding with "I will talk to Pamela Johnson"). Borer apparently conducted an investigation into the matter, discussing the matter with the new hire, and came to the suspicion that Plaintiff was behind this disclosure. *Id.* On that same day, Borer also suspected and believed for the first time that someone had accessed his voice mail messages and listened to them without his permission. *Id.* Tired of "feeling the wrath of a person in

upper management . . . for the disclosure of information he understood to be held by H.R. as confidential," Borer resolved to "talk to Pamela Johnson." *id.*, Ex. 35 (10/27/98 Borer Memorandum to File re: "PRF: Confidentiality; Johnson; Sharpe") at 1-4.

*J. Testimony in Howard's Second Deposition* [*39] *Heighten The Washington Times' Concerns Regarding Plaintiff and Bring The Situation to a Head*

Howard's deposition testimony under oath and accompanied by counsel in her civil case against The Washington Times continued on October 28, 1998. Def.'s Stmt. P 167; Pl.'s Resp. P 167. Borer was present on behalf of The Washington Times for this testimony. Def.'s Stmt. P 169; Pl.'s Resp. P 169. Howard later recanted much of her October 28, 1998 testimony in her August 22, 2001 deposition in this case by claiming that all documents were mailed to her anonymously, and contending that she only testified as she did on October 28, 1998 because The Washington Times' counsel in that matter n5 badgered her during questioning and -- during the deposition -- threatened the livelihood of her husband's military career. *See* Pl.'s Opp'n, Ex. 10 (8/22/01

n5 Counsel for The Washington Times in the case relating to Ms. Howard is the same counsel appearing before the Court in this case.

Howard Dep.) at 114:6-120:10 (noting that [*40] she dropped her lawsuit after her testimony). Despite this claim, it is undisputed that *on October 28, 1998*, Howard testified:

. After leaving The Washington Times, she requested an employment verification. Def.'s Mot. for Summ. J., Ex. 28 (10/28/98 Howard Dep.) at 498.

. Howard was willing to enlist her friends, Plaintiff and Palmer, to provide false information for her. *Id.* at 513, 522.

. Both Palmer and Johnson told Howard that they had verified her employment at $ 31,000 as an Employment Specialist, and that they both knew that the verification was false. *Id.* at 522.

. At Howard's request, Palmer provided a false employment verification for her, providing inaccurate information as to Howard's employment position and title,

her salary, and her dates of employment. *Id.* at 505-11.

. Howard was aware that Plaintiff and Palmer knew that they had provided false information to her. *Id.* at 522.

. Howard enlisted Plaintiff and Palmer to get for her, after she was no longer with the paper, confidential personnel records including doctors' notes about employees who had taken leaves of absences. *Id.* at 552.

. Howard had Plaintiff [*41] and Palmer pull those documents from the personnel records and provide them to her even though she knew it was wrong for them to take such an action. *Id.*

. Both Plaintiff and Palmer pulled confidential personnel files for her after she had left The Washington Times and provided those to her. *Id.* at 552-54.

. Howard agreed that Plaintiff and Palmer could be fired for having provided confidential personnel records to her. *Id.* at 555-56.

. Howard acknowledged that she had previously testified falsely as to how she had received the confidential "leave of absence" records because she was trying to conceal her agreement with Plaintiff and Palmer to provide false information to employers and to take confidential personnel documents from The Washington Times' files and to provide them to her. *Id.* at 573-75.

During her deposition in this case, Plaintiff agreed that if someone at The Washington Times provided confidential personnel records to an individual such as Howard after that employee no longer worked with the company, then that action would not be consistent with the policies of The Washington Times and would be a violation of the duty of confidentiality [*42] to the newspaper. Def.'s Stmt. P 169; Pl.'s Stmt. P 169. Plaintiff also agreed that such an action would be the basis for disciplinary action, including firing, because "leave of absence" records are highly confidential personnel records that are not to be misused. Def.'s Stmt. PP 170-171; Pl.'s Stmt. PP 170-171. Plaintiff further noted that she had no reason to believe that Borer, Martin, Reddin, or Palmer provided the "leave of absence" documents to Howard.

Def.'s Stmt. P 175; Pl.'s Stmt. P 175. Personnel files were kept in file drawers in Plaintiff's office, and Plaintiff had access to such files. Def.'s Stmt. P 177; Pl.'s Stmt. P 177. Plaintiff was also aware that Howard testified under oath on October 28, 1998 that Plaintiff had given her confidential personnel files from The Washington Times after Howard no longer worked there. Def.'s Stmt. P 178; Pl.'s Stmt. P 178. As such, given these facts, Plaintiff herself agreed during her deposition that her employer could have reasonably formed the view that she had stolen the "leave of absence" documents from the Human Resources Department and given them to Howard. Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 130:2-11; [*43] *but see id.* at 130:12-20 (Plaintiff does not agree that, based on her friendship with Howard alone, the paper could have come to such a conclusion).

*K. Plaintiff's Termination from The Washington Times*

When faced with Howard's October 28, 1998 testimony, Borer believed that Plaintiff and Palmer were Howard's friends, and that Howard had tried to protect them in her first deposition but was basically confronted and confessed in her second deposition. Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 167. He did not believe that it was possible for Howard to have copied the "leave of absence" files before she left The Washington Times, given the circumstances of her departure. *Id.* at 164. Borer believed that Plaintiff had released confidential files based on, among other things, the files from her office that were produced by Howard and Howard's admission that Plaintiff had provided those files to her. *Id.* at 87. As such, Borer believed that he had a responsibility to investigate and question Plaintiff about these personnel and confidentiality matters, which he considered to be extremely important. *Id.* at 20, 58-59.

Given his beliefs, Borer met with Plaintiff [*44] on October 29, 1998 -- the day after Howard's second deposition. Def.'s Stmt. P 185; Pl.'s Resp. P 185. Clarke accompanied Borer to this meeting with Plaintiff. *See* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 103:14-15. n6 At the meeting, Borer sought to ask her questions about personnel matters. Def.'s Stmt. P 188; Pl.'s Resp. P 188. Borer had typed up a written note prior to the meeting, and informed Plaintiff that he had to question her regarding important personnel matters, warning her that refusal to answer his questions could result in her discharge. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 59:1-6; *see also* Pl.'s Opp'n, Ex. 61 (Borer's 10/28/98 Note re: "Employment" to Johnson). At the meeting, Borer asked Plaintiff a number of questions regarding whether she provided false data on Howard's employment verification and if she had disclosed confidential information to Teague, Howard, the new hire, and others. *See* Def.'s Mot. for Summ. J., Ex. 9 (Borer Dep.) at 42;

Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 105:7-106:6. While Plaintiff believed that she was answering all of Borer's questions, and that he was simply repeating the same series [*45] of questions over and over during the fifteen (15) minute meeting, *see* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 102:14-18, Clarke remembers that she evaded Borer's question regarding providing false verification data to Howard, *see* Def.'s Opp'n, Ex. 14 (7/12/01 Clarke Dep.) at 125:13-126:4, and Borer recalled that Plaintiff would answer a question and then refuse to answer follow-up questions, *see* Def.'s Opp'n, Ex. 9 (7/10/01 Borer Dep.) at 7:3-20, 42. Both Clarke and Borer remember Borer telling Plaintiff that she would be fired if Plaintiff refused to answer Borer's questions, *see* Def.'s Opp'n, Ex. 9 (7/10/01 Borer Dep.) at 58-59, 83-84, 86; *id.*, Ex. 14 (7/12/01 Clarke Dep.) at 128:15-129:6, 131:14-21 (noting that after Plaintiff was informed of this, she responded: "I can't deal with this."), while Plaintiff recalls that Borer never used words to this effect, *see* Pl.'s Opp'n, Ex. 1 (Johnson Aff.) P 24; *id.*, Ex. 2 (6/25/01 Johnson Dep.) at 102:14-15. Clarke concurred with Borer's belief that Plaintiff was uncooperative during the meeting. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 129:7-21.

n6 Plaintiff had actually been out of the office from October 23, 1998 to October 28, 1998 in connection with work-related stress. *See* Pl.'s Opp'n, Ex. 5 (7/12/01 Clarke Dep.) at 91:22-92:22, 95:5-10, 98:13-100:12; *see also id.*, Ex. 74 (Concentra Medical Center -- Initial Visit Report) at 1 (Plaintiff told medical providers that she felt stressed and scrutinized since her April 1998 EEOC Charge and allegedly had been yelled at by her supervisor on October 23, 1998). Plaintiff returned to work on October 29, 1998 to meet with Clarke to inform him that she had been cleared to return to work at The Washington Times with a restriction. *See id.* at 109:3-111:5; *id.*, Ex. 1 (Johnson Aff.) P 15; *id.*, Ex. 75 (Concentra Medical Center -- Restricted Return to Work Form). Accordingly, Plaintiff did not believe that she would be dealing with Borer on the day of October 29, 1998 and his choice to accompany Clarke was a surprise to Plaintiff.

[*46]

According to Borer's recollection, Plaintiff continued to refuse to answer some of his questions, and threatened to leave. *Id.*, Ex. 9 (7/10/01 Borer Dep.) at 83:20-22. In contrast, Plaintiff recalls that she did not threaten to leave the room during the investigatory interview. *See* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 105:1-3. According to Borer, after reminding Plaintiff

again that she need to answer his important questions "and if she left without answering those questions, that she would be discharged and that I had a note in my hand." Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 83:19-84:2. Borer recalls that Plaintiff then "crossed the room and took that note out of my hand, scanned it and then left, slamming the door." *Id.* at 84:3-5. Clarke remembers Borer handing Plaintiff the note, who then read it, turned around, and left the office by slamming the door "hard enough where all the stuff came down off of my wall and dumped some posters and things that were behind it." Pl.'s Opp'n, Ex. 5 (7/12/01 Clarke Dep.) at 132:3-18. Clarke did not recall Borer verbally announcing Plaintiff's termination. *Id.* at 131:4-132:7. Clarke then followed Plaintiff [*47] out of the building. *See* Def.'s Mot. for Summ. J., Ex. 14 (7/12/01 Clarke Dep.) at 134:15-21. Clarke did not believe that Borer acted unreasonably during the meeting. *Id.* at 134:7-11. Plaintiff's employment with The Washington Times was terminated after this meeting. *See* Pl.'s Opp'n, Ex. 2 (6/25/01 Johnson Dep.) at 102:8-10 (Q: "You were fired after a meeting with Mr. Borer, correct?" A: "Yes."); *see also* Pl.'s Opp'n, Ex. 68 (10/26/99 Borer EEOC Aff.) at 2 ("Because Ms. Johnson refused to answer my questions, she was terminated.").

The note drafted by Borer prior to the meeting, which ended up in Plaintiff's possession, read in full:

It appears that your relationship with the company has been irreparably harmed. Several incidents have occurred including:

-- copying and/or passing copies of confidential personnel files to a person suing the company;

-- serving as a reference while using a false title for yourself;

-- agreeing to verify false data on an ex-employee's resume;

-- releasing confidential information to an employee.

You are being discharged for disclosing confidential information.

Employee Handbook, page 4, under the [*48] heading entitled, **"Confidential Information"** states: "Disclosure of confidential information may lead to discipline up to and including discharge."

Employee Handbook, page 7, under the title: **I. Commission of Any One of the Following Acts Will Be Considered Just Cause for Immediate Dismissal** "h. theft, misappropriation, misuse, or willful destruction of a fellow employee's or Company property, or unauthorized removal of such. . . ."

Pl.'s Opp'n, Ex. 61 (Borer's 10/28/98 Note re: "Employment" to Johnson) at 1 (emphasis in original). At least one other employee of The Washington Times, a white male, was dismissed from the newspaper the previous year (1997) for a somewhat similar disclosure of confidential company information and work-product to a third party. *See* Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 253:5-18 ("it was somebody in the production department that was discharged for disclosing confidential information"); *id.*, Ex. 40 (one-page, unnumbered termination letter of a Washington Times employee dated February 4, 1997, and a one page attachment to that letter dated January 27, 1997); Pl.'s Resp. P 217 (drawing a distinction between [*49] this termination and Plaintiff's firing, and noting that the employee was terminated for "violated the Advertising Ethics' section of the Employee Handbook" for releasing an advertisement prior to publication).

*L. Events Following Plaintiff's Dismissal*

Following Plaintiff's departure from The Washington Times on October 28, 1998, Elizabeth Henkin, a white Unification Church member, was hired to fill her position as the HRIS Specialist in the Human Resources Department. Def.'s Stmt. PP 215-216; Pl.'s Resp. PP 215-216 (not disputing this fact). Henkin, who was working for about a year at another publication related to Defendant and The Unification Church entitled "World & I" as the photo billing coordinator when she took the position, was being paid -- and continued to be paid -- $ 14.48 by Defendant when she took the position of HRIS Specialist with The Washington Times. *See* Def.'s Mot. for Summ. J., Ex. 1 (Borer Aff.) P 26 (attesting that the attached exhibit represents Henkin's Confidential Wage/Salary History maintained by Defendant in the regular and ordinary course of business); *id.*, Ex. 39 (Confidential Wage/Salary History of Henkin); Pl.'s Opp'n, Ex. 7 (7/17/01 Henkin [*50] Dep.) at 18:1-22, 55:3-21; *see also id.*, Ex. 7 (7/17/01 Henkin Dep.) at 17:14-23 (Henkin notes that she worked at "World & I" approximately five years in the late 1980s/early 1990s before taking maternity leave; she then re-joined "World & I" in the mid-1990s). n7 In contrast, Plaintiff was earning $ 15.14 per hour as the HRIS Specialist when she was terminated

on October 28, 1998. Def.'s Stmt. P 22; Pl.'s Resp. P 22. Plaintiff now argues that Henkin was unqualified for the position, *see* Pl.'s Resp. P 216 (citing Pl.'s Opp'n, Ex. 6 (7/12/01 Reddin Dep.) at 153:10-154:11 (giving his opinion that Henkin was now qualified for the position, but was initially unqualified given the fact that she occasionally inputted incorrect data when she first came aboard)), *id.* (citing Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 127:4-128:2 (agreeing that Henkin had no experience in a human resources department but contending that she had a plethora of experience inputting data and handling other responsibilities at World & I), and was brand new to The Washington Times, *id.* (citing Pl.'s Opp'n, Ex. 7 (7/17/01 Henkin Dep.) at 15:4-18:22, 55:3-55:13 (admitting that while [*51] she had worked for many years at World & I, she had never worked for The Washington Times).

n7 Plaintiff, in her Response to Defendant's Statement of Material Facts Not in Dispute, wonders how this information can be accurate given that Henkin started with The Washington Times in November 1998, yet the salary history in Exhibit 39 lists the $ 14.45 rate as beginning on "8/1/98" i.e., before she was hired. *See* Pl.'s Resp. P 216. Given that Defendant News World Communications owns both publications, it seems logical that Defendant would keep all of Henkin's salary information on the same form, regardless of whether it came from The Washington Times or World & I -- a fact borne out by Exhibit 39 to Defendant's Motion for Summary Judgment. Indeed, given this logical explanation, Borer's Affidavit attesting to the fact that the attached form does relate to Henkin, and no evidence to the contrary by Plaintiff, the Court accepts Exhibit 39 as an accurate depiction of Henkin's salary.

Following Plaintiff's dismissal, [*52] she filed an Amended EEOC Charge on November 17, 1998, adding the fact that she was terminated on October 28, 1998 by The Washington Times to her claim. *See* Pl.'s Opp'n, Ex. 63 (11/17/98 Amended EEOC Charge) at 1. During the EEO process, the EEO found -- based on the affidavit evidence before it -- that Plaintiff had presented evidence sufficient for it to render a conclusion that she was denied her 1998 salary increase request and ultimately terminated because she was not a member of The Unification Church; however, the EEO found no evidence that The Washington Times ever discriminated against Plaintiff based on her race. *See* Pl.'s Opp'n, Ex. 67 (6/6/00 EEO Letter of Determination) at 3. Following this decision, Plaintiff filed a Complaint alleging race-based and religion-based discrimination by Defendant in the Supe-

rior Court for the District of Columbia, Civil Division, on October 16, 2000. *See* 1/2/01 Notice of Removal, Ex. 1 (Pl.'s Compl.). Defendant removed Plaintiff's action to this Court pursuant to *28 U.S.C. § 1441* on January 2, 2001. *See* 1/2/01 Notice of Removal. In her Complaint, Plaintiff contends that: (1) Defendant discriminated [*53] against her in violation of the District of Columbia Human Rights Act ("DCHRA"), Title VII, and *42 U.S.C. § 1981* on the basis of her race and religion by denying her certain benefits, namely, the requested March 1998 salary increase similar to the one provided to Reddin, *see* Compl. PP 13-16 (Count I -- DCHRA), PP 25-28 (Count IV -- Title VII), PP 37-40 (Count VII -- *Section 1981* Claim); *see also* Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 80:1-4 (Plaintiff clarifies that she only claims discrimination vis-a-vis her 1998 salary request, and does not claim that she was discriminated for "the years when [she] got cost of living raises"); Pl.'s Resp. P 210 (same); (2) Defendant unlawfully retaliated against her for bringing an EEOC Charge by terminating her employment in violation of the DCHRA, Title VII, and *42 U.S.C. § 1981, id.* PP 21-24 (Count III -- DCHRA), PP 33-36 (Count VI -- Title VII), PP 45-48 (Count IX -- *Section 1981* Claim); and (3) Defendant unlawfully terminated her on October 29, 1998 for race and religion-based reasons in violation of the DCHRA, Title VII, and *42 U.S.C. § 1981,* [*54] *id.* PP 17-20 (Count II -- DCHRA), PP 29-32 (Count V -- Title VII), PP 41-44 (Count VIII -- *Section 1981* Claim).

## II: LEGAL STANDARDS

### A. Rule 56 Summary Judgment Standards

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c); Tao v. Freeh, 307 U.S. App. D.C. 185, 27 F.3d 635, 638 (D.C. Cir. 1994).* Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and [*55] admissions on file, designate' specific facts showing that there is a genuine issue for trial." *Id. at 324* (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party,

the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251, 106 S. Ct. 2505* (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby, 477 U.S. at 249-50, 106 S. Ct. 2505* [*56] (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996)*. The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with specific facts showing that there is a *genuine issue for trial*." *Id. at 587, 106 S. Ct. 1348* (citing *Fed. R. Civ. P. 56(e)*) (emphasis in original).

Importantly, "while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001)* [*57] (quoting *Calhoun v. Johnson, 1998 U.S. Dist. LEXIS 22376, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998)* (internal citation omitted), *aff'd, 1999 U.S. App. LEXIS 25165, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)*); *see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003)* (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall, 276 F. Supp. 2d at 47* (quoting *Celotex Corp., 477 U.S. at 327*). Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr., 325 U.S. App. D.C. 255, 116 F.3d 876, 879 (D.C. Cir. 1997)* (internal quota-

tions omitted), *overturned on other grounds, 332 U.S. App. D.C. 256, 156 F.3d 1284 (D.C. Cir. 1998)* (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment [*58] in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

*B. The McDonnell Douglas Framework for Discrimination Claims*

Plaintiff brings this action pursuant to Title VII, which states that all personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-16(a)*. Plaintiff also brings the suit pursuant to the DCHRA and *42 U.S.C. § 1981*; however, "the burdens of persuasion and production for claims raised under *§ 1981* or under the D.C. law are identical to those for claims alleging discriminatory treatment in violation of Title VII." *Mungin v. Katten Muchin & Zavis, 325 U.S. App. D.C. 373, 116 F.3d 1549, 1553 (D.C. Cir. 1997)* (citing cases); *see also Knight v. Georgetown Univ., 725 A.2d 472, 478 n.5 (D.C. 1999)* (same); *Daka v. Breiner, 711 A.2d 86, 94 (D.C. 1998)* (same). As such, when the Court refers to the "Title VII framework" in this Memorandum Opinion, it does so as a short-hand reference to the [*59] framework governing claims arising under Title VII, the DCHRA, and *42 U.S.C. § 1981*. Here, it is uncontested that Plaintiff was an employee during the relevant time period and Defendant is an employer within the meaning of Title VII. The Court exercises jurisdiction over Plaintiff's claims according to *28 U.S.C. § 1331*.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by Defendant were "more likely than not based on the consideration of impermissible factors" such as race or gender. *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* (internal quotation marks and citation omitted). Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala, 339 U.S. App. D.C. 299, 199 F.3d 512, 516 (D.C. Cir. 2000)* (citing *McDonnell Douglas v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*). It is the district court's responsibility to closely adhere to this analysis and go no [*60] further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions" *Fischbach v. D.C. Dep't of Corr., 318 U.S. App. D.C. 186, 86 F.3d 1180, 1183 (D.C. Cir. 1996)* (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817. If she succeeds, the burden shifts to Defendant to articulate some Legitimate, non-discriminatory reason for Plaintiff's salary determination and/or termination, and to produce credible evidence supporting its claim. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S. Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("The determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment. [*61] "). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 356 U.S. App. D.C. 109, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L. Ed. 2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S. Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappears, and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations and quotation marks omitted); *see also Burke v. Gould*, 351 U.S. App. D.C. 1, 286 F.3d 513, 520 (D.C. Cir. 2002) (once defendant offers a non-discriminatory explanation for its actions, the presumption of discrimination "simply drops out of the picture") (quoting *St. Mary's Honor Ctr.*, 590 U.S. at 511, 113 S. Ct. 2742). At that point, Plaintiff [*62] has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S. Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S. Ct. 2097. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S. Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S. Ct. 2742) ("Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also*

*Aka v. Washington Hosp. Ctr.*, 332 U.S. App. D.C. 256, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment [*63] decision is entitled to considerable weight."). Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S. Ct. 2097. "The trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S. Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S. Ct. 1089).

Accordingly, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 357 U.S. App. D.C. 413, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1290. The D.C. Circuit recently defined "all of the evidence" as "any combination of (1) evidence establishing the plaintiff's *prima facie* case; (2) evidence [*64] the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 369 U.S. App. D.C. 122, 433 F.3d 889, 2006 WL 45853, at *5 (D.C. Cir. Jan 10, 2006) (citing *Aka*, 156 F.3d at 1289). "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 326 U.S. App. D.C. 224, 119 F.3d 23, 27-28 (D.C. Cir. 1997). "The court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

## III: DISCUSSION

Plaintiff's claims resolve around two central events: (1) The Washington Times' March 1998 decision to provide her with a raise of 3.05% rather than her requested raise; and (2) Plaintiff's [*65] termination from The Washington Times on October 29, 1998 following her meeting with Borer. Because Plaintiff's claims neatly divide along these two incidents, in its discussion the Court shall first address Plaintiff's Title VII, DCHRA, and Section 1981 discrimination claims in the context of her March 1998 salary raise request, and then shall turn to an examination of Plaintiff's Title VII, DCHRA dis-

crimination claims and her Title VII retaliation claims with respect to her October 1998 termination.

*A. Plaintiff's Claims Arising From Her March 1998 Salary Request*

Count I, IV, and VII of Plaintiff's Complaint in this action relate to her allegation that Defendant discriminated against her "based on her race and religion in favor of her co-worker, Les Reddin," when dealing with raise requests by Human Resources Department employees in March 1998. *See* Pl.'s Opp'n at 9. In support of her claim, Plaintiff notes that in February 1998, in response to his initial salary demands and threat of resignation, Defendant increased the salary of Reddin -- a white male Unification Church member -- by 16.58% to $ 667.85 per week. *Id.* at 10 (citing Pl.'s Opp'n, Ex. 29 (2/1/99 Reddin Personnel [*66] Action Form)). At that time, Plaintiff was earning $ 14.74 per hour, on a forty (40) hour work week totaling $ 589.60 per week -- a difference amounting to $ 78.25 per week. In March 1998, Defendant once again gave into Reddin's salary demands, increasing his salary again by 15% to $ 38,500 and providing him with a $ 1,500 education reimbursement. *Id.* (citing Pl.'s Opp'n, Ex. 28 (3/23/98 Reddin Personnel Action Form)). In contrast, when faced with Plaintiff's request for a raise in March 1998, Defendant provided Plaintiff -- an African-American Protestant -- with a raise of 3.05%, raising her salary by $ 0.44 to $ 15.14 per hour on a forty (40) hour work week. *Id.* (citing Pl.'s Opp'n, Ex. 26 (3/23/98 Johnson Personnel Action Form)). Plaintiff contends that this 3.05% raise, when compared to the raise provided to Reddin, was obviously discriminatory and "the result of favoritism because of [Reddin's] religon and/or skin color," as "with this increase Ms. Johnson would earn $ 31,491.20-$ 7,008.80 less than Mr. Reddin -- for performing duties as significant and difficult as Reddin." *Id.* (citations omitted).

1. Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination [*67]    With Respect to Her Salary Claims

To establish a *prima facie* case on a claim of disparate-treatment discrimination under the Title VII framework, Plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) she was treated differently from similarly-situated employees outside the protected class. *See Mitchell v. Baldrige, 245 U.S. App. D.C. 60, 759 F.2d 80, 84 (D.C. Cir. 1985); Douglas v. Pierce, 707 F. Supp. 567, 571 (D.D.C. 1988), aff'd, 285 U.S. App. D.C. 89, 906 F.2d 783 (1990); cf. Stella v. Mineta, 350 U.S. App. D.C. 300, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 339 U.S. App. D.C. 233, 199 F.3d 446, 452 (D.C. Cir. 1999)); Charles v. Nat'l Rehab. Hosp.,* Civ. No. 94-0171, 1994 WL 874211, at *5 (D.D.C. Sept.

29, 1994); *Childers v. Slater, 44 F. Supp. 2d 8, 18 (D.D.C. 2000), vacated in part on other grounds, 197 F.R.D. 185, 191 (D.D.C. 2000).*

In this case, it is clear that Plaintiff has met the first prong of the *prima facie* case for her disparate treatment racial discrimination claim -- she is an African-American, and therefore a member of a protected [*68] class. An interesting question is posed as to whether Plaintiff's religion (Protestant) puts her into a protected class for the purposes of her Title VII religious disparate treatment claim, given the fact that her religious affiliation places her within the plurality -- if not majority -- of Americans. *See* Tom W. Smith & Seokho Kim, The Vanishing Protestant Majority, NORC/University of Chicago GSS Social Change Report No. 49 (July 2004) *available at* http://www-news.uchicago.edu/releases/04/040720.protestant.pdf (finding that in the Year 2002, 52% of Americans identified themselves as Protestant, but that percentage was likely to fall below 50% by mid-decade). Indeed, Plaintiff's case is also not a simple "reverse discrimination" claim either, given the fact that (1) only approximately 17% of News World Communications employees were members of The Unification Church during the time period relevant to this suit, meaning that a minority religious group did not necessarily control Defendant's personnel actions and actually remained a minority within the organization, *see* Pl.'s Opp'n, Ex. 19 (Spreadsheet Based on 10/1998 Staff Directory) (based on member lists and testimony, [*69] estimating that 110 of the 645 News World Communications employees listed in the staff directory were members of The Unification Church); and (2) of the two decision-makers involved in the salary raise decision process, one was a member of The Unification Church (Borer) while the other (Edwards) was not and has never been a member of The Unification Church. *See* Def.'s Stmt. P 51; Pl.'s Resp. P 51.

As such, this case is not necessarily similar to *Shapolia v. Los Alamos National Laboratory, 992 F.2d 1033 (10th Cir. 1993),* a case in which the Tenth Circuit confronted a plaintiff (a non-Mormon) who received a negative review from both his supervisor (a Mormon) and the individual in charge of the administrative review proceedings (also a Mormon). In *Shapolia,* the Tenth Circuit applied a modified *McDonnell Douglas* test and found that "the use of the protected class factor is inappropriate" in what was akin to a reverse-discrimination claim. *Id.* at 1038 & n.6. However, given that the stated goal of Title VII is that all personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex, or national [*70] origin," *42 U.S.C. § 2000e-16(a),* and the context of Plaintiff's religion-based disparate treatment claim bears a resemblance to *Shapolia,* the Court shall follow the path

blazed by the Tenth Circuit and essentially "assume away" this protected class requirement with respect to Plaintiff's religion-based disparate treatment salary claim. However, like the *Shapolia* court, the Court shall require that Plaintiff "establish background circumstances that support an inference that the defendant is one of those unusual employees who discriminates against the majority," *Shapolia, 992 F.2d at 1038 n.6* (citation and quotation marks omitted). Accordingly, the Court shall still examine whether Plaintiff can show that Defendant's partial denial of her raise request constituted an adverse action and whether or not similarly-situated employees were subjected to similar treatment.

With respect to the traditional second prong of the *prima facie* analysis, the "adverse employment action" requirement, Defendant in March 1998 clearly did not take an action that *decreased* Plaintiff's salary or benefits, or that negatively impacted her chances [*71] for promotion, affected her responsibilities, or changed her workload. Indeed, Defendant actually *increased* Plaintiff's salary by 3.05% -- a significant amount, although less than Plaintiff had requested. While it is not necessarily self-evident that providing an individual with an added benefit (a raise) that fell below their expectations is an "adverse action" for the purposes of Title VII, the Court will assume for the purposes of Defendant's motion that Defendant's failure to completely meet Plaintiff's raise request was an "adverse action," given (1) Defendant's failure to address this issue, (2) the fact that a salary alteration was at issue, and (3) the recent decision by the D.C. Circuit in *Rochon v. Gonzales, 438 F.3d 1211, 2006 WL 463116, at *4-*8 (D.C. Cir. Feb. 28, 2006)*, that suggests a more expansive reading of the "adverse action" requirement is appropriate. As such, because Plaintiff has met -- or the Court has assumed that Plaintiff has met -- the first two prongs of the "adverse action" requirement, the Court shall proceed to the third requirement, which involves a comparison of the treatment encountered by Plaintiff to that afforded to similarly-situated [*72] employees.

Plaintiff's disparate treatment salary claim wilts on the *prima facie* vine due to her inability to meet the third prong of the relevant test -- the "similarly situated" requirement. With respect to this prong, Plaintiff must identify an employee outside her class who was similarly situated to her, but afforded more favorable treatment. *See Neuren v. Adduci, Mastriani, Meeks & Schill, 310 U.S. App. D.C. 82, 43 F.3d 1507, 1514 (D.C.Cir. 1995)*. Plaintiff is unable to meet this requirement.

Importantly, Reddin -- the white male Unification Church member whose salary was increased to $ 38,500 and who was provided with a $ 1,500 educational stipend -- is not an appropriate comparator to Plaintiff and was not similarly situated to her. n8 While Plaintiff asserts

that "Mr. Reddin was similarly situated in that he was an administrative employee of the Human Resources Department," Pl.'s Opp'n at 12, Plaintiff neither provides record evidence to support her conclusory allegation, nor makes any attempt to analyze the way in which Reddin's duties and responsibilities as a Benefits Specialist compared to her own duties as the HRIS Specialist. To show that someone was "similarly situated" [*73] to her, Plaintiff "is required to demonstrate that all of the relevant aspects of her employment situation were nearly identical'" to that of her comparator, Reddin. *Neuren, 43 F.3d at 1514* (quoting *Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)); see also Mungin, 116 F.3d at 1554 (same); Dickerson v. Sectek, Inc., 238 F. Supp. 2d 66, 77 (D.D.C. 2002)* (same); *Byrd v. Ronayne, 61 F.3d 1026, 1032 (1 st Cir. 1995)* ("A disparate treatment claimant bears the burden of proving that she was subjected to different treatment than persons *similarly situated in all relevant aspects.*'") (citation omitted) (emphasis in original). To satisfy her burden of proof, Plaintiff must do more than simply identify a person outside of her protected class or religious group who received different treatment. Instead, she must point to evidence that would meet her burden to show, by a preponderance of the evidence, *see St. Mary's Honor Ctr., 509 U.S. at 506, 113 S. Ct. 2742*, that all of the relevant aspects of Reddin's employment situation were "nearly identical" to the aspects [*74] of her employment at The Washington Times.

> n8 As noted previously, Plaintiff testified during her deposition that the salary ultimately awarded to Reddin in 1998 was appropriate and fair given his level of responsibility. She simply complains that the difference in the percentage raise awarded to Reddin as compared to the percentage raise awarded to her was unfair. *See* Def.'s Stmt. P 82; Pl.'s Resp. P 82.

Plaintiff has not made this showing; rather, a review of the record adduced during discovery plainly reveals that not only did Reddin have a different job title and position than Plaintiff, he also had very different duties and responsibilities, including the duty of overseeing benefits plans with an estimated value in excess of $ 3 million, and a different level of experience. *See* Def.'s Stmt. PP 55, 71, 72; Pl.'s Resp. PP 55, 71, 72; Def.'s Mot. for Summ. J., Ex. 9 (7/10/01 Borer Dep.) at 238:1-6 (explaining that Plaintiff, Palmer, and Reddin all had "three different jobs"); *see also* Def.'s Mot. [*75] for Summ. J., Ex. 38 (Pl.'s Resp. to Def.'s Interrogs.) at Answer No. 3 (identifying Reddin as someone who received more favorable treatment without explaining how he qualifies as a valid comparator to her). Because Plaintiff

has adduced no evidence to show that Reddin was similarly situated to her other than the fact that he happened to work in the same department at the newspaper, Plaintiff has failed to meet the necessary third prong of the *prima facie* analysis to sustain her disparate treatment claim. *See Mungin, 116 F.3d at 1554* (noting that the plaintiff, an African-American associate at a law firm, failed to show how the white associates that he compared himself to were similarly situated); *Dickerson, 238 F. Supp. 2d at 77* (finding that plaintiff, a female, failed to produce any evidence that male employees with similar responsibilities were treated more favorably).

2. Assuming *Arguendo* that Plaintiff Could Meet the *Prima Facie* Test, Defendant Had Legitimate, Non-Discriminatory Reasons for Awarding Her a 3.05% Raise, Rather than the Raise She Desired

Even assuming *arguendo* that Plaintiff could establish a *prima* [*76] *facie* case of disparate treatment based on her race and religion with respect to her March 1998 raise request, Defendant has clearly met its burden of production under the *McDonnell Douglas* test by offering a legitimate, non-discriminatory reason for its decision to award Plaintiff only a 3.05% raise, rather than the raise that she desired.

According to Borer, Plaintiff's supervisor at the time of her March 1998 raise request, he decided to award Plaintiff a 3.05% raise that would take effect in March 1998 despite the fact that -- under normal procedures -- her next performance review and raise (if any) was not to be conducted for another five months. *See supra* Section II(C) (Chart showing that from 1993-1997, Plaintiff received any salary increase in the month of August, and Plaintiff had just seen her salary increased on August 19, 1997). Borer testified that he made his decision vis-a-vis Plaintiff's raise request based on his personal assessment that: (1) Plaintiff was adequately paid; (2) a raise of 3.05% was adequate; and (3) the raise he advocated and ultimately awarded Plaintiff was more than anyone else had in mind for her. Edwards, The Washington Times' General [*77] Manager who has not and has never been a member of The Unification Church, actually was not initially keen on any raise for Plaintiff, but ultimately agreed with Borer's recommendation. Borer also noted that when he made his decision regarding Plaintiff's compensation, he did so based on his own assessment of Plaintiff, her subordinates, and her position, duties, and responsibilities. Accordingly, Defendant has met its burden under the tripartite *McDonnell Douglas* and provided evidence suggesting that neutral, non-discriminatory reasons were behind its employment decision affecting Plaintiff's raise.

With respect to Reddin, Defendant also offered numerous, non-discriminatory reasons why he received a raise larger than that given to Plaintiff. In early 1998, Reddin lobbied for a raise by submitting three separate memos to his superiors. In these memoranda, Reddin outlined his various bases for requesting a raise, and included a threat to resign from his position if his expectations were not met by the newspaper. *See Def.'s Mot. for Summ. J., Ex. 15 (1/19/98 Reddin Memo to Dong Moon Joo); id., Ex. 16 (2/12/98 Reddin Memo to Edwards); id., Ex. 17 (3/4/98 Reddin Memo to [*78] Dong Moon Joo)* (announcing resignation effective 3/18/98). Reddin contended that he was entitled to a raise because, *inter alia*, he had saved the company millions of dollars by negotiating lower rates from its insurance carriers. *Id.* Moreover, Reddin made the case that he had extensive duties and responsibilities with significant financial consequences for the newspaper, including administering the budget for benefits of roughly $ 3 million and administering all of the benefit plans having to do with the health care, the newspaper's cafeteria plan, and the newspaper's pension and 401 (k) plans. *Id.* A review of his memoranda indicates that Reddin presented the case that he held a particularly important position as the Benefits Specialist, worthy of pay substantially greater than he had received over the previous years and necessary to sustain his position as his family's sole breadwinner. *Id.*

Unlike Plaintiff, Reddin also took the additional, persuasive step of drafting a new, detailed job description highlighting his responsibilities for administering the newspaper's multi-million dollar benefit plans. *See Pl.'s Resp. P 70* (contending that "Defendant provides no [*79] record evidence that the attached Job Description was prepared by Mr. Reddin. . . ."); *but see Def.'s Mot. for Summ. J., Ex. 18 (1/16/98 Reddin Job Description)* ("Prepared by: Les Don Reddin"); *id., Ex. 1 (Borer Aff.) P 12* ("That which is attached hereto to [sic] the Statement as Exhibit 18 is a true and accurate copy of a proposed job description submitted by Les Reddin to me in response to my request that he prepare and provide such a job description."). Fully cognizant of these facts, Borer and Edwards carefully considered Reddin's requests -- and threats of resignation. In the course of doing so, Edwards, with over thirty (30) years of experience on a newspaper, formed the opinion that Reddin deserved not just one but two raises based on his Reddin's responsibilities for supervising the administration of the newspaper's multi-million dollar benefit plans. Borer, as Reddin's immediate supervisor, also considered Reddin's request and concluded that he would recommend Reddin's requested raises based on (1) his personal assessment that Reddin had a great deal of responsibility as the Benefits Specialist, and (2) his analysis, using a salary survey provided by Employment Specialist [*80] Palmer, that showed Reddin to be underpaid compared to his cohorts at other companies. Accordingly, given that Defendant has offered neutral, non-discriminatory rea-

sons for its decision to award Plaintiff a raise of 3.05%, rather than a larger increase like the one provided to Reddin, Defendant has satisfied its burden of production and the burden shifts back to Plaintiff to introduce evidence sufficient that a fact-finder could find that she suffered an adverse employment action for discriminatory reasons through an examination of Plaintiff's *prima facie* case, evidence introduced to show that Defendant's explanations were pretextual, and any further evidence of discrimination by Defendant. *See Waterhouse v. Dist. of Columbia, 353 U.S. App. D.C. 205, 298 F.3d 989, 992-93 (D.C. Cir. 2002).*

3. Plaintiff Has No Evidence to Show Pretext or Discrimination *Vel Non.*

Upon an examination of Plaintiff's *prima facie* case, any evidence in the record to show that Defendant's explanations were pretextual, and any further evidence of discrimination by Defendant, it is clear that no reasonable fact-finder could conclude that Defendant awarded Plaintiff a raise of 3.05% in March 1998 [*81] -- rather than her larger request -- for discriminatory reasons based on her race or religious affiliation. Accordingly, an award of summary judgment in favor of Defendant as to Counts I, IV, and VII of Plaintiff's Complaint is appropriate.

First, as noted *supra* Section III(A)(1), Plaintiff's *prima facie* case framing her claims of race and religion-based discrimination is incomplete and inadequate. While the Court has assumed or Plaintiff has proven that she is a member of a protected class, her claims of having suffered an "adverse employment action" are quite weak, given that Plaintiff herself was presented with a salary *increase* in March 2005. Plaintiff herself in her deposition admitted under oath that she did not believe that she suffered discrimination in those years when The Washington Times had presented her with what was essentially only a cost-of-living increase. *See* Def.'s Mot. for Summ. J., Ex. 3 (6/25/01 Johnson Dep.) at 80:1-4 (Plaintiff clarifies that she only claims discrimination vis-a-vis her 1998 salary request, and does not claim that she was discriminated for "the years when [she] got cost of living raises"). In August 1993 through August 1997, [*82] Plaintiff received cost of living raises 47 each year ranging from 2.00% to 3.85%. *See supra* Section II(C) (Chart showing that from 1993-1997, Plaintiff received any salary increase in the month of August, and Plaintiff had just seen her salary increased on August 19, 1997). Edwards, the paper's General Manager who was not a Unification Church member, acceded to providing Plaintiff with a raise at the unusual time of March 1998 when he became convinced that it basically represented a cost-of-living increase. *See* Def.'s Mot. for Summ. J., Ex. 12 (9/26/01 Edwards Dep.) at 57:13-22 ("the 3 percent -- if [Plaintiff] got 3 percent, it was adequate . . . because

that's the sort of semi-cost of living arrangement."). Therefore, given that Plaintiff had never previously complained of cost-of-living increases, her March 1998 raise was another cost-of-living increase after her August 1997 raise, and her salary was actually *increased*, Plaintiff's claim of an "adverse employment action" is not strong. However, her ability to meet the *prima facie* "similarly-situated" employee requirement is nonexistent; as the Court has noted, Reddin simply is not an adequate comparator to Plaintiff [*83] given the vast differences in their positions, responsibilities, experience, and duties. *See supra* Section III(A)(1). According, given that Plaintiff cannot meet the *prima facie* requirements due to her inability to meet the third prong of the applicable test, summary judgment in Defendant's favor is appropriate. Even assuming *arguendo* that Plaintiff could make such a showing, her overall *prima facie* case for race and religion-based discrimination would be quite weak.

Second, to the extent that the Court considers pretext under the *McDonnell Douglas* analysis, Plaintiff simply has presented no evidence indicating that Defendant's stated reasons for awarding Plaintiff and Reddin their respective raises are pretextual. Under a pretext analysis, Plaintiff may think that Defendant's decision with respect to her raise request was not fair, but it does not matter if the decision was "'not just, or fair, or sensible.'" *Carter v. Greenspan, 304 F. Supp. 2d 13, 28 (D.D.C. 2004)* (quoting *Fischbach, 86 F.3d at 1183*); *Dickerson, 238 F. Supp. 2d at 82 n.14* ("An employer's proffered explanation for its adverse action need not [*84] be one that is desirable or attractive."); *see also Pignato v. Am. Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994)* (same). Rather, Plaintiff must show that Defendant's "'explanation given is a phony reason.'" *Id.; see also Fischbach, 86 F.3d at 1183* ("the issue is not the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers"). While Plaintiff might cry foul that Defendant refused to give her exactly what she wanted, she must adduce evidence showing that its stated reasons -- whether fair or ill-considered -- were actually a pretext covering up race-based or religious-based motivations. *See Hollins v. Fed. Nat'l Mortgage Ass'n, 760 A.2d 563, 571 (D.C. 2000).*

Plaintiff attempts to demonstrate pretext by focusing on the difference in religious affiliation between herself and Borer, and the connections between The Washington Times and The Unification Church. *See* Pl.'s Opp'n at 2-3. In many respects, Plaintiff's argument boils down to a claim that Borer's membership in The Unification Church (leaving aside the fact that Borer testified that he is also a member [*85] of the Catholic Church) -- to which she does not belong -- demonstrates that he discriminated against her on the basis of her religion. Plain-

tiff's contention is utterly inadequate to demonstrate pretext. *See Shapolia, 992 F.3d at 1039* (noting that "there mere fact that one Mormon supervisor reviewed another Mormon supervisor's performance appraisal of a non-Mormon employee is not sufficient to raise an inference of discrimination"). Indeed, the evidence adduced during discovery shows that the only individual who advocated a raise for Plaintiff was Borer, a member of The Unification Church, while Edwards, who was never a member of The Unification Church, initially opposed Plaintiff's request and then acceded reluctantly. Further, simply stating that The Unification Church has a connection to The Washington Times and 17% of Washington Times employees during the relevant time period were members of The Unification is insufficient to raise an inference of pretext. *See id.* ("Shapolia's mere assertions that the Mormons are clannish' and his own assessment of his job performance are inadequate to raise an issue of fact for trial.").

Moreover, Plaintiff has presented [*86] no documentary evidence or testimony suggesting that Borer, Reddin, or Joo ever referred to or considered her race or religious affiliation when making the March 1998 decision to award her a 3.05% promotion. While Borer himself might have been able to uncover whether or not Plaintiff was a member of The Unification Church through a reference to a variety of church materials at his home, Plaintiff has presented no evidence that Defendant ever obtained or kept information regarding the religious affiliation or non-affiliation of its employees. Indeed, Plaintiff -- who served in its Human Resources Department for over nine (9) years -- would have been in a prime position to have known of such a practice, but she provides no evidence showing that such knowledge was ever gleaned from the paper's employees. Additionally, the fact that Plaintiff is African-American while Borer and Edwards a white is also insufficient to raise an inference of racial-discrimination. Plaintiff has presented no evidence whatsoever connecting Defendant's raise decision to her race. Finally, Plaintiff's unfounded attempt to compare herself to Reddin further weakens her claim of pretext. *See Dickerson, 238 F. Supp. 2d at 78* [*87] ("[This] Circuit has held that a plaintiff's attempts to show that her employer's explanation is a pretext for discrimination are seriously undermined if those to whom she compares her treatment are not similarly situated.") (citing *Waterhouse, 298 F.3d at 995-96* and *McGill v. Muz, 340 U.S. App. D.C. 185, 203 F.3d 843, 848 (D.C. Cir. 2000)*). Because Plaintiff has failed to provide evidence suggesting that Defendant's stated reasoning behind its award of her March 1998 salary increase was pretextual, her case is severely weakened, if not fatally wounded. *See Forman v. Small, 350 U.S. App. D.C. 24, 271 F.3d 285, 293-94 (D.C. Cir. 2001), cert. denied, 536 U.S. 958, 122 S. Ct. 2661, 153 L. Ed. 2d 836 (2002)* (af-

firming dismissal of age discrimination claim where plaintiff failed to show that defendant's reasons for denying his promotion were pretextual); *Mungin, 116 F.3d at 1154, 1158* (overturning jury verdict where plaintiff failed to show that employer's explanation for his treatment was pretextual, or that similarly-situated colleagues were treated more favorably).

Finally, a consideration of other evidence regarding Defendant's potential discrimination [*88] undermines Plaintiff's claims of race and religion-based discrimination during the consideration of her March 1998 raise request. It is noteworthy that in alleging disparate treatment based on race and religion, Plaintiff has focused exclusively on Reddin. While both Reddin and Plaintiff requested and received raises for their work in the Human Resources Department of The Washington Times, so did another individual -- Sherrie Palmer. Palmer (1) was also an "administrative employee" in the Human Resources Department (the Employment Specialist); (2) she, like Plaintiff, is African-American; (3) she, like Plaintiff, was not and has never been a member of The Unification Church; and (4) she was awarded a substantial raise in March 1998 that resulted in her earning the *exact* same base salary as Reddin ($ 38,500) and the same $ 1,500 educational stipend. *Compare Def.'s Mot. for Summ. J., Ex. 21 (Personnel Action Form for Sherrie Palmer) with id., Ex. 22 (Personnel Action Form for Les Reddin); see also Def.'s Stmt. PP 87, 89; Pl.'s Resp. PP 87, 89.* As such, at the same time Plaintiff was requesting a raise, Defendant chose to provide another African-American non-Unification [*89] Church member in the same department as Plaintiff with a substantial salary increase that brought her pay exactly into line with Reddin, the individual so focused on by Plaintiff. Notably, Plaintiff never complains about the sizable increase provided at the same time to her friend Palmer. *See Def.'s Stmt. PP 87, 89; Pl.'s Resp. PP 87, 89* (Palmer's pay from March 1998 forward would have been 15% over Palmer's prior year's base salary). Plaintiff's neglect of this issue is telling, as Defendant's decision with respect to Palmer highlights the plethora of evidence in the record suggesting that it did not use race or religion-based criteria in determining its employees' salaries or raises.

Ultimately, Plaintiff is unable to sustain a *prima facie* case of race and religion-based discrimination. Plaintiff also has no evidence suggesting that Defendant's stated reasons were pretextual; rather, the record is inundated with evidence suggesting that Borer believed, in good faith, that Plaintiff was adequately paid and that her 3.05% raise was also adequate in his view. Finally, other evidence in the record relating to Ms. Palmer highlights the non-discriminatory aspects of Defendant's [*90] decision-making process. Accordingly, Counts I, IV, and VII of Plaintiff's Complaint, alleging race and religion-

based discrimination with respect to her March 1998 raise, cannot survive Defendant's Motion for Summary Judgment.

### B. Plaintiff's Claims Arising From Her October 1998 Termination

Plaintiff's claims arising from her October 29, 1998 termination from The Washington Times may be divided into two (2) central categories. First, Plaintiff contends that Defendant's decision to terminate her employment was founded upon race and religious-based discrimination in violation of the DCHRA, Title VII, and *42 U.S.C. § 1981. See* Compl. PP 17-20 (Count II-DCHRA), PP 29-32 (Count V -- Title VII), PP 41-44 (Count VIII -- *Section 1981* Claim). Second, Plaintiff claims that her termination was the result of retaliation against her following her April 24, 1998 EEOC Charge (which was focused on her salary/raise claim) in violation of the DCHRA, Title VII, and *42 U.S.C. § 1981. See id.* PP 21-24 (Count III -- DCHRA), PP 33-36 (Count VI -- Title VII), PP 45-48 (Count IX -- *Section 1981* Claim). The Court shall investigate each category of [*91] claims *seriatim,* first addressing Plaintiff's discrimination claims and then examining Plaintiff's retaliation claims.

#### 1. Plaintiff's Discriminatory Termination Claims

Counts II, V, and VIII of Plaintiff's Complaint allege that Plaintiff's "termination constituted religious and/or racial discrimination" when Plaintiff "was replaced by a Caucasian, Unification Church Member" as HRIS Specialist at The Washington Times -- Elizabeth Henkin. Pl.'s Opp'n at 29. While the Court concludes that Plaintiff has made out a *prima facie* case of race and religion-based discriminatory termination, the Court concludes that -- when looking at the strength of Plaintiff's *prima facie* case, Defendant's neutral, non-discriminatory rationale for terminating Plaintiff, Plaintiff's failure to produce evidence indicating pretext, and other relevant evidence in the record -- no reasonable fact-finder could conclude that Plaintiff suffered the adverse employment action for a discriminatory reason. *See Aka,* 156 F.3d at 1289.

##### i. *Plaintiff Can Establish a Prima Facie Case of Discriminatory Termination*

To make out a *prima facie* case of discriminatory termination under the [*92] Title VII framework, a plaintiff must show that: (a) "she belongs to a protected class"; (b) "she was qualified for the job from which she was terminated"; (c) "her termination occurred despite her employment qualifications"; and (d) "her termination was based on the characteristic that placed her in the protected class." *McManus v. MCI Commc'ns Corp.,* 748 A.2d 949, 954 (D.C. 2000); *see also Neuren,* 43 F.3d at 1512. To satisfy the fourth of these elements, the plaintiff

must show either: (i) that "'she was replaced by a person outside of her protected class, or if the position remained vacant, that the employer has continued to solicit applications for the position'"; or (ii) "'that other similarly situated employees . . . were not terminated but were instead treated more favorably.'" *Id.* (quoting *Blackman v. Visiting Nurses Ass'n,* 694 A.2d 865, 868-69 (D.C. 1997)). "The requirement of showing that similarly situated employees were treated more favorably is imposed when a plaintiff has not alleged that someone replaced her when terminated." *Id.* This *prima facie* framework is applicable for both Plaintiff's race-based [*93] termination claims and her religion-based termination claims. *See Klein v. Derwinski,* 869 F. Supp. 4, 8 (D.D.C. 1994) ("Where the religious discrimination involves termination rather than failure to accommodate, the case more closely approximates those straight-forward disparate treatment cases in which the plaintiff claims that she was terminated because of her sex or race.'") (quoting *Shapolia,* 992 F.2d at 1037). If the plaintiff succeeds in establishing the *prima facie* case, the traditional *McDonnell Douglas* framework then runs its course. *See Neuren,* 43 F.3d at 1512.

Defendant attacks Plaintiff's ability to meet two out of the four prongs necessary to make a *prima facie* showing of discriminatory termination. First, Defendant contends that Plaintiff cannot meet the second prong, requiring that she was qualified for the job when terminated, because her job performance was deficient in significant respects -- namely, Plaintiff knowingly breached the paper's confidentiality policy on numerous occasions, refused to cooperate with Borer's requests for information to be provided to his secretary, admittedly responded to [*94] her co-worker Reddin in an unprofessional manner, and refused to cooperate or answer questions relating to an investigation into breaches of confidentiality. *See* Def.'s Mot. for Summ. J. at 31-33; Def.'s Reply at 16-18. Second, Defendant claims that Plaintiff cannot meet the fourth prong of the analysis, requiring that Plaintiff introduce evidence that would support an inference and jury finding that Borer terminated her employment because she was not affiliated with The Unification Church. *See* Def.'s Mot. for Summ. J. at 34; Def.'s Reply at 16-18. Both arguments are without merit.

With respect to the qualification prong of the *prima facie* test, courts have generally been unwilling to use a defendant's alleged legitimate, non-discriminatory reason(s) to terminate a plaintiff to support a finding that the plaintiff was "unqualified," thereby defeating the plaintiff's claims at the *prima facie* stage. *See Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 662 (6th Cir. 2000) (noting that the defendant's qualifications argument "should have instead been treated as its production of a nondiscriminatory reason" and "to assess this evidence at

the *prima* [*95] *facie* stage is to misapply legal rules governing the allocation of burdens and order of proof"); *Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1360 (11th Cir. 1999), cert. denied, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000)* (explaining that "based on [plaintiffs'] employment history . . . we can infer that they were qualified for their respective positions" and holding that in finding the plaintiffs unqualified, the district court "incorrectly considered" the defendant's allegations of their "poor performance"); *Miners v. Cargill Commc'ns, Inc., 113 F.3d 820, 823-24 & n.6 (8th Cir. 1997)* (holding that a defendant's proffer of a legitimate, non-discriminatory reason for its action does not prevent the plaintiff from establishing a *prima facie* case); *Thomas v. Denny's, Inc., 111 F.3d 1506, 1510-11 (10th Cir. 1997), cert. denied, 522 U.S. 1028, 118 S. Ct. 626, 139 L. Ed. 2d 607 (1997)* (in order to avoid the frustration of Plaintiff's ability to establish pretext, "the employer's subjective reasons are not properly considered at the *prima facie* stage, and should instead [*96] be considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination") (citation and quotation marks omitted); *Freeman v. Package Mach. Co., 865 F.2d 1331, 1335-36 (1st Cir. 1988)* (same). An analysis of the evidence adduced during discovery reveals that -- at the time of Plaintiff's salary request in March 1998 and her termination in October 1998 -- Plaintiff was in fact "qualified" for the HRIS Specialist position at The Washington Times. Not only did Plaintiff have nine (9) years of experience at the newspaper, she also served her entire tenure in the Human Resources Department. Throughout the years prior to this request, Plaintiff had regularly received complementary performance evaluations, and her most recent review stated, "Pam's work continues to be accurate, thorough and completed in a dependable fashion." *Id.*, Ex. 16 (Johnson's 1997 Performance Evaluation); *see also id.*, Exs. 11-16 (1990, 1992, 1994, 1995, and 1996 Johnson Performance Evaluations). Given these facts, the Court concludes that Plaintiff has made the requisite showing that she was "qualified" for the position from which she was terminated [*97] for the purposes of the *prima facie* analysis. *See Paquin, 119 F.3d at 27* (looking at the plaintiff's evidence, including her "twenty year tenure" and "series of promotions" prior to negative performance evaluations proffered by defendant to find that plaintiff had surpassed the *prima facie* stage).

Defendant's second argument, which asserts that Plaintiff cannot meet the fourth prong of the *prima facie* analysis because there is no record evidence that would support an inference that she was terminated based on a discriminatory motive, falls into a similar trap. Once again, Defendant is introducing fact-based arguments at an inappropriate stage of the *McDonnell Douglas* analy-

sis; instead, an argument that Plaintiff failed to present evidence "that would support an inference and jury finding that Borer terminated her employment because she was not affiliated with the Unification Church" or was not a Caucasian is proper at the third stage of the tripartite framework, not the first, *prima facie* stage. Moreover, Defendant ignores the fact that the fourth prong of the *prima facie* case is satisfied if Plaintiff "'was replaced by a person outside of [*98] her protected class, or if the position has remained vacant, that the employer has continued to solicit applications for the position'" *McManus, 748 A.2d at 954* (quoting *Blackman, 694 A.2d at 868-69*)); *see also Neuren, 43 F.3d at 1512* ("replacement by a person of equal or less ability who is not a member of a protected class or, alternatively, the position remains open after termination"). Here, Plaintiff has presented evidence that less than one (1) month after her termination, her position as HRIS Specialist at The Washington Times was filled by Henkin, who is both Caucasian and a Unification Church member. Accordingly, Plaintiff has met the requirement necessary to establish the fourth prong of the *prima facie* test. Because Defendant has not contested the remaining two prongs of the analysis, the Court concludes that Plaintiff has met the *prima facie* case necessary to proceed with the remainder of the traditional *McDonnell Douglas* framework with respect to her discriminatory termination claims.

ii. *Defendant Has Offered Neutral, Non-Discriminatory Reasons for Plaintiff's Termination*

Upon a review of the evidence [*99] adduced during discovery and the parties' accompanying legal arguments, it is clear that Defendant has met its burden of production to offer neutral, non-discriminatory reasons for Plaintiff's termination. As Borer testified, he alone made the decision to terminate Plaintiff's employment with The Washington Times, after security breaches and violations of confidentiality were constantly occurring in the Human Resources Department, there was reason to suspect Plaintiff, and -- in his opinion -- Plaintiff failed to adequately respond to his questioning on October 29, 1998. According to Borer, at least eight (8) events led up to and culminated in the termination of Plaintiff.

First, Reddin's computer had been accessed without authorization in the Spring of 1998. After this event, Plaintiff submitted Reddin's three salary requests/demands from January-March 1998 in support of her April 24, 1998 EEOC Charge revolving around her raise request. Borer logically believed that Plaintiff was involved in improperly accessing Reddin's computer.

Second, Borer believed -- based on what he considered to be an inordinate amount of circumstances pointing to Plaintiff -- that she had given Howard the [*100] confidential "leave of absence" documents that were pre-

sent at Howard's October 8, 1998 deposition. Borer based his belief, whether accurate or not, on these facts: (1) he was aware that Plaintiff and Howard were friends; (2) since Howard had left her position unexpectedly in late 1996 and did not return as an employee, there would be no way that she could have taken these documents before her departure; (3) Borer thought that only Reddin, Palmer, Martin, Plaintiff, and himself had access to these documents; (4) the personnel files were kept in Plaintiff's office and Plaintiff had access to them; (5) he found a "Post-It" note near the "leave of absence" files that appeared to be in Plaintiff's handwriting and contained the names of certain employees who had already returned from leave; (6) he found staples of Plaintiff's staple remover near the "leave of absence" files, which indicated to him that she had copied certain documents then stapled them back together; and (7) Borer was present on October 28, 1998 when Howard swore under oath that -- at her request -- Plaintiff and Palmer agreed to take confidential "leave of absence" documents from The Washington Times to aid Howard's [*101] case. In Borer's mind, this was an extremely serious offense, and his initial suspicions had apparently been confirmed.

Third, Borer found documents on Plaintiff's computer that contained confidential information from his personnel file -- a file for which Plaintiff did not have access. Borer believed that his personnel file had been tampered with, and Clarke shared that view. Given that Plaintiff had access to this file because it was located in her office with the other files, coupled with other circumstances that Borer thought were suspicious, Borer once again suspected Plaintiff of breaching confidentiality guarantees.

Fourth, according to Borer, he became suspicious on October 28, 1998 that someone had been accessing his voice mail messages without permission. Around this same time, he had suspected someone of improperly going through a file cabinet in his office because he found that the file cabinet -- which he never locked because he did not have a key -- had been locked during a period that he was away from his office.

Fifth, Borer had contemporaneous concerns that Plaintiff may have been providing confidential information to another Washington Times employee, Teague, who [*102] was pursuing a claim against the newspaper and her former supervisor. Borer based this belief on his discovery that: (1) he saw information about Teague's former supervisor on Plaintiff's computer screen with no believable explanation provided by Plaintiff; (2) Plaintiff's calendar apparently indicated that she was having lunch with Teague in mid-October 1998; and (3) he found a torn-up note in Plaintiff's trash basket with both contact information for Teague's attorney and what appeared to be a list of items that had been requested by

Teague. Borer felt that there would be no reason for Plaintiff to communicate with Teague or her attorney about Teague's case, and any contact by an attorney should have resulted in a referral to Clarke, the security manager.

Sixth, Borer also grew concerned that Plaintiff had provided confidential salary information to a new hire, essentially telling that new hire that she was receiving a lower salary than her predecessor. Borer conducted an investigation of this incident, including an interview of the new hire, and found signs that he felt pointed to Plaintiff as the culprit, especially given the fact that -- at this time -- Palmer no longer worked [*103] in the Human Resources Department.

Seventh, at Howard's October 28, 1998 deposition, for which he was present, Borer also heard Howard testify under oath that Plaintiff had intentionally provided false information in response to an employment verification request for her -- another breach of Plaintiff's employment obligations.

Eighth, and finally, Borer knew that Plaintiff had been the subject of two complaints lodged by Reddin, in which Reddin claimed that Plaintiff had told him to "shut up" and get out of a work area, and then referred to him using the "f-word" during a phone call discussing her run-in with Reddin. When he attempted to investigate these incidents, Borer felt that Plaintiff was less than cooperative.

Based on the culmination of these circumstances and suspicions, especially the events that occurred in the last month or two of Plaintiff's employment (after Palmer's resignation), Borer found himself with grave doubts about whether he could trust Plaintiff to be loyal to the company and fulfill her duty to maintain confidentiality. Accordingly, he wanted to meet with Plaintiff at the first possible opportunity, which presented itself during her planned meeting with [*104] Clarke on October 29, 1998. Borer went into the meeting with Plaintiff seeking to investigate security breaches, leaks, and the misuse of confidential information; in short, Borer sought to investigate actual and suspected wrongdoing in the Human Resources Department. Concerned the Plaintiff would not provide adequate answers to his questioning, would admit guilt, or would refuse to cooperate, Borer prepared a brief termination memorandum prior to the meeting. During the questioning, Borer believed that Plaintiff was evading his questions and refusing to answer necessary follow-up questions, an observation with which Clarke concurred. Viewing this as the ultimate confirmation of his suspicions and the opposite reaction of an innocent person, Borer terminated Plaintiff on the spot. As Plaintiff admitted during testimony, if someone in the Human Resources Department had breached the guarantee of

confidentiality, that person was subject to termination. Based on the evidence before him, Borer believed that Plaintiff committed such a breach.

Given the testimony of Borer, the supporting observations of Clarke, the deposition admissions of Howard, and the documentary evidence in the record, [*105] it is clear that Defendant has met its burden of production under the *McDonnell Douglas* analysis and has provided numerous neutral, non-discriminatory justifications for Plaintiff's termination. According, Plaintiff must adduce evidence -- using her *prima facie* case, evidence indicating pretext, and other support record evidence -- that would allow a reasonable fact-finder to find that Defendant discriminated against her on the basis of her race or religion when she was terminated from its employ on October 29, 1998.

iii. *Plaintiff Cannot Show Pretext, and No Additional Evidence Indicates Impermissible Discriminatory Motivation*

Plaintiff spends virtually her entire argument attempting to show that Borer's stated reasons for her termination were pretextual. *See* Pl.'s Opp'n at 16-28. As discussed previously, pretext may be established "by showing that the employer's proffered explanation is unworthy of credence." *Burdine, 450 U.S. at 256, 101 S. Ct. 1089*. The Court may also "consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual. [*106]   " *Reeves, 530 U.S. at 143, 120 S. Ct. 2097* (citation and internal quotations omitted). However, as noted, "it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible." *Fischbach, 86 F.3d at 1183*. Courts are without authority to "'second guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Id. at 1183* (quoting *Milton v. Weinberger, 225 U.S. App. D.C. 12, 696 F.2d 94, 100 (D.C. Cir. 1982)*). "Consistent with the courts' reluctance to become involved in micromanagement of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of . . . discrimination, not whether she was treated fairly. . . ." *Forman, 271 F.3d at 291* (citations omitted); *see also Fischbach, 86 F.3d at 1183* ("He must show that the explanation given is a phony reason."). The relevant question at this stage is not whether Plaintiff actually committed the actual offenses for which she was under suspicion by Borer; rather, the pertinent inquiry becomes whether Borer believed -- in good faith -- that Plaintiff [*107] had violated the newspaper's confidentiality policy on numerous occasions, had been uncooperative and insubordinate, and could not longer be trusted, or whether discrimination based on Plaintiff's race and reli-

gious affiliation was the actual motivation for his decision.

Plaintiff, attempting to show pretext, makes four basic arguments, each of which are without merit. First, Plaintiff claims that "there is no way that Mr. Borer could have terminated" her on certain bases "since he had not determined that she had done anything wrong" prior to the October 29, 1998 meeting. *See* Pl.'s Opp'n at 24-28. In making this argument, Plaintiff takes excerpts from Borer's deposition out of context. While it is true that Borer testified that he had not definitively *concluded* prior to the meeting that Plaintiff had accessed Reddin's computer, revealed confidential "leave of absence" documents to Howard, provided false employment verification information to Howard, released salary information to the new hire, or had engaged in wrongdoing in connection with Reddin's complaints, *see id.*, Borer consistently testified that he was investigating these matters with Plaintiff as a prime suspect [*108] and he "wanted to question her about [them] in some detail so [he] could form an opinion of her credibility and what processes may have happened," *see, e.g.*, Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 88:20-23. Plaintiff's argument is specious: while Borer might not have been able to say that -- prior to the meeting -- he had concluded that Plaintiff was guilty of these offenses beyond a reasonable doubt, all evidence suggests that he certainly had significant suspicions in advance of the meeting such that he drafted a brief termination memorandum that actually detailed his finding of Plaintiff's guilt and which he was prepared to give her, depending on the quality of her responses to his investigation.

Second, Plaintiff attempts to show that Borer has provided "shifting explanations" for discharging her because his October 29, 1998 termination memorandum does not mention her refusal to answer his questions, while at the EEOC stage he claimed that "because Ms. Johnson refused to answer my questions, she was terminated[.]" *See* Pl.'s Opp'n at 16-17, 19, 21 (citing Pl.'s Opp'n, Ex. 68 (10/26/99 Borer EEO Aff.) at 2); *see id.* at 23 (citing *Ferguson v. Small, 225 F. Supp. 2d 31, 40 (D.D.C. 2002)* [*109] (holding that conflicting explanations given for termination are sufficient to "raise a reasonable inference that defendant's proffered reasons for the termination are pretextual")). Plaintiff's semantic argument fails for multiple reasons. First, the termination memorandum drafted by Borer and provided to Plaintiff neither states nor implies that it contains every reason for or incident leading up to her dismissal. *See* Pl.'s Opp'n, Ex. 61 (Borer's 10/28/98 Note re: "Employment" to Johnson) at 1 ("Several incidents have occurred *including*. . . .") (emphasis added). Additionally, it is undisputed that Borer actually questioned Plaintiff on October 29, 1998 and provided her with the termination memo-

randum only after a period of approximately fifteen (15) minutes of questioning. Plaintiff's argument might be sustainable had Borer never questioned her and now claimed that she was terminated for failing to respond appropriately; however, all evidence in the record supports Borer's testimony that he suspected Plaintiff of certain offenses, questioned her, and then -- finding her responses inadequate, evasive, and indicative of guilt -- concluded that providing her with the termination [*110] memorandum and firing her was the necessary next step. Moreover, for Plaintiff to suggest that the termination memorandum should include "failure to answer questions" is to request the impossible; it is undisputed that Borer drafted the memorandum prior to the termination meeting, and therefore Borer could not be expected to note Plaintiff's subsequent refusal to cooperate in the memorandum. Finally, Plaintiff takes Borer's EEO Affidavit statement completely out of context in her effort to draw a distinction between Borer's "refusal to answer questions" reason and his other justifications. Borer's EEO Affidavit instead supports his testimony that he long suspected Plaintiff of multiple offenses and her failure to answer questions apparently confirmed his suspicions. In relevant part, his EEO Affidavit states:

> With regard to Ms. Johnson, it was discovered that she gave another employee, Sheletha Howard, confidential personnel information. Ms. Howard was suing the company at the time and the information she had was confidential. Ms. Howard was deposed on October 8 and October 28, 1998. Ms. Howard initially said she got the information anonymously but later changed her story to [*111] say that Ms. Johnson gave her the information. Ms. Johnson denies giving any information to anyone. On October 23, 1998, I had evidence and suspicion that Ms. Johnson was copying documents and disclosing them to people suing the company. I saw the name of an employee on Ms. Johnson's screen who is a defendant in a case against the company. I later confronted Ms. Johnson about this information. Ms. Johnson accused me of harassing her and refused to answer my questions. Because Ms. Johnson refused to answer my questions, she was terminated[.]

Pl.'s Opp'n, Ex. 68 (10/26/99 Borer EEO Aff.) at 2. As such, this entire aspect of Plaintiff's pretext argument is grounded in the distortion of the record evidence. Borer

has been consistent with his stated justifications, which flow logically under his explanation of his beliefs and recollection of the relevant incidents.

Third, and finally, Plaintiff attempts to make certain factual arguments to prove that she was not guilty of certain offenses for which she was suspected as the culprit by Borer. See, e.g., Pl.'s Opp'n at 24 (pointing to testimony that shows Ms. Palmer actually tampered with Reddin's computer). Moreover, Plaintiff [*112] claims that (1) "it would have made no sense for Mr. Borer to terminate Ms. Johnson, a nine year veteran with The Washington Times, based on Ms. Howard's testimony given that Mr. Borer believed Ms. Howard was untrustworthy and had a motive to lie to protect herself from appearing as the wrongdoer," Pl.'s Opp'n at 25, and (2) "Ms. Howard has since recanted her testimony and now denies that Ms. Johnson had given her any documents," instead claiming once again that they appeared in anonymous package, id. Plaintiff's argument is not legally cognizable. The question of whether or not Plaintiff actually committed certain offenses is not for this Court to determine or consider with respect to pretext; while Plaintiff might feel that her termination was not just, fair, or sensible given her actual conduct versus Borer's suspicions, such considerations are insufficient within the Title VII framework. Rather, Plaintiff must provide evidence that Borer's stated legitimate, non-discriminatory reasons are actually pretextual and that race and religion-based discrimination actually occurred. This is a showing that Plaintiff has not made.

Ultimately, apart from meeting the rather minimal requirements [*113] of the prima facie case for discriminatory termination, Plaintiff has provided no evidence -- beyond mere baseless speculation -- that Borer ever considered her race or religion in his termination decision. Plaintiff's own speculation and conjecture, absent some affirmative evidentiary proof, is insufficient to defeat summary judgment. See, e.g., Steinberg v. Dep't of Justice, 179 F.R.D. 357, 360 (D.D.C. 1998); Carter v. Pena, 14 F. Supp. 2d 1, 7 (D.D.C. 1997) (use of conjecture is particularly inappropriate where plaintiff would bear the burden of proof at trial) (citing Celotex Corp., 477 U.S. at 322-23, 106 S. Ct. 2548); Campbell-El v. Dist. of Columbia, 874 F. Supp. 403, 407 (D.D.C. 1994) ("Beliefs are not fact," and a plaintiff -- to defeat a motion for summary judgment by a defendant -- must provide facts); Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'") (citation omitted). Plaintiff has not shown pretext; rather, Borer's stated reasons [*114] are legitimate and non-discriminatory, and his history of sticking to those reasons over time is borne out in the record. Moreover, ab-

sent a showing of pretext, Plaintiff has adduced no other evidence in the recording showing any discriminatory animus or motivation on the part of Borer; she offers no statements by Borer referencing her race or religion, no testimony from others indicating that Borer made reference to or considered those impermissible factors, and no documentary support for her claim. Indeed, other evidence adduced during discovery shows that during the previous year, 1997, Defendant had terminated a Caucasian employee for a breach of confidentiality somewhat similar to the breaches for which Plaintiff was suspected. Ultimately, Plaintiff has failed to meet her burden under the *McDonnell Douglas* test: no reasonable fact-finder could find, based on the evidence presented and inferences due Plaintiff, that she was terminated on October 29, 1998 by The Washington Times because of her race or religious affiliation. *See Waterhouse, 298 F.3d at 995* (granting summary judgment because plaintiff's "responses offered no grounds for a rational juror to conclude [*115] that the reason she was fired was racial discrimination rather than poor performance"). As such, summary judgment in favor of Defendant is appropriate with respect to Counts II, V, and VIII of Plaintiff's Complaint.

2. Plaintiff's Retaliation Claims

Counts III, VI, and IX of Plaintiff's Complaint allege that her October 29, 1998 termination was the result of retaliation against her following her April 24, 1998 EEOC Charge (which was focused on her salary/raise claim) in violation of the DCHRA, Title VII, and *42 U.S.C. § 1981. See id.* PP 21-24 (Count III -- DCHRA), PP 33-36 (Count VI -- Title VII), PP 45-48 (Count IX -- Section 1981 Claim).

Title VII not only prohibits federal agencies from discriminating on the basis of race and gender, *42 U.S.C. § 2000e-16*, it also prohibits them from retaliating against employees for the assertion of their rights under Title VII. *See Forman, 271 F.3d at 297 (D.C. Cir. 2001)*. To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) the employer took an adverse action against her; and (3) a causal [*116] connection exists between the protected activity and the adverse action. *See Morgan, 328 F.3d at 651; Holbrook v. Reno, 339 U.S. App. D.C. 4, 196 F.3d 255, 263 (D.C. Cir. 1999)*. The same test applies under the DCHRA. *See Arthur Young & Co. v. Sutherland, 631 A.2d 354, 361 n.17 (D.C. 1993)*. To prove the required third element, i.e., a causal connection, Plaintiff must make a "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell, 759 F.2d at 86; see also Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir. 1980)* ("Courts have recognized that proof of causal connection

can be established indirectly by showing that discriminatory activity is followed by discriminatory treatment."). Causation is often demonstrated by proximity in time, *see Gleklen v. Democratic Congressional Campaign Comm'n, Inc., 339 U.S. App. D.C. 354, 199 F.3d 1365, 1368 (D.C. Cir. 2000)*, but can be negated by evidence discrediting any claim of retaliation, *see Roberts v. Segal Co., 125 F. Supp. 2d 545, 550 (D.D.C. 2000); see also* [*117] *Carter, 304 F. Supp. 2d at 28*). "Once the requisite *prima facie* showing has been made, the same burden shifting analysis used for discrimination claims applies." *Dickerson, 238 F. Supp. 2d at 85* (citing *Singletary v. Dist. of Columbia, 225 F. Supp. 2d 43, 55-56 (D.D.C. 2002)*).

Here, Plaintiff has met the requirements necessary to establish a *prima facie* case of retaliation. Plaintiff was engaged in statutorily protected activity through her April 24, 1998 EEOC Charge, Plaintiff's employer took an adverse action against her in October 1998 by terminating her employment with The Washington Times, and Borer -- the terminating official -- learned of this charge when he received a Notice of Charge of Discrimination from the EEOC, dated April 30, 1998, *see* Pl.'s Opp'n, Ex. 3 (7/10/01 Borer Dep.) at 129:14-130:6, *id.*, Ex. 64 (Notice of Charge of Discrimination), and participated in Plaintiff's EEO process during the summer of 1998 when he responded to the EEOC Charge with a preliminary response dated June 5, 1998, *see id.*, Ex. 65 (Washington Times Position Statement to the EEOC Dated 6/5/98), and then with a supplemental [*118] response dated June 22, 1998, *id.*, Ex. 66 (Washington Times Position to the EEOC Dated 6/22/98), *id.*, Ex. 3 (7/10/01 Borer Dep.) at 129:21-129:23.

For the reasons set forth in *supra* Section III(B)(1)(ii), the Court concludes that Defendant has met its burden of production by offering numerous, significant, and legitimate non-discriminatory reasons for Plaintiff's termination. Under the *McDonnell Douglas* analysis, the burden shifts back to Plaintiff to adduce sufficient evidence -- using the strength of her *prima facie* case, evidence indicating pretext, and other record evidence -- that a reasonable fact-finder could find that retaliatory animus motivated Defendant's decision to discharge Plaintiff. For the reasons set forth in *supra* Section III(B)(1)(iii), the Court concludes that Plaintiff has failed to show pretext, and no other evidence in the record indicates any retaliatory motivation on the part of Borer or Defendant. Rather, all evidence indicates that Borer had a good faith belief in his stated neutral, non-discriminatory reasons in firing Plaintiff. As such, the Court shall grant Defendant's Motion for Summary Judgment with respect to Counts III, VI, [*119] and IX of Plaintiff's Complaint.

**IV: CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in its entirety. An Order accompanies this Memorandum Opinion.

Date: March 12, 2006

COLLEEN KOLLAR-KOTELLY

United States District Judge

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 12th day of March, 2006, hereby

**ORDERED** that [114] Defendant's Motion for Summary Judgment is GRANTED; it is further

**ORDERED** that [139] Defendant's Motion to Strike Plaintiff's Opposition and Statement of Material Facts in Dispute is DENIED; it is further

**ORDERED** that the status conference in this action previously set for Monday, March 13, 2006 at 11:00 a.m. is VACATED. This case is dismissed. This is a final, appealable Order.

**SO ORDERED.**

COLLEEN KOLLAR-KOTELLY

United States District Judge



LEXSEE 2006 U.S. DIST. LEXIS 42911

**MARIALICE BATHRUS WILLIAMS, Plaintiff, v. FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al., Defendants.**

**Civil Action No. 05-1483 (JDB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 42911*

**June 26, 2006, Decided**
**June 26, 2006, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a private entity that provided liquidity for mortgage investments and two of its employees, filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or for summary judgment of all claims raised by plaintiff former employee in her suit alleging violations of *42 U.S.C.S. §§ 1985*(3), 1981, and District of Columbia tort claims for tortious interference with business relationships and intentional infliction of emotional distress.

**OVERVIEW:** Plaintiff filed a Fed. R. Civ. P. 56(f) motion for continuance of discovery. Plaintiff alleged that she relied on defendants' promise that, after she left their employment in 1998, they would refer brokerage business to her. After a number of failed attempts to obtain such business, she sued in 2003, alleging that they had discriminated against her on the basis of sex and race because she had exercised her constitutional rights by filing a grievance while an employee. The court held that the complaint stated claims of race discrimination under *42 U.S.C.S. § 1981* and for tortious interference with business relationships only insofar as it pertained to a specific contract proposal defendants rejected in 2001; defendants' general promises to do business with plaintiff were too vague to be actionable. Plaintiff's *42 U.S.C.S. § 1985*(3) claim was precluded by the intra-corporate conspiracy doctrine, which stated that a corporation could not be held liable for conspiring with its agents. Assuming that defendants had falsely pretended to encourage plaintiff's business, such behavior was not outrageous; thus, plaintiff's intentional infliction of emotional distress claim failed.

**OUTCOME:** The court granted defendants' motion to dismiss plaintiff's claims of retaliation under § 1981,

civil conspiracy under § 1985(3), and intentional infliction of emotional distress. The court dismissed, in part, plaintiff's race discrimination claim under § 1981 and claim for tortious interference with business relationships or prospective economic advantage. The court granted plaintiff's motion for a continuance to permit additional discovery.

**COUNSEL:** [*1] For MARIALICE BATHRUS WILLIAMS, Plaintiff: Michael W. Beasley, Falls Church, VA; Brian J.H. Lederer, Washington, DC.

For FANNIE MAE, RICHARD LAWCH, GRACE HUERSCHER, Defendants: Evelyn L. Becker, Sarah Alexander Goldfrank, O'MELVENY & MYERS LLP, Washington, DC.

**JUDGES:** JOHN D. BATES, United States District Judge.

**OPINION BY:** JOHN D. BATES

**OPINION:**

**MEMORANDUM OPINION**

Plaintiff, an African-American woman and former employee of the Federal National Mortgage Association (" Fannie Mae"), brings this action against defendants Fannie Mae and two of its vice-presidents, Richard Lawch and Grace Huebscher. She alleges that, after her departure from Fannie Mae, defendants discriminated against her by denying her subsequent potential business contracts on the basis of her race and prior protected civil rights activity and also interfered with her business relationships with other entities. n1 Plaintiff seeks damages pursuant to federal civil rights laws, *42 U.S.C. §§ 1981*

Case 1:07-cv-00797-RWR    Document 2-4    Filed 05/29/2007    Page 2 of 12

Page 2
2006 U.S. Dist. LEXIS 42911, *

and *1985(3)* (Counts I through III), and District of Columbia tort law (Counts IV and V). n2

> n1 Plaintiff also originally asserted a sex discrimination claim under *42 U.S.C. § 1981*, but withdrew the claim at the motions hearing held on June 5, 2006. Mot. Hrg. Tr. at 25.

[*2]

> n2 Plaintiff characterizes her *§ 1981* claim as being "applied through" *42 U.S.C. § 1983*. However, as defendants point out, *§ 1983* has no applicability here. In order to bring a claim under *§ 1983*, a plaintiff must allege that the defendant acted under the color of state law. See *Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980)* (holding that a plaintiff must allege both deprivation of a federal right and that the depriving party acted under the color of state law in order to bring a *§ 1983* claim). Because plaintiff has not alleged that defendants acted under the color of state law, she may not bring (and has not brought) any claims under *§ 1983*.

Defendants move to dismiss all claims for failure to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)(6)*, and in the alternative, move for summary judgment on the ground that the three-year statute of limitations has expired for each claim. Plaintiff has moved for a continuance to permit discovery in aid of her opposition to [*3] summary judgment pursuant to *Fed. R. Civ. P. 56(f)*. The Court held a hearing on the motions on June 5, 2006. For the reasons explained below, the Court concludes that the amended complaint states a claim for relief as to race discrimination in violation of *§ 1981* with respect to the rejection of her May 2001 contract proposal and also states a claim for tortious interference with business relationships. The remainder of the claims will be dismissed for failure to state a claim upon which relief can be granted. The Court also concludes that full discovery should proceed in this matter, and thus grants plaintiff's motion for a continuance under *Rule 56(f)*.

**BACKGROUND**

The following facts are alleged in plaintiff's complaint, and are taken as true for purposes of resolving defendants' motion to dismiss. Plaintiff worked in various capacities at Fannie Mae's Multifamily Division from January 1990 to June 1998. See Am. Compl. P 11. Plaintiff developed securities and other insurance products while working with Fannie Mae customers under the supervision of defendant Richard Lawch. Id. P P 13, 17.

Plaintiff left Fannie Mae in June [*4] 1998 after a negotiated settlement agreement resolving allegations of race and sex discrimination as well as retaliation. Id. P 19.

Both before and immediately after plaintiff left her position, Fannie Mae promised her a continuing post-departure business relationship, consistent with its common business practice of maintaining commercial relationships with former employees. Id. PP 20, 21, 24. Lou Hoyes, Senior Vice President of Fannie Mae's Multifamily Division, assured plaintiff in writing that Fannie Mae would "do at least $ 1 billion of insurance-based business in the next year through her, as a broker, and would utilize her services in the years following in addressing components of a yearly total market of approximately $ 10 billion." Id. P 22 .

In reliance on Hoyes's written statement as well as other "promises and assurances" by defendants to do business with her, plaintiff started her own firm in October 1998 (" Risk Mitigation Strategists, LLC") and obtained a broker's license. Id. PP 27, 33. Plaintiff also developed a business plan which included the use of risk transfer products through Fannie Mae, another common practice among former employees. Id [*5] . P 28. In developing her firm, plaintiff incurred financial obligations of over $ 500,000 in reliance on the promises to do business with her. Id. P 31. Furthermore, plaintiff's firm entered a joint venture with CAM Financial, another firm with which she hoped to do business utilizing Fannie Mae insurance products. Id. P 32.

During this time and up until October 2003, defendants continued to promise plaintiff a business relationship, although no contracts were consummated despite plaintiff's business development efforts. Id. PP 36, 41-42. In May 2001, plaintiff discussed with Fannie Mae a specific proposal reflecting her ongoing and exhaustive work in refining her business products. In that proposal, plaintiff and CAM Financial "secured the interest of several A-plus rated insurance companies and brought an additional and significant proposal to [Fannie Mae] for doing specific mortgage-related business," which defendants rejected. Id. P 42. During this time, defendants instead directed "all such business and accompanying financial remuneration" to Craig Ott, a white male without a history of protected EEO activities and whose credentials, expertise, and experience [*6] in the relevant business were "demonstrably inferior" to those of plaintiff. Id. PP 45, 59.

On May 31, 2001, defendant Huebscher forwarded an e-mail to defendant Lawch which considered assigning the project to Ott. Id. P 46. In the e-mail, defendant Huebscher wrote:

"Richard, Marialice [Williams] wants to pursue the credit risk insurance for DUS risk. Do you want to pursue with her? MY GUT IS NO but if you think it is worth continuing discussions, I will focus on her questions?"

Id. Defendant Lawch then responded by e-mail:

> ?
>
> "If Ofheo comes back with bad RBC rules we may be interested. Are these different players than Craig [Ott] is showing us?"

Id. Defendant Huebscher then replied:

> ?
>
> "Probably not so if we want to engage Craig [Ott] on this project, that might be a better choice. If you like that plan then let's discuss what we want to ask Craig to find for us . . . ."

Id. At some point in the next month, June 2001, plaintiff received the e-mail from a former colleague. Id. P 47. Plaintiff states that she did not understand the full meaning of the conduct reflected in the e-mail until October 2003, [*7] over two years later. Id.

Despite the sentiment of the e-mail, plaintiff continued to propose projects and work assiduously on developing a business relationship with defendants based on their assurances of prospective business. Id. P 48. Plaintiff also alleges that from July 1998 to October 2003, defendants conspired to deny her the promised business relationships because of her race, sex, and former protected EEO activities, and defamed her to other potential clients in order to destroy her business reputation and relationships with other lenders and customers of Fannie Mae. Id. P 62. As part of defendants' alleged campaign to destroy plaintiff's business relationships, plaintiff alleges that defendants "purposefully discouraged" CAM Financial from entering into a co-brokerage agreement with plaintiff, causing her over $ 35,000,000 in lost co-brokerage fees. Id. PP 61, 67.

In October 2003, plaintiff attended a meeting with Fannie Mae officials, including defendant Huebscher, on the use of Captive Insurance Companies by Fannie Mae's Multifamily Division. Id. P 51. After the meeting, Fannie Mae stopped all contact with plaintiff, and refused to respond to her [*8] calls. Id. P 53. Plaintiff alleges that, because of defendants' refusal to do business with her

and her resultant bankruptcy, she suffered severe emotional distress, pain and suffering. Id. PP 66, 69.

Plaintiff filed suit on July 28, 2005. Her original complaint alleged that defendants unlawfully denied her the opportunity to make and enforce contracts and interfered with contractual relationships based on her race and sex, and in retaliation against her former EEO activities, and unlawfully conspired to do the same in violation of federal laws *42 U.S.C. §§ 1981* and *1985(3)*. She also raised four claims based on District of Columbia common law (breach of contractual relations, tortious interference with business relations, intentional infliction of emotional distress, and defamation). See Compl. PP 61-82. In response to defendants' first motion to dismiss, plaintiff filed an amended complaint dropping the counts related to breach of contract, contractual interference, and defamation but continuing to pursue the other claims. See Am. Compl. PP 70-84.

## ANALYSIS

### I. Defendants' Motion to Dismiss Under *Rule 12(b)*(6 [*9] )

#### A. Standard of Review

A motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; see also *Haynesworth v. Miller, 261 U.S. App. D.C. 66, 820 F.2d 1245, 1254 (D.C. Cir. 1987)*. All that the Federal Rules of Civil Procedure require of a complaint is that it contain "' a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)* (quoting *Conley, 355 U.S. at 47*). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*). [*10]

Under *Rule 12(b)(6)*, the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. *Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*; *Phillips v. Bureau of Prisons, 192 U.S. App. D.C. 357, 591 F.2d 966, 968 (D.C. Cir. 1979)*. The plaintiff must be given every favorable inference that may be drawn from the allegations

of fact. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Sparrow v. United Air Lines, Inc., 342 U.S. App. D.C. 268, 216 F.3d 1111, 1113 (D.C. Cir. 2000)*. However, "the court need not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir. 1994)*; see also *Domen v. Nat'l Rehabilitation Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996)* (citing *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))*.

Furthermore, in resolving a motion to dismiss, [*11] the Court may consider documents specifically referenced in the complaint where the authenticity of the document is not questioned. See *Newborn v. Yahoo!, Inc., 391 F. Supp. 2d 181, 188 n. 6 (D.D.C. 2005)*; see also *New York State Bar Ass'n v. F.T. C., 276 F. Supp. 2d 110, 114 n. 6 (D.D.C. 2003)* ("[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned") (quoting *Cooper v. Pickett, 137 F.3d 616, 622-23 (9th Cir. 1997))*. In the present case, plaintiff cites in her complaint a letter written by Fannie Mae Senior Vice President Lou Hoyes, a document which defendants have submitted in support of their motion to dismiss. See Am. Compl. PP 23, 32; Defs.' Mot. to Dismiss 1-2. Because the complaint relies upon the document and its authenticity is not questioned, the Court may properly consider it in resolving the motion.

## B. Racial Discrimination Under *42 U.S.C. § 1981* n3

n3 It bears noting that the federal government may not be sued under *§ 1981* because the terms of this provision do not contain a waiver of federal sovereign immunity. See, e.g., *Idrogo v. U.S. Army, 18 F. Supp. 2d 25, 29 (D.D.C. 1998); Williams v. Glickman, 936 F. Supp. 1, 5 (D.D.C. 1996)*. Thus, the Court briefly addresses plaintiff's characterization of Fannie Mae as an "instrumentality of the federal government." Am. Compl. P 2. Little discussion is needed, as it is well-established that Fannie Mae is a private, for-profit entity. See *Fannie Mae v. United States, 379 F.3d 1303, 1305 (Fed. Cir. 2004)* (" Formerly a federal government agency, FNMA is a private, for-profit entity that provides liquidity for mortgage investments"). See also *Katz v. Dime Sav. Bank, FSB, 992 F. Supp. 250, 255 (W.D.N.Y. 1997)* (holding that defendants, including Fannie Mae, do not have sovereign immunity). Accordingly, Fannie Mae does not have sovereign im-

munity, and the Court considers plaintiff's claim on its merits.

[*12]

Plaintiff alleges that defendants' course of conduct from July 1998 to October 2003, and the lack of any contracts awarded to her, supports her claim that defendants denied her the opportunity to make and enforce contracts on the basis of race, in violation of *42 U.S.C. § 1981*. Defendants move to dismiss this claim on the ground that plaintiff has failed to identify, first, any specific contract that was denied to plaintiff or, second, that another person outside of her protected class received a contract she was denied. In response, plaintiff contends, without citing any cases, that the law does not require her to identify any specific potential contracts at issue and, instead, that general allegations of reasonable and good faith efforts to develop a business relationship are sufficient to sustain a *§ 1981* claim. The Court declines to adopt plaintiff's interpretation of *§ 1981*, but finds that plaintiff has alleged one contract denied to her with sufficient specificity to support her claim.

In order to plead a claim of racial discrimination under *§ 1981*, a plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant [*13] intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in *§ 1981*. See *Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir. 1993); Mitchell v. DCX, 274 F. Supp. 2d 33, 45 (D.D.C. 2003)*. See also *White v. Florida Highway Patrol, Div. of Florida Dep't of Highway Safety and Motor Vehicles, 928 F. Supp. 1153, 1157 (M.D. Fla. 1996); Thomas v. St. Luke's Health Systems, Inc., 869 F. Supp. 1413, 1432 (N.D. Iowa 1994)*, aff'd, *61 F.3d 908 (8th Cir. 1995)*.

Courts have looked to the body of case law analyzing *§ 1981* claims in employment discrimination cases to evaluate the viability of non-employment contract claims. See *Mitchell, 274 F. Supp. 2d at 45-46* (explaining that "[t]he allocation of burdens in a *§ 1981* case is governed by the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*," and applying those standards in non-employment refusal-to-contract context). Under that case law, an inference of discrimination [*14] is created if the plaintiff is "significantly better qualified for the job" -- or, here by analogy, the contract -- than the less qualified candidate selected by the defendant. See *Aka v. Washington Hosp. Center, 332 U.S. App. D.C. 256, 156 F.3d 1284, 1294 (D.C. Cir. 1998)* (en banc); see also *Holbrook v. Reno, 339 U.S. App. D.C. 4, 196 F.3d 255, 261 (D.C. Cir. 1999)* (evidence demonstrating that similarly situated persons outside of pro-

tected class were treated more favorably is sufficient to support inference of discrimination).

It is undisputed that plaintiff has pleaded facts sufficient to support the first element of the prima facie case because she asserts that she is African-American. See Am. Compl. P 1. As to discriminatory intent, plaintiff has not presented any direct evidence, but has alleged facts supporting an inference of discrimination. Specifically, she alleges that "all such business" (presumably including the May 2001 proposal) promised to her instead went to Craig Ott (a white male). See Am. Compl. P 45. Plaintiff also alleges that Ott's expertise and experience were "demonstrably inferior" to hers. Id. P 59. [*15] Therefore, plaintiff has alleged facts sufficient to support an inference of discrimination.

In order to satisfy the third element of the prima facie case, the denial of an enumerated activity, plaintiff alleges, among other things, that in May 2001, she brought a specific proposal to defendants in association with CAM Financial and defendants rejected it. See id. P 42. Plaintiff alleges that she "secured the interest of several A-plus rated insurance companies and brought an additional and significant proposal to [defendant] for doing specific mortgage-related business." Id. Although the subject and scope of the proposed contract are unclear, this aspect of the complaint sufficiently identifies a contractual interest, and the denial of the right "to make" a contract, so as to state a claim under § 1981. That said, plaintiff's May 2001 proposal is the only contract alleged with enough specificity to state a claim under § 1981. n4

> n4 Plaintiff's counsel suggested at the motions hearing that defendants' actions at or after the October 2003 meeting indicated another rejection of a contract proposed by plaintiff. However, plaintiff's allegations with regard to the October 2003 meeting do not refer to any contract proposal, but rather allege only that "[plaintiff] participated in a meeting in Washington, D.C. with certain officials of Fannie Mae," that plaintiff had "prepared extensively" for the meeting, and that the subject of the meeting was "the use of Captive Insurance Companies by Fannie Mae's Multifamily Division." See Am. Compl. P 51. These factual allegations are insufficient to support an inference that plaintiff made a contract proposal.

[*16]

Throughout her complaint, plaintiff alleges that defendants made general promises to do business with her, but ultimately no contracts were achieved. See, e.g., id. P 22 (" Mr. Hoyes reasonably assured in writing to Plain-

tiff Williams that Fannie Mae would do at least $ 1 billion of insurance-based business in the next year through her, as a broker, and would utilize her services in the years following . . . ."); id. P 50 (" Through this time [October 2003], while no contracts had been achieved, Plaintiff Williams had been led to believe by the Defendants that such contracts would occur"); id. P 55 (" At all times from July 1, 1998, to the present, [defendants] have purposefully, intentionally, improperly, and willfully refused to do business with Plaintiff"). However, vague and conclusory allegations about the speculative loss of prospective business opportunities -- in contrast to the actual loss of a specific potential contractual interest -- fail to allege the type of contractual interests enumerated in § 1981's protection of the right "to make and enforce contracts." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1267 (10th Cir. 1989) [*17] (" Plaintiff has alleged that defendants' actions have interfered with his 'prospective business opportunities'. . . . but we find that vague and conclusory allegation insufficient to state a deprivation of the right to make and enforce contracts that is protected by § 1981"); see also Gonzalez v. Ingersoll Mill. Mach. Co., 133 F.3d 1025, 1034 (7th Cir. 1998) (holding that a laid-off at-will employee failed to state a claim under § 1981 because there was no underlying "contractual relationship" at issue, a required element); Morris v. Office Max, Inc., 89 F.3d 411, 414 (7th Cir. 1996) (holding that a potential retail purchase is not enough to establish a contract under § 1981 where the store does not actually refuse to sell a specific item; plaintiff's "general interest in [the] merchandise" is insufficient to implicate a contractual interest). Thus, plaintiff's allegations of general promises and assurances by defendants of a future business relationship or opportunities to do business do not identify a contractual interest under § 1981. n5 Accordingly, the Court grants in part and denies in part defendants' motion to dismiss the § 1981 claim [*18] (Count I), allowing it to proceed only as to the May 2001 project.

> n5 At the motions hearing, plaintiff suggested that the Supreme Court's recent decision in Domino's Pizza, Inc. v. McDonald, 126 S. Ct. 1246, 163 L. Ed. 2d 1069 (2006), is instructive on the disposition of her claim. Domino's addressed whether a non-party to a contract may bring an action under § 1981 in the context of a shareholder's relationship to the contracting corporate party. See id. at 1250. The Supreme Court's discussion of the standards applicable to § 1981 are fully consistent with the disposition reached above. See id. The Court reiterated the well-established principle that "a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those

who already have made contracts," a principle that underlies the decision today. *Id. at 1249-50.* At the same time, it emphasized that the focus of *§ 1981,* including after the 1991 amendments, is on a "contractual relationship," either existing or "proposed" (*id. at 1250*), which, as discussed above, is distinct from speculative prospective business opportunities.

[*19]

## C. Retaliation Under *42 U.S.C. § 1981*

Plaintiff alleges that the same course of conduct by defendants -- that is, from July 1998 to October 2003 -- also constitutes unlawful retaliation for her prior protected civil rights activities, including the filing of an EEO complaint prior to her June 1998 departure, in violation of *§ 1981.* Before evaluating the sufficiency of plaintiff's allegations, the Court pauses to note the scarcity of law in this area. The Court's review of the case law indicates that the vast majority of *§ 1981* retaliation claims have arisen in the employment context. As one court has aptly noted, there are few cases addressing *§ 1981* discrimination claims outside of the employment context, and "even fewer cases dealing with the question of retaliation outside the employment context under *§ 1981.*" See *Benton v. Cousins Properties, Inc., 230 F. Supp. 2d 1351, 1370, 1381 (N.D. Ga. 2002),* aff'd, *97 Fed. Appx. 904 (11th Cir. 2004).* Thus, one must extrapolate the pertinent elements of the McDonnell Douglas analysis to a *§ 1981* retaliation claim. *Id. at 1370.*

In order to make a prima [*20] facie case for retaliation under *§ 1981* in the employment context, plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is at least an inference of causation between the two. See *Carney v. American Univ., 331 U.S. App. D.C. 416, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998)* (assuming without deciding that *§ 1981* authorizes a claim for retaliation, and applying the traditional three-part test used in employment cases). n6 Extrapolating these elements to a non-employment, commercial setting, the elements would be substantially the same, except that instead of an adverse employment action, plaintiff must show an adverse decision in the making of a contract.

n6 This Court also assumes without deciding that a retaliation claim is authorized under *§ 1981.* Defendants have not raised the issue, and as explained in this opinion, the Court will dismiss the claim on other grounds.

Plaintiff alleges that she engaged in statutorily [*21] protected activity before leaving Fannie Mae. See Am.

Compl. P 19. She also alleges that defendants took action adverse to her by denying her contracting rights under *§ 1981* when she proposed the May 2001 contract. However, plaintiff does not allege facts sufficient to show a causal connection between her statutorily-protected activity and defendants' alleged rejection of her May 2001 proposal. Instead, plaintiff relies solely on the temporal proximity of events to support causation. It is true that causation may be construed from "close temporal proximity" between the protected action and the act of discrimination (or alleged retaliation). See *Childs-Pierce v. Utility Workers Union of Am., 383 F. Supp. 2d 60, 76 (D.D.C. 2005)* (holding that nine weeks suffices as close temporal proximity for retaliation claim under *§ 1981*). Although the case law is mixed with regard to how close temporal proximity must be to support an inference of causation, under the relevant case law, temporal proximity refers to a period of weeks or months -- not a period of years. See id.; see also *Mitchell v. Baldrige, 245 U.S. App. D.C. 60, 759 F.2d 80, 86-87 (D.C. Cir. 1985)* [*22] (holding that three months is sufficient for temporal proximity); *Castle v. Bentsen, 867 F. Supp. 1, 3 (D.D.C. 1994)* (holding that three to five months is sufficient); *Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002)* (holding that two months is not sufficient).

Here, plaintiff alleges that she engaged in statutorily protected activity before she left Fannie Mae in June 1998 and that defendants did not take adverse action until May 2001, just over three years later. See Am. Compl. PP 19, 42. A three-year period between the protected activity and the adverse contract decision is too long under any standard to support an inference of causation. Therefore, the Court concludes that plaintiff has not established a prima facie case of retaliation under *§ 1981.* Because plaintiff failed to plead facts sufficient to support her retaliation claim, defendants' motion to dismiss this claim is granted.

## D. Conspiracy Under *42 U.S.C. § 1985(3)* n7

n7 Defendants' contention that a heightened pleading standard applies to *§ 1985* claims is in error. This Circuit has firmly rejected heightened pleading requirements in *§ 1981* cases and its reasoning applies with equal force to *§ 1985* claims. See *Sparrow v. United Airlines, Inc., 342 U.S. App. D.C. 268, 216 F.3d 1111, 1115 (D.C. Cir. 2000)* (" as the Supreme Court held in Leatherman, this [dismissal under *Rule 12(b)(6)*] may not be accomplished by employing heightened pleading standards except in those cases specifically listed in Federal *Rule 9(b)*").

[*23]

Plaintiff's third claim against defendants alleges that they engaged in a conspiracy in violation of *42 U.S.C. § 1985(3)* to discriminate and retaliate against her in the making and enforcing of contracts, based on the same course of conduct alleged in support of her *§ 1981* claims. Defendants move to dismiss on the ground that the only conspiracy alleged is that between Fannie Mae and two of its officers, which fails to state a claim for a conspiracy under the intracorporate conspiracy doctrine.

In order to sufficiently plead a conspiracy claim under *§ 1985*, plaintiff must allege that: (1) the conspiracy involved two or more persons; (2) the conspiracy is for the purpose of depriving (directly or indirectly) someone or a group of people of the equal protection of the laws; (3) there has been an overt act in furtherance of the conspiracy; and (4) plaintiff has been deprived of her rights. See *Brown v. Sim, 2005 U.S. Dist. LEXIS 35415, No. 03-2655, 2005 WL 3276190 at *3 (D.D.C. Sept. 30, 2005)* (citing *Great American Federal Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 373, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979))*; see also *Love v. Bolinger, 927 F. Supp. 1131, 1139 (S.D. Ind. 1996)*; [*24] *Greene v. Hawes, 913 F. Supp. 136, 144 (N.D.N.Y. 1996)*.

Of these elements, the one dispositive here is the requirement that the conspiracy involve two or more persons. Generally, the law does not recognize a conspiracy between a corporation and its agents. See *McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000)*. Accordingly, under the "intracorporate conspiracy doctrine,"

> because a company cannot conspire with itself, the officers and directors of a corporation generally cannot be held liable under *§ 1985(3)* for actions taken in concert with one another . . . . Instead, the relevant inquiry is whether the acts of the defendants were in fact taken on behalf of the corporation, each acting within the scope of their employment, or instead were taken solely for personal, nonbusiness motivations.

*Weaver v. Gross, 605 F. Supp. 210, 214-15 (D.D.C. 1985)* (holding that an intracorporate conspiracy may only exist when the employees act outside the scope of their employment); see also *Brown, 2005 U.S. Dist. LEXIS 35415, 2005 WL 3276190, at *4; Cross v. General Motors Corp., 721 F.2d 1152, 1156 (8th Cir. 1983)*; [*25] *Brace v. Ohio State Univ., 866 F. Supp. 1069, 1075 (S.D. Ohio 1994)*.

In order to claim civil conspiracy against a corporation, plaintiff must allege facts in her complaint suggesting that the officers of Fannie Mae were acting outside the scope of their employment. See *Norkol/Fibercore, Inc. v. Gubb, 279 F. Supp. 2d 993, 1000 (E.D. Wis. 2003)* (dismissing conspiracy claim because of failure to allege that corporate employees were pursuing personal interests); see also *Bremiller v. Cleveland Psychiatric Inst., 879 F. Supp. 782, 789 (N.D. Ohio 1995)* (holding that the plaintiff pleaded facts sufficient to show employees were acting outside the scope of employment). Plaintiff does not allege in her complaint that defendants Lawch and Huebscher were acting outside the scope of their employment. As counsel for plaintiff candidly acknowledged at the motions hearing, plaintiff alleges just the opposite -- that Lawch and Huebscher acted within the scope of their employment -- so that plaintiff may be able to recover against Fannie Mae. See Mot. Hrg. Tr. at 27. Because no factual allegations of the complaint support an inference that Lawch [*26] and Huebscher acted outside the scope of their employment, the alleged conspiracy among the corporation and its agents is insufficient and defendants' motion to dismiss this claim is granted.

### E. Tortious Interference with the Reasonable Expectation of Prospective Economic Advantage

Plaintiff's fourth claim against defendants alleges that they tortiously interfered in her business relationships with third parties by making knowingly false and defamatory statements about her. To state a prima facie case for tortious interference with a business relationship or reasonable expectation of prospective economic advantage, a plaintiff must allege: (1) a valid business relationship or expectancy with a third party; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) intentional interference by the defendant, causing a breach or termination of the relationship or expectancy; and (4) resultant damage. See *Bennett Enters. v. Domino's Pizza, 310 U.S. App. D.C. 192, 45 F.3d 493, 499 (D.C. Cir. 1995)* (holding that all four elements must be met in order to bring tortious interference with prospective economic advantage claim). Defendants [*27] move to dismiss on the ground that plaintiff fails to identify any valid business relationships or any conduct amounting to intentional interference under the law, and furthermore, that no termination of a business expectancy is alleged.

As to the threshold element of a valid business relationship, the amended complaint casts a wide net but ultimately identifies only one such relationship -- that with CAM Financial concerning a co-brokerage agreement. See Am. Compl. P 61. Aside from this allegation, plaintiff does not specifically name any other third parties with which she had a business relationship or expec-

tancy; plaintiff instead alleges that defendants interfered with other unspecified relationships between plaintiff and "various lenders and customers of Fannie Mae" and "Fannie Mae consultants, brokers, lenders and customers and their representatives." Am. Compl. PP 60, 61. Because her intent to work with CAM Financial is the only expectancy that plaintiff specifically alleges, it is the only relationship that conceivably can support her tortious interference claim.

Defendants contend that even the relationship with CAM Financial is too unilateral to support a claim of a [*28] valid business relationship or expectancy. It is well-established that "[a] protected relationship exists only if there is a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope." *Klein v. Grynberg, 44 F.3d 1497, 1506 (10th Cir. 1995)*; see also *Ellsworth Assocs. v. United States, 917 F. Supp. 841, 850 (D.D.C. 1996)*. Construing the complaint in the light most favorable to plaintiff, the Court concludes that she has satisfied this standard. Plaintiff alleges that she intended to work with CAM Financial under a co-brokerage agreement as part of her business plan, and that she had a business history with CAM Financial, including a past joint venture. See Am Compl. P 32. These factual allegations indicate that it was reasonably likely that a co-brokerage contract would have resulted.

Defendants contend that this claim nonetheless fails because plaintiff fails to allege facts supporting an inference of intentional interference. Defendants correctly note that a general intent to interfere is not enough; there must be a "strong showing of intent" in order to make a prima facie case for [*29] tortious interference. *Bennett, 45 F.3d at 499*; see *Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 423 (D.D.C. 1988)*. However, a plaintiff who alleges slander on the part of the defendant sufficiently asserts this strong showing of intent. *Genetic Sys. Corp., 691 F. Supp. at 423* (" A competitor's conduct must be more egregious . . . . it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement.") (citing *Business Equip. Ctr., Ltd. v. DeJur-Amsco Corp., 465 F. Supp. 775, 788 (D.D.C. 1978)*). In this case, plaintiff alleges that defendants communicated "knowingly false and defamatory information" against plaintiff to companies associated with her, including CAM Financial. Am. Compl. P 62. Accordingly, the Court concludes that plaintiff pleads facts sufficient to support this element.

The elements of termination and resultant damage are easily met and require little discussion. Plaintiff pleads that defendants' interference caused a breach or termination of her expected co-brokerage contract with CAM Financial. See *id. P 64*. In addition, plaintiff alleges resulting damages [*30] with specificity: she

claims loss "in an amount in excess of $ 35,000,000 as a direct result of lost co-brokerage commissions with CAM Financial." *Id. P 67*. Accordingly, the Court concludes that plaintiff's claim of tortious interference with a business relationship may proceed with respect to her alleged relationship with CAM Financial only, but not in any other respect.

**F. Intentional Infliction of Emotional Distress**

Plaintiff's final claim against defendants alleges that their course of conduct from July 1998 to October 2003 constitutes intentional infliction of emotional distress. To support a claim for this tort, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211 (D.C. 1997)* (quoting *District of Columbia v. Thompson, 570 A.2d 277, 290 (D.C. 1990)*), vacated on other grounds, *593 A.2d 621 (D.C. 1991)*); see *Wise v. District of Columbia, Case No. 03-cv-310, 2005 U.S. Dist. LEXIS 6361, at *16 (D.D.C. Mar. 21, 2005)*; *Hoffman v. Hill & Knowlton, Inc., 777 F. Supp. 1003, 1005 (D.D.C. 1991)*. [*31] More specifically, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Duncan, 702 A.2d at 211* (quoting *Drejza v. Vaccaro, 650 A.2d 1308, 1312 (D.C. 1994)*); accord, *Sturdza v. United Arab Emirates, 350 U.S. App. D.C. 154, 281 F.3d 1287, 1305 (D.C. Cir. 2002)* (citing *Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984)*).

Plaintiff highlights defendants' "active, conspiratorial, malicious and secretive attempts to curtail or terminate Plaintiff Williams's prospective and ongoing business relationships" and their efforts to damage her personal and business reputation all during a period when they gave false appearances of intending to do business with her. Am. Compl. P 83. The conduct alleged fails, as a matter of law, to rise to the level of extreme and outrageous conduct under District of Columbia law. Conduct must be truly outrageous to make a prima facie case for intentional infliction of emotional distress. See *Browning v. Clinton, 352 U.S. App. D.C. 4, 292 F.3d 235, 248 (D.C. Cir. 2002)* [*32] (holding insults uttered at a press conference and threats insufficient to withstand dismissal of intentional infliction of emotional distress claim); *Thompson, 570 A.2d at 290* (holding that repeated criticisms of employee, misrepresentations, refusal to promote, physical pushing and verbal threats, and ultimately, termination of employment did not rise to level of outrageous conduct); *Tiefenbacher v. AARP, 2006 U.S. Dist. LEXIS 23629, No. 05-1802-CKK, 2006 WL 1126841, at *2-3 (D.D.C. Apr. 27, 2006)* (holding wrongful discharge and retaliation not enough to state a claim for intentional infliction of emotional distress).

Plaintiff essentially alleges that defendants refused to contract with her because of her race and engaged in a campaign to prevent others from doing business with her. Even taking defendants' alleged misrepresentations into account, their alleged conduct is not atrocious and outside the bounds of civilized society under District of Columbia law. In the commercial arena and elsewhere, it is commonplace that sought-after contracts fail to materialize for illegitimate reasons and that other parties engage in misrepresentation, renege on promises, [*33] and seek to take business away from others. While such conduct may support other causes of action (such as plaintiff's *§ 1981* claim), it does not rise to the level of outrageous behavior required to support a claim for intentional infliction of emotional distress. Accordingly, the Court grants defendants' motion to dismiss this claim.

## II. Plaintiff's *Rule 56(f)* Motion for a Continuance to Permit Discovery in Aid of Opposition to Summary Judgment

Defendants have moved for summary judgment on the ground that all of plaintiff's claims are time-barred. In this case, the statute of limitations is three years for both the *§ 1981* claim and the tortious interference claim. n8 See *Carney, 151 F.3d at 1095* (holding that claims under *§ 1981* have a three-year statute of limitations); *Beard v. Edmondson & Gallagher, 790 A.2d 541, 546 (D.C. 2002)* (holding the same for tortious interference). Defendants' motion is based on their contention that plaintiff's undisputed deposition testimony in another case establishes that she knew or should have known that she had a cause of action on or about June 4, 2001, when she read the May 31, 2001, e-mail indicating [*34] that she would not receive the contract she sought. In that testimony, plaintiff states that, after reading the e-mail, "it was clear that [defendant Fannie Mae] was not going to do business with [her]." Defs.' Mot. for Summ. J. at 3 (quoting Ex. E, Marialice Williams Dep. at 91 (Mar. 17, 2003)). n9 In response, plaintiff moves for a continuance to permit discovery in aid of her opposition to summary judgment pursuant to *Fed. R. Civ. P. 56(f)*.

n8 At the motions hearing, plaintiff raised the issue of whether *28 U.S.C. § 1658* -- the catch-all four year statute of limitations for civil actions arising under federal statutes enacted after December 1, 1990 -- applies to her *§ 1981* claim, in light of *Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)*. The Court concludes that the three-year statute of limitations discussed above is not affected by that decision. In Jones, the Supreme Court held that the catch-all four-year statute of limitations applies to a federal claim "if the plaintiff's claim against the defendant was made possi-

ble by a post-1990 enactment" -- there, the 1991 amendments to *§ 1981 Id. at 382* (emphasis added). Thus, *§ 1981* claims authorized pre-1991 would continue to be subject to limitations periods borrowed from local law, while claims arising under the 1991 amendments would be subject to the *§ 1658* catch-all period. See *id. at 384-85 & n. 18* (noting that lower courts would be "required to determine whether the plaintiff has alleged a violation of the relevant statute as it stood prior to December 1, 1990, or whether her claims necessarily depend on a subsequent amendment" in order to decide which statute of limitations is applicable). Plaintiff's *§ 1981* claim is authorized by the pre-1991 version of *§ 1981* because it concerns only pre-formation contractual issues, rather than the category of post-formation conduct covered by the 1991 amendments. See *Domino's Pizza, Inc., 126 S. Ct. at 1250*. As such, it remains appropriate to borrow the limitations period from local law.

[*35]

n9 Defendants quote other excerpts of the deposition to similar effect. For example, plaintiff stated that "it was clear from [the e-mail dated May 31, 2001] that [defendants] were not doing anything but taking my time and attention and using that with other people." Id., quoting Williams Dep. at 88. Plaintiff also noted that when she received the e-mail, she knew she was "being screwed" and that it was clear to her that she was "not going to be given the same opportunity as everyone else" to do business with defendants. *Id. at 4*, quoting Williams Dep. at 94, 121.

In order to prevail, plaintiff must show what facts she "intend[s] to discover that would create a triable issue" and why she cannot yet produce them. See *Byrd v. United States EPA, 335 U.S. App. D.C. 403, 174 F.3d 239, 248 n. 8 (D.C. Cir. 1999)* (citing *Hotel & Restaurant Employees Union, Local 25 v. Attorney Gen. of United States, 256 U.S. App. D.C. 227, 804 F.2d 1256, 1259 (D.C. Cir. 1986)*, vacated on other grounds, *257 U.S. App. D.C. 243, 808 F.2d 847 (D.C. Cir. 1987))*; see also *Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004)* [*36] (holding that every *Rule 56(f)* motion must include (1) the nature of the uncompleted discovery; (2) an explanation of how the facts sought are reasonably expected to create a genuine issue of material fact; (3) a showing that the plaintiff made efforts to obtain these facts by other means; and (4) why these efforts were not successful).

To create a triable fact over a statute of limitations issue, a plaintiff may show that the defendant engaged in subsequent misrepresentation, tolling the statute of limitations. See *Sprint Communs. Co., L.P. v. FCC, 316 U.S. App. D.C. 168, 76 F.3d 1221, 1226 (D.C. Cir. 1996)* (" If, however, the plaintiff did not discover the injury because the defendant fraudulently concealed material facts related to its wrongdoing, then the court will deem the cause of action not to have accrued during the period of such concealment -- unless the defendant shows that the plaintiff would have discovered the fraud with the exercise of due diligence."); see also *Richards v. Mileski, 213 U.S. App. D.C. 220, 662 F.2d 65, 70 (D.C. Cir. 1981)* (same). Here, plaintiff alleges that defendants engaged in misrepresentations and fraud *after* denying her the May [*37] 2001 proposal, and she casts such conduct as lying at the heart of her case. See Pl.'s Mot. for Continuance at 3-5. Plaintiff alleges that, after June 2001, defendants provided "continuing encouragement" with regard to prospective business opportunities, participated in business development efforts with her, and through those and similar actions, led her to believe that she would be rewarded with business contracts, all the while knowing that they would not accept any contracts from her. Id. If plaintiff can demonstrate that defendants continued to promise other business opportunities to her, then a trier of fact could reasonably conclude that she could not have been aware of any racially discriminatory intent on the part of defendants in rejecting her May 2001 proposal.

The conundrum here is that there is a disconnect between the facts plaintiff seeks to prove and the discovery sought. Plaintiff seeks full access to documents from the CAM Financial litigation, CAM Financial Servs., Inc. v. General Star National Ins. Co., Fannie Mae, et al., No. 1: 01-cv-314-LG-JMR (S.D. Miss.), which defendant has relied on in part to support its motion for summary judgment. n10 However, [*38] it is unclear how these documents would establish the misrepresentations and deceit alleged by plaintiff. In order to create a triable issue, plaintiff must discover evidence of defendants' attempts to hide its unlawful discriminatory intentions after June 2001. But plaintiff never explains why the documents in the CAM Financial litigation would reveal such facts; her counsel only makes the conclusory statement that the documents would do so.

> Those documents would facilitate our response to the motion for summary judgment and our ability to show that material facts are in dispute, notwithstanding Defendants' claims in their Motion, as to the following: when they refused to do business, when Plaintiff should have known such, and when the statute of limitations

began running. What we are seeking to demonstrate further, as already alleged in the amended complaint, [is] that Fannie Mae continued at least through October 2003, in a serious manner intended to be believed by Plaintiff, in business development with her. It was not until thereafter that Fannie Mae made clear in their actions against Plaintiff that they would not do business with her. Such demonstration clearly would [*39] create a material issue of fact in dispute . . . .

Pl.'s Motion for *Rule 56(f)* Continuance, Lederer Aff. P G. There is little description of what the CAM Financial litigation is about and why it would be relevant. What little there is suggests that the documents requested by plaintiff would not be relevant to any fraudulent conduct by defendants after June 2001. Plaintiff states that she was a key player in the litigation and that the case involved business transactions similar to those in which she has expertise, but she fails to explain how that is relevant to her allegations of fraud:

> The entire *CAM Financial* docket sheet does indeed have numerous personal references to Plaintiff Williams. The subject matter of that case also addressed promises by Defendant Fannie Mae regarding complex business transactions of a nature of those which had been conducted by Plaintiff Williams while at Fannie Mae prior to her departure, and for which she was qualified to conduct following her departure from Fannie Mae.

*Id. at 7.*

> n10 These documents are unavailable directly from that court because they were destroyed by Hurricane Katrina.

[*40]

Moreover, the complaint and amended complaint in that litigation were filed on August 3, 2001, and December 20, 2001, respectively, indicating that the conduct at issue is in the 2001 time frame or earlier. See Doc. Nos. 1 and 37 in CAM Financial Servs., Inc., supra. n11 But the misrepresentations plaintiff seeks to prove extend far beyond those dates. It is thus apparent to the Court that there is likely to be discoverable information relevant to

the misrepresentations alleged and their possible impact on the statute of limitations -- e. g., testimony from defendants Lawch and Huebscher, their internal e-mails, and e-mails from those defendants to third parties such as Craig Ott. But it is also apparent that the litigation is not necessarily the repository of this information. Something close to full discovery in this case would be necessary to produce that information because the issues related to the statute of limitations are closely intertwined with the merits.

n11 Plaintiff filed the docket sheet from this litigation as an exhibit in support of its *Rule 56(f)* motion after the motions hearing.

[*41]

Whether plaintiff ultimately can prove the alleged misrepresentations remains to be seen. But under these circumstances, she should be given the chance to do so pursuant to *Rule 56(f)*. See *Chappell-Johnson v. Powell, 370 U.S. App. D.C. 162, 440 F.3d 484, 488 (D.C. Cir. 2006)* (noting that "before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation" of a party's proof, and ordering that discovery be allowed to proceed based on counsel's affidavit describing the facts that it intended to produce during discovery) (citations omitted). The Court will therefore grant plaintiff's motion for a *Rule 56(f)* continuance, and deny defendants' motion for summary judgment without prejudice. n12

n12 It bears noting that defendants' evidence in support of summary judgment does not address when the statute of limitations began running on plaintiff's claim of tortious interference with business relationships. There is no information in the record as to plaintiff's anticipated co-brokerage agreement with CAM Financial and, thus, defendants' motion for summary judgment on this claim would be denied without prejudice in any event.

[*42]

**CONCLUSION**

For the foregoing reasons, the Court grants defendants' motion to dismiss plaintiff's claims of retaliation under *§ 1981* (Count II), civil conspiracy under *§ 1985* (Count III), and intentional infliction of emotional distress (Count V). The Court grants in part and denies in part defendants' motion to dismiss Counts I and IV. Plaintiff's claim of race discrimination under *42 U.S.C. § 1981* (Count I) may proceed only with respect to her claim that defendants unlawfully rejected her May 2001

proposal. Her claim of tortious interference with business relationships or prospective economic advantage (Count IV) may proceed only with respect to defendants' alleged tortious interference with the CAM Financial co-brokerage agreement. Those claims are dismissed in all other respects.

The Court grants plaintiff's *Rule 56(f)* motion for a continuance to permit discovery in aid of plaintiff's opposition to summary judgment and denies defendants' motion for summary judgment without prejudice. Full discovery shall proceed in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of the Court following the filing of defendants' [*43] answer to the amended complaint. A separate order will be issued herewith.

**ORDER**

Upon consideration of defendants' motion to dismiss and, in the alternative, for summary judgment, and plaintiff's motion for continuance pursuant to *Rule 56(f)* to permit discovery in aid of her opposition to defendants' motion for summary judgment, and for the reasons stated in the memorandum opinion issued this date, it is hereby

**ORDERED** that defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that plaintiff's claims of racial discrimination pursuant to *42 U.S.C. § 1981* (Count I) may proceed only with respect to the claim that defendants unlawfully rejected her May 2001 proposal, and Count I is dismissed in all respects; it is further

**ORDERED** that plaintiff's claims of tortious interference with business relationships or prospective economic advantage may proceed only with respect to defendants' alleged tortious interference with the CAM Financial co-brokerage agreement (Count IV), and Count IV is dismissed in all other respects; it is further

**ORDERED** that [*44] plaintiff's claims of retaliation under *42 U.S.C. § 1981* (Count II), civil conspiracy under *42 U.S.C. § 1985(3)* (Count III), and intentional infliction of emotional distress (Count V) are **DISMISSED**; it is further

**ORDERED** that defendants' motion for summary judgment is **DENIED** without prejudice; and it is further

**ORDERED** that plaintiff's motion for continuance pursuant to *Rule 56(f)* to permit discovery in aid of her opposition to defendants' motion for summary judgment is **GRANTED**, and full discovery shall proceed in accordance with the Federal Rule of Civil Procedure and the Local Civil Rules of the Court following the filing of defendants' answer to the amended complaint.

2006 U.S. Dist. LEXIS 42911, *

**SO ORDERED**

JOHN D. BATES

United States District Judge

Dated: June 26, 2006



# Administration & Operations Manual



EXHIBIT
4

## Introduction

**Last Revised:** 6 Sep 2006

### INTRODUCTION

The Administration and Operations Manual contains Board approved and administration approved operating policies for Gallaudet University. Policies that are submitted to and approved by the Gallaudet University Board of Trustees are usually those which relate to and have a significant impact on institutional direction, values, priorities and principles and/or on the human, fiscal or physical resources of the Institution. The President is authorized by the Board of Trustees to implement administrative policies that relate to and have an impact on major functional operations, service delivery, and University practices. The Administration and Operations Manual is a resource document; it is in no way a contract of employment and should not be relied upon as such.

Each policy defines to whom or for what area(s) the statements apply (Scope). The policy statements provide the guiding principle (s) or practices(s) by which the University normally operates. Procedures, if necessary, describe the guidelines, form of action, or series of steps normally followed in implementing the policy.

All management personnel are expected to know policies and procedures fully and to ensure their effective implementation. While every effort is made to inform employees in a timely manner of new or revised policies, it is the employee's responsibility to refer to the Manual from time to time to keep abreast of revisions, additions, or deletions. An up-to-date Manual is available for review on the Gallaudet University web page, http://af.gallaudet.edu/A_O.asp . Printed copies of the Manual can be found in the University, MSSD, and KDES libraries.

### PROCEDURES FOR ADDING, REVISING, OR DELETING A POLICY

The procedures described below support the practice of shared governance at Gallaudet University. They are designed to ensure that policy proposals are processed in a manner that leads to timely, intelligent, and humanistic decisions based on appropriate consultation with affected constituencies.

Recommendations for new or revised policies may be initiated by any employee or committee within the organization. Ideas should be reviewed by the appropriate administrative officer who, in turn, consults with the Coordinator, Administrative Services, Administration and Finance, in the development of a draft policy. The Coordinator is responsible for providing for its review by appropriate administrator(s), the President's Council, and appropriate campus constituencies. Policies are ultimately submitted to the President and, if appropriate, to the Board of Trustees for final approval.

Minor or editorial changes in policies require only administrative review and do not require full Board approval. Laws, regulations or interpretations of laws and regulations of the District of Columbia or the Federal Government may supersede a policy statement and are implemented immediately by the University. Any resulting changes in policies are submitted for approval as soon as possible.

### NOMENCLATURE

Administrative officer refers to the President, the Provost, and the Vice President for Administration and Finance. Senior administrator refers to the special assistants reporting to the President, and to the deans (including associate deans), executive directors, and directors reporting to the Provost or Vice President. Unit administrator refers to directors, managers, and department heads reporting to a senior administrator. All are considered budget unit heads for the accounts under their control.

Administration & Operations Manual | Print this

Copyright © 2006 Gallaudet University
800 Florida Avenue, NE, Washington, DC 20002

**Gallaudet University**
est. 1864

# Administration & Operations Manual

## 4.32 Termination

**Last Revised:** 15 Oct 2004



EXHIBIT
**5**

Refer Questions To: Director, Human Resources

**SCOPE**
This policy applies to regular and extended temporary staff and supervisors of staff employees in all offices and divisions of Gallaudet University, unless specifically covered by collective bargaining agreements made between Gallaudet University and certified bargaining agents.

**POLICY**
The University will experience separations from time to time because of resignations, retirements, etc. Additionally, conditions may arise which call for the dismissal of an employee. The University does not have a contract of employment with any of its staff employees. Nevertheless, it is the University's general practice to attempt to improve poor performance through counseling and warning before undertaking involuntary termination. *Employees who are unable to achieve the required level of sign language proficiency within the established time frame are notified that they have one final year to achieve the required level or be terminated. Any exceptions must be made by the President and should only be made in highly unusual circumstances. (Employees hired prior to the date of the Sign Communication Policy are considered "grandfathered" into the system and are not subject to termination consideration solely based on sign language skills.) For additional information, refer to the policy on Sign Communication.* Employees charged with gross misconduct may be terminated immediately and without prior warning. Employees in senior administrator and administrative officer positions serve exclusively by appointment of the President or his/her designee and may be terminated (or, if tenured, removed from the position) with 30 days notice, without counseling or warning and without right of appeal.

For information regarding termination during the probationary period, refer to the Probationary Period policy. For termination due to layoff, refer to the Staff Layoff policy.

***APPROVED BY THE GALLAUDET UNIVERSITY BOARD OF TRUSTEES***

*Note: Statements in italics are currently suspended.*

**Definitions**

1.  Voluntary Separation

    A.  Not Encouraged: The resignation of an employee.
    B.  Encouraged: The requested resignation of an employee when discharge is imminent.
    C.  Unauthorized Absence: An employee fails to return to work following a period of approved leave or is absent for three or more consecutive working days and fails to notify the University of the need for leave.
    D.  Other: Any other voluntary termination not covered under A, B, or C above.

2.  Involuntary Termination

    A.  Discharge for Poor Performance
        The termination of an employee for acts which indicate an unacceptable level of performance or adversely affect departmental operations. Such acts include, but are not limited to: failure or inability to perform assigned tasks; failure to achieve the required level of sign proficiency; sub-standard quality or quantity of work; poor attitude toward or lack

of interest in work; lack of cooperation; failure to recognize and/or adhere to University and/or departmental policies and procedures; excessive absenteeism or tardiness.

B.  Discharge for Gross Misconduct
The termination of an employee for acts which jeopardize the safety or well-being of students, employees, or other individuals, cause damage to or destruction of University property, constitute a crime, demonstrate a resistance to or disregard of authority or direction, or evidence that counseling and/or warning are not in the best interest of the University.  Such acts include, but are not limited: commission of a University-related crime (e.g., theft of or on University property); possession, manufacture, sale, distribution, use or under the influence of illegal drugs during work hours or while on University property; abuse of or under the influence of alcohol during work hours or while on University property; physical fights; inexcusable neglect of duty; unruly physical or verbal resistance to or willful disobedience of authority or work direction; unauthorized dissemination of confidential information.

C.  Other
Any other involuntary termination not covered under A or B above.

## Procedures

1.  Voluntary Separation - Not Encouraged
When an employee notified the supervisor of his/her intent to resign, the supervisor should:

  A.  Obtain a written letter of resignation from the employee.
  B.  Confirm the resignation in writing. (If an employee does not submit a letter of resignation, the verbal resignation should be confirmed in writing.)
  C.  Instruct the employee to arrange an exit interview with Human Resources Services for a review of benefits.
  D.  Prepare a Separation Personnel Action Form and verify return of University property and any monies due.

If an employee's employment is terminated because of an unauthorized absence, the employee should be informed in writing and a Separation Personnel Action Form prepared.

2.  Voluntary Separation - Encouraged
When an employee's performance has deteriorated to the point that discharge is imminent, the employee may be offered the opportunity to resign.  If the employee elects to resign, the procedures outlined in Procedure 1 should be followed.

3.  Involuntary Discharge for Poor Performance
Termination for poor performance should occur after attempts at corrective action (i.e., counseling, a written warning, including a one-year warning notice regarding termination for failing to meet the required sign proficiency level, and a suspension without pay not to exceed ten working days, if appropriate) do not substantially improve the employee's performance.  If termination is warranted, the supervisor should:

  A.  Contact the senior administrator and Director, Human Resources Services and Director, Equal Opportunities Programs to review events leading to the termination.
  B.  Inform the employee in writing of the reason(s) for termination and the effective date of separation.  No notice is required.
  C.  Instruct the employee to arrange an exit interview with Human Resources Services for a review of benefits.
  D.  Prepare a Separation Personnel Action Form and verify return of University property and any monies due.

4.  Involuntary Discharge for Gross Misconduct
Termination for gross misconduct need not be preceded by attempts at corrective action.  When discharge is warranted, the supervisor should:

  A.  Contact the senior administrator and Director, Human Resources Services and Director, Equal Opportunities Programs to review the events leading to the termination.  If necessary, the employee may be placed on administrative leave while the circumstances are being reviewed.
  B.  Inform the employee verbally and in writing of the reason(s) for termination and the effective date and time of separation.  No notice is required.
  C.  Instruct the employee to arrange an exit interview with Human Resources Services for a review of benefits.
  D.  Prepare a Separation Personnel Action Form and verify the return of University property and any monies due.

Employees who are dismissed for gross misconduct are not eligible for reemployment consideration.

**Severance Pay**

Discharged employees, except those who are discharged for gross misconduct, receive severance pay in accordance with the following schedule:

| *Length of Continuous Service* | *Amount of Severance Pay* |
|---|---|
| Less than 1 year | 1 week base salary |
| 1 year but less than 10 years | 2 weeks base salary |
| 10 years or more | 2 weeks base salary plus 1 week base salary for each full 5 years of continuous employment from date of hire |

Employees who are dismissed for gross misconduct do not receive severance pay.

**Final Pay**

If the Payroll Office receives at least three days prior notification on voluntary terminations, the employee's final paycheck is issued on the last day of work. Otherwise the employee is paid no later than the next regular pay date.

Involuntarily separated employees receive their final paycheck on their last day of work provided the Payroll Office receives notification by 1 p.m. Otherwise, the employee is paid on the next business day.

Collection procedures may be implemented if the employee does not return all University property or has not satisfied all financial obligations with the University.

**Benefits**

Insurances/Retirement:

All separating employees should contact Human Resources Services for information regarding termination, continuation of coverage or conversion privileges for insurances, and for information regarding retirement options.

Annual Leave:

Separating employees receive a lump sum payment for unused annual leave up to the following maximum balances:

| *Years of Continuous Service* | *Maximum Annual Leave Payoff* |
|---|---|
| Less than 3 years | 240 hours (30 days) |
| 3 years but less than 15 years | 360 hours (45 days) |
| 15 years or more | 480 hours (60 days) |

Unused annual leave is reimbursed at the final accrual rate.

Sick Leave:

Unused sick leave is not reimbursable but will be reinstated (if not used for other purposes) if an employee returns to regular status staff employment within one year of the date of separation.

Rights of Appeal:

Involuntary terminated employees who have satisfactorily completed their initial probationary period may appeal their termination through the dispute resolution process.

Administration & Operations Manual | Print this

Copyright © 2006 Gallaudet University
800 Florida Avenue, NE, Washington, DC 20002

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **KAREN L. KIMMEL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GALLAUDET UNIVERSITY,** | ) |
| | ) |
| **Defendant.** | ) |

**Case No. 1:07-cv-00797 (RWR)**

**PROPOSED ORDER**

UPON CONSIDERATION of the Defendant's Motion To Dismiss, any Opposition thereto, and the record as a whole, it is this __ day of _____, 2007, by this Court,

ORDERED, that Defendant's Motion To Dismiss be and hereby is GRANTED IN ITS ENTIRETY.  Plaintiff's claims are hereby dismissed with prejudice.

_____
J U D G E
United States District Court
For the District of Columbia

262662.1