IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAREN L.KIMMEL, ) | |
| ) | Case No. 1:07-cv-00797 (RWR) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GALLAUDET UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

**REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Karen Kimmel ("Kimmel" or "Plaintiff") in her Opposition to Defendant Gallaudet University's ("Defendant" or "Gallaudet" or "University") Motion to Dismiss has conceded that she does not have the basis for a cause of action for intentional infliction of emotional distress or breach of contract. She therefore has withdrawn Counts V and VII of her Complaint. The five remaining counts include: retaliation under Title VI (Count I), retaliation under the D.C. Human Rights Act (Count II), discrimination on the basis of a disability under the D.C. Human Rights Act (Count III), hostile work environment on the basis of a disability under the D.C. Human Rights Act (Count IV), and tortious interference with prospective business relations (Count VI). As demonstrated below as well as in Defendant's Motion to Dismiss, each of these claims fails as a matter of law.

First, as to her discrimination and hostile work environment claims under the D.C. Human Rights Act (Counts III and IV), Plaintiff now contends that they are solely based on her own hearing loss and the hearing loss and/or race of others. However, when all of the allegations in her Complaint are considered as a whole, it is clear that these causes of action are not about hearing loss or race. In laying the foundation for her Complaint, Plaintiff carefully articulated

266972.1

her belief that she was the victim of an alleged political backlash being orchestrated by supporters of the "Deaf Culture" because she supported Jane Fernandes, who was "not Deaf enough," and for being "not Deaf enough" herself. *See* Compl. at ¶¶ 9-26. In other words, as explained more fully below, this case is not about hearing loss, but about her view that American Sign Language ("ASL") is not the only acceptable form of communication among the deaf and that the deaf community as a whole should be tolerant of alternate forms of communications, such as speaking and lip reading, as well as the use of technological advances to improve an individual's ability to hear. Being "not Deaf enough" is not a physical or mental condition and thus cannot be a disability. In addition, having a difference of opinion about acceptable or unacceptable modes of communication does not constitute a disability. Thus, her discrimination and hostile work environment claims (Counts III and IV) fail as a matter of law.

Second, as to her retaliation claim under the D.C. Human Rights Act, it is evident that her concern about the application of a certain Mathematics Department policy was not based on a student's race, but his or her proficiency with the use of ASL to communicate. As Kimmel carefully explained, the African American student's academic performance improved when he was given the opportunity to study using both ASL and voice, not solely sign. Compl. at ¶ 19. A student's preferred mode of communication is not a protected status. Furthermore, she has not set forth an adverse action to support her retaliation claim. Thus, Count II fails as a matter of law.

Third, as to her retaliation claim under Title VI, Plaintiff attempts to recharacterize the allegations that are central to her Complaint. She repeatedly alleged in her Complaint that she opposed the Mathematics Department's policy because it adversely affected African American

266972.1

students. Such a claim of disparate impact is not a basis for retaliation under Title VI. Thus, Count I must be dismiss as a matter of law.

Finally, Plaintiff's tortious interference claim suffers a number of deficiencies, including: (1) Gallaudet cannot interfere with its own contract, (2) failure to allege that the Washington Post article was published to intentionally interfere with Kimmel's prospective employment opportunities, and (3) failure to allege that the University was aware of any specific prospective employment opportunities. Thus, Count VI of the Complaint must be dismissed as a matter of law.

In sum, Plaintiff has "'plead[ed] too much'" and has "'plead[ed] [her]self out of court by alleging facts that render success on the merits impossible.'" *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000)); *Public Citizen v. Clerk, United States District Court for the District of Columbia*, 451 F. Supp. 2d 109, 114 (D.D.C. 2006) (holding that "[s]ome factual allegations may render success on the merits impossible, and these also are accepted as true"), *aff'd*, 486 F.3d 1342 (D.C. Cir. 2007). Because there is no legal basis for Plaintiff's five remaining causes of action to go forward against the University, the Complaint must be dismissed.

I.  **PLAINTIFF'S DISCRIMINATION AND HARASSMENT CLAIMS ON THE BASIS OF A DISABILITY FAIL AS A MATTER OF LAW**

Plaintiff accuses Gallaudet of "twist[ing] the language of the Complaint" in moving to dismiss the disability discrimination and harassment claims. Opp. at 9-10. Instead, Kimmel now claims in her Opposition that she is being discriminated against because of her "level of deafness" and "the manner in which she chooses to respond to her hearing impairment." Opp. at 9-10.

Plaintiff made her assertions plainly in her Complaint. To that end, in a rather

straightforward manner, Kimmel alleged in her Complaint that "[a]lthough Plaintiff has the aforementioned disability, she is considered 'not Deaf enough' and has therefore been discriminated against by Gallaudet employees and agents," and that the "harassment occurred because of Plaintiff's disability, specifically because she is considered 'not Deaf enough.'" Compl. at ¶¶ 42, 47. Plaintiff's Opposition desperately tries to make these candid assertions disappear by ignoring them.

This case simply is not about Kimmel's limited hearing ability. As she has made plainly clear throughout her Complaint, this case is about being deemed "not Deaf enough" -- which she states "signifies a culture rather than the physical condition of hearing loss" (Compl. at ¶ 9) -- by "Deaf Culture," a subgroup within the deaf community that she blames for forcing Dr. Hernandes out. Being "not Deaf enough" means that she supports and encourages the use of other modes of communication (such as speech and lip reading), not simply ASL, and that she tolerates the use of technological advances to enhance hearing abilities -- what she refers to as views of "diversity and tolerance" within the deaf community. *See* Compl. at ¶¶ 9, 14, 15.

On the other hand, advocates of "Deaf Culture believe[] ASL is the only acceptable form of communication and often express[] hostility toward deaf or hard-of-hearing individuals who choose to function within the hearing world." Compl. at ¶ 13. To that end, "Deaf Culture values only native ASL signers, particularly Deaf offspring of Deaf parents, as the elite members of this culture, and many Deaf individuals therefore socialize primarily, or even exclusively, only with others who share these culturally biased and discriminatory views." *Id.* at ¶ 9. As further explained by Plaintiff, this "aspect of Gallaudet's culture has its roots in the social structure of Deaf Culture's tribal, personal relations, where people pay dues by demonstrating allegiance to Deaf Culture values." *Id.* at ¶ 9. As Kimmel concedes, she is an outsider and is "not considered

4

part of Deaf Culture because her family did not use sign communication and was not part of the Deaf community." *Id.* at ¶ 8.

Kimmel believes that the University's administration has "capitulated to pressure by Deaf Culture advocates," that the University as "filled the offices of President and certain related positions with individual who ascribed to or who were sympathetic to the Deaf Culture led protests," and that these "individuals thereupon took actions that had the effect of ostracizing or harassing members of the Gallaudet community, including Dr. Kimmel, who are 'not Deaf enough' and/or who supported Dr. Fernandes and her views of diversity and tolerance." Compl. at ¶ 15. She is simply trying to move this on-going political and cultural debate from the campus to the courtroom, using her hearing loss to establish legal status under existing laws that would not otherwise apply.[1] *See also* Mot. at 18-19.

Assuming *arguendo* that Plaintiff's claim of discrimination is based on her hearing loss and preferred mode of communication, she will have to prove that there was a causal connection between her "disability" and the adverse employment actions. *See Morgenstein v. Morgan Stanley DW Inc.*, 2007 U.S. Dist. LEXIS 6781, at * 13 (D.D.C. Jan. 31, 2007).[2] However, her

---

[1] In making her argument, Plaintiff seems to disregard the different purpose behind laws prohibiting discrimination on the basis of a disability, which require employers to evaluate the disability in order to remove barriers and to ensure equal access to employment. 29 C.F.R. App. to Part 1630 (Interpretative Guidelines to Title I of the Americans with Disabilities Act), Background. *See Teru Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004) (holding that because the DCHRA and the Americans with Disabilities Act ("ADA") are substantially similar, courts consider ADA case law as persuasive authority for DCHRA claims). To the extent that Kimmel claims discrimination on the basis of her hearing loss, Gallaudet is not required to turn a blind eye to her disability. It can consider the nature and extent of her disability to determine if she is a qualified individual with a disability, meaning that she can perform the essential functions of the job with or without an accommodation -- a necessary element of her complaint of discrimination based on a disability. *See* 29 C.F.R. App. to Part 1630; *Morgenstein v. Morgan Stanley DW Inc.*, 2007 U.S. Dist. LEXIS 6781, at * 13 (D.D.C. Jan. 31, 2007); *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 6 (D.D.C. 2000) (discussing the purpose of the ADA); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) (holding that the ADA "prohibits employment discrimination against qualified individuals with disability, no more and no less"), *cert. denied*, 516 U.S. 1172 (1996).

[2] To prevail on her claim of discrimination based on a disability, Plaintiff must establish a *prima facie* case (1) that she has a disability under the D.C. Human Rights Act, (2) that she was an otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation, and (3) that there is a causal connection between the disability and the adverse action. *Morgenstein v. Morgan Stanley DW Inc.*, 2007 U.S. Dist. LEXIS

own allegations are fatal to this prong of her *prima facie* case. Kimmel concedes that the alleged adverse actions "were directly related to Plaintiff's disability, insofar as she is considered 'not Deaf enough' by agents and employees of Gallaudet." Compl. at ¶ 43. The "degree of her disability" -- which necessarily includes reference to her preferred method of communication (ear alignment, amplification and speech reading), which in turn contributed to the designation that she is "not Deaf enough" (*see id*. at ¶¶ 8, 15) -- "was the cause of the many adverse employment actions Plaintiff has suffered …." *Id.* Again and again, when all of her allegations are taken as a whole, it is evident that the genesis of Kimmel's malcontent is the highly charged debate between "Deaf Culture" and non-"Deaf Culture" advocates regarding acceptable and nonacceptable forms of communication, which does not constitute a disability.

Moreover, Plaintiff's reference in her Opposition to unlawful discrimination by a member of a protected group against another member of a protected group is inapposite in this case. *See* Opp. at 10. The cases cited by Plaintiff refer to Title VII, which specifically prohibits discrimination on the basis of color. *See Udoh v. Trade Center Mgmt. Assocs.*, 479 F. Supp. 2d 60, 63 n.1 (D.D.C. 2007) (stating that "Title VII claims based on color have been interpreted by the courts as relating to the complexion of one's skin"); *Brack v. Shoney's, Inc.*, 249 F. Supp. 2d 938, 947 (W.D. Tenn. 2003) (analyzing plaintiff's Title VII color claim). The D.C. Human Rights Act also specifically prohibits discrimination based on color. *See* D.C. Code § 2-1401.11(a). On the other hand, there is no law protecting individuals from discrimination based on their preferred mode of communication or how they wish to communicate (*i.e.*, speech, writing, lip reading, signing, or other method of communication). Thus, that Kimmel prefers other methods of communication over solely ASL and that she disagrees with the cultural and

---

6781, at * 13 (D.D.C. Jan. 31, 2007). Defendant does not concede or otherwise waive its right to challenge the second element of this analysis.

6

266972.1

social viewpoints of a group that espouses the use of ASL as the only form of communication do not mean that she is disabled.

In summary, because being "not Deaf enough" is not a physical or mental condition, it cannot qualify as a disability. Moreover, Plaintiff's difference of opinion about acceptable forms of communication in the academic setting or within the deaf community does not constitute a disability. Therefore, Plaintiff's purported claims of discrimination and harassment are not based on a disability and thus Counts III and IV must be dismissed as a matter of law.

**II.   THE COMPLAINT ON ITS FACE FAILS TO PRESENT FACTS TO SUPPORT THE NECESSARTY ELEMENTS OF A CLAIM OF RETALIATION UNDER THE D.C. HUMAN RIGHTS ACT**

In her Opposition, Kimmel attempts to recharacterize the allegations that are central to her Complaint. As set forth below and in the Motion to Dismiss, because Kimmel has not alleged any facts to support the necessary elements of her retaliation claim in her Complaint, it must be dismissed. *See Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, (D.D.C. 2005) (holding that while plaintiff does not have to establish a *prima facie* case to survive a motion to dismiss, plaintiff "must present facts that would establish the elements of each claim"); *Rochon v. Ashcroft*, 319 F. Supp. 2d 23, 29 (D.D.C. 2004) (holding that court can explore the plaintiff's *prima facie* case for a motion to dismiss to determine "whether the plaintiff can ever meet his initial burden to establish a *prima facie* case"), *rev'd on other grounds*, *sub nom. Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). Kimmel's mere "labels and conclusions, and a formulaic recitation of the elements" of her retaliation claim "will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940 (2007).

**A.   Plaintiff has not pleaded a protected activity.**

Kimmel has not presented any facts that would support her conclusory statement that she

7

engaged in a protected activity by "aiding and encouraging Jane Fernandes." Compl. at ¶ 35. *See* Mot. at 11-12. Contrary to the allegations in the Opposition (Opp. at 5), Kimmel never alleges in her Complaint that Gallaudet was discriminating against Dr. Fernandes because of her disability (*i.e.*, her hearing loss). She in fact concedes that "[o]ther than her being 'not Deaf enough,' there was no basis, much less a reasonable basis, for the revocation of Dr. Fernandes' appointment." Compl. at ¶ 15. Being "not Deaf enough" did not refer to Dr. Fernandes' hearing ability but rather, to her support of "a climate of diversity and tolerance that would accommodate both Deaf and deaf students, as well as minorities who are not proficient in ASL, and those who embrace technology as a means to integrate more fully into the outside world" -- a philosophy that was viewed "by Deaf Culture advocates as a threat to Deaf Culture." Compl. at ¶ 14. *See* Compl. at ¶ 9. As explained in the Motion to Dismiss, because being "not Deaf enough" is not a physical or mental condition, an individual who is considered "not Deaf enough" is not disabled under the D. C. Human Rights Act. *See* Mot. at 11-12. Because Dr. Fernandes' appointment was revoked because she was "not Deaf enough," which has nothing to do with her hearing ability, Kimmel was not engaged in a protected activity when she aided and encouraged Dr. Fernandes. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (holding that dismissal is appropriate where the allegations contradict the claim asserted).

Similarly, Kimmel has not presented any facts that would support her conclusory conclusion that she engaged in a protected activity by expressing concerns about the Mathematics Department policy and its impact on African American and other minority students. *See* Mot. at 12-13. She again ignores her own allegations. Kimmel was concerned about the policy because it purportedly adversely affected students who "were learning disabled, lacked sufficient math preparation because they are deaf, and possessed a range of communication skills

8

266972.1

from no signing to ASL, and therefore did not do well on high-stakes examinations, particularly in the context of mathematics." Compl. at ¶ 20. Some of those students affected by the policy were African American and other minorities.

However, when her actions are considered within the context of her support for an inclusive policy of students with a wide range of communication skills and reliance on technology, the reasonable inference to be drawn from her careful factual recitation is that the students' race did not motivate her actions. Rather, based on her own allegations, Kimmel was advocating on behalf of all students allegedly adversely affected by the policy because they needed alternate forms of communication to succeed in the academic setting. She refers to the one African American student whose academic performance improved because he was able to communicate with his professors with his "preferred mode of communication" (voice and sign as opposed to sign alone). Compl. at ¶ 19. She does not allege that his academic performance improved because the Mathematics Department policy was not applied to him. Thus, how a student prefers to communicate and what kind of communication should be provided to them in the academic setting is not related in any way to the student's race and/or hearing loss. Accordingly, Kimmel's concerns about the Mathematics Department's policy was not a protected activity.

  B. <u>**Plaintiff has not pleaded an adverse action**</u>.

As set forth in the Motion to Dismiss, an adverse action must be material and produce an injury or harm to be actionable. *See* Mot. at 14-16; *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-2416, 165 L. Ed. 2d 345, 359-361 (2006) (holding that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm" and that "petty slights" do not constitute material adversity).

Here, Kimmel has not pleaded any injury or harm because she was not included in a few personnel decisions and excluded from a couple of committees. *See* Mot. at 14-15. She retained her job as Dean of the College of Liberal Arts, Science and Technologies as well as her tenured associate professorial position. Not being involved in a few personnel decisions or participating in a committee had a *de minimus* impact on her overall responsibilities as Dean and Associate Professor.

She also has not established that she was harmed or injured in any way because she got a less-than-expected pay raise. *See* Mot. at 15-16. She is still getting paid more than she was before the raise, has not alleged that her raise was smaller than other employees of the University, and has not pleaded any justification, other than her own subjective expectation, that she was entitled to a higher raise.[3] In any event, she has not, as erroneously alleges in her Opposition, lost any pay. Opp. at 8.

### C.   Plaintiff's own assertions defeat causation.

Contrary to the assertion in the Opposition, Plaintiff does not simply assert in her Complaint that she suffered adverse actions because of her purported protected activities. Throughout her Complaint, she attributes these purported adverse actions to a campaign by the Deaf Culture and its supporters to force her to leave Gallaudet because she too is "not Deaf enough." *See* Compl. at ¶¶ 15, 17-18, 22, and 26. Thus, she is being targeted because of her own social, cultural and political views, not solely because she supported Dr. Fernandes or challenged a policy, which are not protected activities in any event. *See* Mot. at 16-18.

In summary, because she has not alleged the necessary elements of a retaliation claim

---

[3] To that end, the *Johnson v. Joo* decision does not hold that receiving a less than expected pay raise is indeed an adverse action. 2006 U.S. Dist. LEXIS 13022, at *71 (D.D.C. Mar. 12, 2006) (attached as Exhibit 2 to Motion to Dismiss). The defendant employer in *Johnson* did not address the issue so the Court assumed, for purposes of that decision, that the adverse action had been satisfied.

266972.1

under the D.C. Human Rights Act, Count II must be dismissed as a matter of law.

### III. THE COMPLAINT ON ITS FACE ASSERTS A TITLE VI CLAIM BASED ON THE DISPARATE IMPACT OF A POLICY AND THUS, IT MUST BE DISMISSED.

As set forth in the Motion, Title VI does not provide for a private right of action based on disparate impact claims. Mot. at 5-9. Kimmel does not dispute this statement of the law. Instead, she attempts to cure the fatal defect in her Title VI claim as stated in her Complaint by arguing in her Opposition that she "has alleged retaliation for complaining about discrimination against *individuals* on the basis of their race." Opp. at 3-4.

It is well settled that "it is the defendant's conduct *as alleged in the complaint* that is scrutinized" for purposes of a Rule 12(b)(6) motion. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (emphasis in original). Thus, contrary factual allegations made in opposition briefs "may never be considered when deciding a 12(b)(6) motion … and most certainly may not be considered when the facts they contain contradict those alleged in the complaint." *Henthron v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994) (citations omitted); *Randolph v. Ing Life Ins. and Annuity Co.*, 486 F. Supp. 2d 1, 11 (D.D.C. 2007) (holding that factual allegations "in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint").

It is clear on the face of the Complaint that the Title VI retaliation claim is based on Kimmel's opposition to the alleged disproportionate impact that Gallaudet's policies and practices purportedly had on African American students. *See 2922 Sherman Avenue Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (stating that a disparate impact claim involves the allegation that "the challenged policy or practice has a disproportionate effect on a protected class"). She plainly alleges that "Gallaudet employs *policies and practices* that

are unlawful under Title VI insofar as they discriminate against students based on race, color, or national origin" (Compl. at ¶ 31 (emphasis added)), that she was retaliated against for "her opposition to Gallaudet *practices* …." (*id.* (emphasis added)), and that she "questioned the *legality and validity of a Mathematics Department policy* that discriminated against African-American and other students …" (*Id*. at ¶ 32 (emphasis added)). She also alleges that she expressed concerns about "specific actions taken by the Mathematics Department *on the basis of this policy* …" (*id.* at ¶ 20 (emphasis added)), and that she supported "a different and fairer *policy* regarding the weight of mathematics examinations …" (*id.* at ¶ 21 (emphasis added)). In fact, even in her Opposition, Kimmel concedes that she was "expressing concerns about policies that disparately impact minority students." Opp. at 1-2.

On the other hand, nowhere in her Complaint does she allege that Gallaudet promulgated the Mathematics Department policy to intentionally discriminate against African American students nor that Gallaudet intentionally discriminated against individual students based on their race. *See* Compl. at ¶¶ 27-33. *See Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 45 (D.D.C. 2003) (holding that the plaintiff must show that the defendant "intentionally treated him or her differently because of his or her race" to establish an intentional discrimination claim).

Accordingly, because the Complaint on its face sets forth a Title VI retaliation claim based on the disparate impact of Gallaudet's policies and practices and because there is no private right of action for disparate impact discrimination claims under Title VI, Count I must be dismissed as a matter of law.

### IV. **PLAINTIFF'S OMISSIONS ARE FATAL TO THE CLAIM OF TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

Finally, Plaintiff's Opposition fails to cure the fatal defects with respect to the claim of tortious interference with prospective business relations/advantage, which fails as a matter of law. *See* Mot. at 20-22. First, contrary to Plaintiff's assertion, the D.C. Court of Appeals specifically held in *McManus v. MCI Comm. Corp.*, 748 A.2d 949, 958 (D.C. 2000), *cert. denied*, 531 U.S. 1183 (2001), that an employer cannot interfere with its own contract under the theory of tortious interference with prospective advantage. Thus, Plaintiff's tortious interference claim based on her employment with Gallaudet must be dismissed as a matter of law. *See* Mot. at 20-21.

Second, as argued in the Motion to Dismiss, Kimmel does not plead that the Washington Post article (assuming for purposes of this Motion only that Gallaudet's employees and agents were responsible for the comments made in the article as alleged in the Complaint) was published to intentionally interfere with any prospective employment opportunities. To the contrary, in her Complaint, Kimmel specifically alleges that the purported "defamation of her character and reputation" was part of the campaign by "Deaf Culture" and its supporters to force her to leave Gallaudet, not to interfere with other prospective opportunities. Compl. at ¶ 21. Because there is no allegation that the Washington Post article was published specifically to interfere with Kimmel's unidentified potential sources of prospective employment, there cannot be tortious interference. *See* Mot. at 20-22; *see Genetic Systems Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1998) (holding that a "general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability"); *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (holding that the defendant must "intentionally interfere[]

with business opportunities")).

Third, Kimmel never alleges that Gallaudet had any knowledge of any specific prospective employment opportunities. Thus, it could not have intentionally interfered with them as a matter of law.

Accordingly, because Defendant cannot interfere with its own contractual relationship, and because Plaintiff does not allege that Gallaudet had any knowledge of any prospective business relations or that it intentionally interfered with those prospective relations, the tortious interference with prospective business relations/advantage claim (Count VI) must be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Motion to Dismiss, Defendant Gallaudet respectfully requests that this Court grant its Motion to Dismiss and dismiss the Complaint in its entirety.

July 30, 2007                             Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP


_____/s/_____
Robert B. Wallace (D.C. Bar No. 108571)
Laura N. Steel (D.C. Bar No. 367174)
Yoora Pak (D.C. Bar. No. 467007)
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, D.C. 20005
(202) 626-7660 (telephone)
(202) 628-3606 (facsimile)

*Attorneys for Defendant Gallaudet University*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss was served via Electronic Case Filing (ECF) this 30th day of July, 2007 to:

Elaine L. Fitch, Esq.
George M. Chuzi, Esq.
KALIJARVI, CHUZI & NEWMAN, P.C.
1901 L Street, N.W., Suite 610
Washington, DC 20036

                                                         /s/
                                         Robert B. Wallace

266972.1