UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
KAREN L. KIMMEL,              )
                              )
        Plaintiff,            )
                              )
        v.                    )     Civil Action No. 07-797 (RWR)
                              )
GALLAUDET UNIVERSITY,         )
                              )
        Defendant.            )
_____)
```

MEMORANDUM OPINION AND ORDER

Plaintiff Karen Kimmel brings this action against Gallaudet University alleging retaliation in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., retaliation, disability discrimination, and hostile work environment in violation of the District of Columbia Human Rights Act ("DCHRA"), § 2-1401.01 et seq., and tortious interference with prospective business relations.  Gallaudet has moved to dismiss the complaint for failure to state claims upon which relief can be granted. With reasonable inferences drawn in her favor, Kimmel has pled facts sufficient to state claims and Gallaudet's motion to dismiss will be denied.

BACKGROUND

During the events relevant to the complaint, Kimmel was Dean of the College of Liberal Arts, Sciences, and Technologies and a fully tenured associate professor at Gallaudet, a higher

-2-

education institution for the deaf.[1]  (Compl. ¶ 5.)  Kimmel

"suffers from mild (right ear) and moderate (left ear) high

frequency hearing loss as a result of a degenerative and

hereditary hearing loss[,]" but "has not yet fully lost her

hearing."  (Id. ¶ 8.)  She is proficient in American Sign

Language ("ASL") and uses other various methods to reduce the

impact of her hearing loss and to improve her ability to

communicate, including the use of amplification and speech

reading.  (Id.)

Kimmel alleges that there is a community at Gallaudet

identifiable as "Deaf Culture"[2] that "rejects the notion of

deafness as a disability and embraces the idea of Deaf people as

an oppressed minority."  (Id. ¶ 9.)  She further alleges that

Deaf Culture argues "that any deaf person can become Deaf by

embracing certain ideas and practices which themselves create

exclusion, hierarchy, and discrimination."  (Id.)  As an example,

she contends that Deaf Culture "supports use only of ASL, which

is primarily used by white, Deaf, middle-class people."  (Id.)

Kimmel further alleges that in October 2006, Gallaudet

students, with the support of Gallaudet faculty, staff, and

---

[1]Gallaudet is a private corporation created by acts of
Congress and receives federal funding.  (Compl. ¶¶ 2, 29.)

[2]Kimmel contends that "capitalizing the word deaf (Deaf)
signifies a culture rather than the physical condition of hearing
loss."  (Compl ¶ 9.)

alumni, staged "lawless and widely publicized sit-ins, blockades, and protests against then-newly selected President" of Gallaudet, Dr. Jane Fernandes.  (Id. ¶ 13.)  Kimmel asserts that "one of the chief complaints of the protesters regarding Dr. Fernandes was that she was 'not Deaf enough.'"  (Id. ¶ 14.)[3]  Kimmel contends that she "openly supported Dr. Jane Fernandes and her beliefs in support of non-discrimination against students who are not members of Deaf Culture."  (Id. ¶ 17.)  She alleges that, as a result of her support for Fernandes and her not being Deaf enough, she was "harassed by various Gallaudet faculty members and other employees," her job responsibilities were reduced, and she was excluded from administrative decisions in which she should have been included, and she was "the victim of defamatory falsehoods spread by Gallaudet employees and agents."  (Id. ¶ 18.)

In addition, Kimmel contends that "[t]hroughout the course of her administration as Dean, [she was] a supporter of deaf/Deaf students, African-American and other minority students," and [a]t various times in the recent past, [she] engaged in protected activity by voicing concerns and complaints over the discriminatory and unfair treatment of" these students.  (Id.

---

[3]After the protests, Gallaudet's Board of Trustees revoked Fernandes' appointment as President.  (Compl. ¶ 15.)  Kimmel alleges that "there was no basis . . . for the revocation of Dr. Fernandes' appointment" except "her being 'not Deaf enough[.]'"  (Id.)

-4-

¶¶ 11-12.)  For example, she alleges that in 2005, she "complained about the discriminatory treatment of a male African-American student who was dismissed from Gallaudet before undergoing learning disability testing after receiving poor grades in mathematics."  (Id. ¶ 19.)  Kimmel also alleges that in 2006, she challenged a mathematics department policy and actions taken under the policy that she believed discriminated against "students, including African-American and developmental students, who were learning disabled, lacked sufficient math preparation because they [were] deaf, and possessed a range of communication skills from no signing to ASL[.]"  (Id. ¶ 20.)  Kimmel claims that Gallaudet retaliated against her for these activities by spreading falsehoods regarding her "character and actions as Dean[,]" including in a November 2006 Washington Post article. (Id. ¶ 21.)

Finally, Kimmel contends that she retained counsel who informed Gallaudet that Kimmel might assert claims under the federal and District of Columbia antidiscrimination laws.  (Id. ¶ 22.)  Kimmel alleges that after her counsel met with Gallaudet regarding her potential claims, among other allegedly retaliatory actions, Gallaudet reduced her job responsibilities as Dean and informed her she would receive a merit pay raise that was lower than expected.  (Id. ¶¶ 23-26.)

-5-

Kimmel's complaint lists seven causes of action.  Counts I and II assert claims for retaliation under Title VI and the DCHRA, respectively.  In Counts III and IV, Kimmel alleges DCHRA claims for disability discrimination and hostile work environment.  Counts V through VII assert intentional infliction of emotional distress, tortious interference with prospective business relations, and breach of contract claims under D.C. law.  Gallaudet has moved to dismiss all of Kimmel's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted.[4]

## DISCUSSION

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  "On review of a 12(b)(6) motion a court 'must treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000)).  "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination."

---

[4]In her opposition to the defendant's motion, Kimmel withdraws her emotional distress and breach of contract claims. (See Pl.'s Opp'n at 2.)  In light of Kimmel's abandonment of these claims, the defendant's motion to dismiss Counts V and VII will be granted.

-6-

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002); see
Sparrow, 216 F.3d at 1115 (concluding that an employment
discrimination complaint need not allege all elements of a prima
facie case at the initial pleading stage and states a claim by
merely saying "I was turned down for a job because of my race"
(citation and internal quotation marks omitted)).  A plaintiff
need only provide a "short and plain statement of [her] claim
showing that [she] is entitled to relief," Fed. R. Civ. P.
8(a)(2), that "'give[s] the defendant fair notice of what
the . . . claim is and the grounds upon which it rests.'"
Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atlantic
Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

I.   DISABILITY DISCRIMINATION (COUNT III)

In her disability discrimination claim, Kimmel alleges that
"she was subjected to adverse action as a result of the nature
and extent of her disability," specifically her being "not
completely deaf" and "using amplification, speech reading, and
ASL" to manage her hearing impairment.  (Pl.'s Opp'n at 10;
Compl. ¶¶ 40-43.)  Gallaudet argues that as Kimmel pleads it,
"[b]eing 'not Deaf enough' . . . 'signifies a culture rather than
the physical condition of hearing loss[,]'" and "[b]ecause being
'not Deaf enough' is not a physical impairment, it cannot be a
disability under the DCHRA."  (Def.'s Mem. at 18-19 (quoting
Compl. ¶ 9).)

-7-

The DCHRA is intended "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit[.]"  D.C. Code § 2-1401.01.  It prohibits any employer or educational institution from discriminating on the basis of "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual[.]"  D.C. Code § 2-1402.11(a); see D.C. Code § 2-1402.41.  The DCHRA defines a "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of an individual, having a record of such an impairment, or being regarded as having such an impairment[.]"  D.C. Code § 2-1401.02(5)(A).  There is no question that Kimmel's deafness is a disability under the DCHRA.  However, Kimmel does not allege that she was discriminated against simply because of her deafness, but rather asserts that she has an actionable claim for discrimination based on "her level of deafness . . . and the manner in which she chooses to respond to her hearing impairment[.]"  (Pl.'s Opp'n at 10.)

"Given the substantial similarity between" Title VII and the DCHRA, the District of Columbia relies on interpretations of Title VII when interpreting DCHRA claims.  Carpenter v. Fed. Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999); see

Estenos v. PAHO/WHO Fed. Credit Union, 952 A.2d 878, 886 (D.C.
2008) (noting that the D.C. Court of Appeals "follow[s] cases
construing Title VII in interpreting and applying the provisions
of the DCHRA when appropriate, that is, to the extent that the
acts use similar words and reflect a similar purpose (internal
quotation marks omitted)).  In interpreting Title VII's
prohibition on discrimination on the basis of sex, the Supreme
Court has repeatedly held that Title VII's broad language
"'evinces a congressional intent to strike at the entire spectrum
of disparate treatment of men and women in employment.'"  Oncale
v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998)
(quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64
(1986) (citations and internal quotation marks omitted)); see
Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (stating
that "'[i]n forbidding employers to discriminate against
individuals because of their sex, Congress intended to strike at
the entire spectrum of disparate treatment of men and women
resulting from sex stereotypes'" (quoting Los Angeles Dep't of
Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978))).  In
Price Waterhouse, the Court concluded that "we are beyond the day
when an employer [can] evaluate employees by assuming or
insisting that they match[] the stereotype associated with their
group[.]"  498 U.S. at 251.  Thus, Price Waterhouse holds that
"[i]n the specific context of sex stereotyping, an employer who

acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." Id. at 250.

"After Price Waterhouse, courts [have] recognized a cause of action under Title VII for discrimination based on failure to conform to gender stereotypes." Schroer v. Billington, 424 F. Supp. 2d 203, 208 (D.D.C. 2006). As Schroer explained, Title VII's protection against sex stereotyping "creates space for people of both sexes to express their sexual identity in nonconforming ways." Id. at 210.

Like Title VII's, the DCHRA's stated goal to eliminate "discrimination for any reason other than that of individual merit," D.C. Code § 2-1401.01, evinces an intent to "strike at the entire spectrum of disparate treatment" of individuals with disabilities. Oncale, 523 U.S. at 78 (internal quotation marks omitted). In this case, Kimmel's allegation that she was discriminated against because of the nature and extent of her disability, including the ways in which she chose to respond to her deafness, evokes a cause of action sufficiently analogous to the sex stereotyping claim found actionable in Price Waterhouse. Kimmel asserts that she was discriminated against because her deafness or management of it did not conform to what was preferred or accepted by the defendant. (See Compl. ¶¶ 9, 42; Pl.'s Opp'n at 9-10.) A decision based on a prejudgment of what

-10-

level of disability or what response to one's disability is
acceptable or not acceptable is unlawful discrimination on the
basis of disability in the same manner as the decision based on
the stereotype that a female cannot be aggressive was found to be
unlawful discrimination on the basis of sex in Price Waterhouse.
See 490 U.S. at 250-51.  Although Kimmel's allegation does not
suggest that she experienced discrimination solely because she
was deaf, but instead because of her particular kind of deafness
and approach to her disability, such an allegation nonetheless
alleges unlawful disability discrimination under the DCHRA.
Accordingly, Kimmel's DCHRA disability discrimination claim will
not be dismissed.

II.  RETALIATION (COUNTS I AND II)

     In Counts I and II of her complaint, Kimmel asserts
retaliation claims under Title VI and the DCHRA, respectively.

     A.   Title VI

     Kimmel contends that she has stated a claim under § 601 of
Title VI for retaliation based upon her complaints of
discriminatory treatment of African-American and other minority
students at Gallaudet.  (See Pl.'s Opp'n at 3-4.)  Section 601
provides that "[n]o person in the United States shall, on the
ground of race, color or national origin, be excluded from
participating in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal

-11-

financial assistance."  42 U.S.C. § 2000d.  In <u>Alexander v.
Sandoval</u>, 532 U.S. 275 (2001), the Supreme Court explained that
§ 601 contains a private cause of action under which "private
individuals may sue to enforce [their rights under the section]
and obtain both injunctive relief and damages."  <u>Id.</u> at 280.  The
Court also recognized that § 601's private cause of action is
limited, however, because § 601 "prohibits only intentional
discrimination."  <u>See id.</u>

    While neither the Supreme Court nor the D.C. Circuit has
considered whether § 601's private cause of action includes a
claim for retaliation, in <u>Chandamuri v. Georgetown University</u>,
274 F. Supp. 2d 71 (D.D.C. 2003), then-Judge Lamberth concluded
that "an action against retaliation is implicitly within the
scope of Title VI's prohibition on intentional discrimination."
<u>Id.</u> at 83.  In reaching this conclusion, <u>Chandamuri</u> explains that
"the Supreme Court has stated that 'the existence of a statutory
right implies the existence of all necessary and appropriate
remedies.'"  <u>Id.</u> at 81 (quoting <u>Franklin v. Gwinnett County Pub.
Sch.</u>, 503 U.S. 60, 69 (1992) (citation omitted)).  Applying this
tenet, the Supreme Court "has interpreted other anti-
discrimination statutes to include an implied right to be free
from retaliation."  <u>Id.</u>  <u>Chandamuri</u> relies on the Court's
decision in <u>Sullivan v. Little Hunting Park, Inc.</u>, 396 U.S. 229
(1969), and <u>Perry v. Sindermann,</u> 408 U.S. 593 (1972).  <u>Perry</u>

-12-

holds that a person has an implied cause of action under the
First and Fourteenth Amendments for retaliation because of the
exercise of one's constitutionally protected speech or
associations because "if the government could deny a benefit to a
person because of [such speech or association], his exercise of
those freedoms would in effect be penalized and inhibited."  408
U.S. at 597.  In Sullivan, the Supreme Court concluded that 42
U.S.C. § 1982[5] contains an implied cause of action for
retaliation not simply for those who experience retaliation for
asserting their own rights under § 1982, but for those
individuals who experience retaliation for helping others assert
their rights under § 1982.  See 396 U.S. at 237.  Construing this
precedent, Chandamuri adopts the conclusion of the Fourth Circuit
in Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003), that "the lack
of a specific prohibition of retaliation in Title VI does not
'lead to an inference that Congress did not mean to prohibit
retaliation in § 601' because 'relevant precedent interpreting
similarly worded antidiscrimination statues' construed
'discrimination' to include 'retaliation.'"  Chandamuri, 274 F.
Supp. 2d at 83 (quoting Peters, 327 F.3d at 316-17.)  "Based
exclusively on the Supreme Court's previous decisions

---

[5]Under § 1982, "[a]ll citizens of the United States shall
have the same right, in every State and Territory, as is enjoyed
by white citizens thereof to inherit, purchase, lease, sell,
hold, and convey real and personal property.  42 U.S.C. § 1982.

-13-

interpreting statutes that prohibit discrimination to also prohibit retaliation, [Chandamuri] recognizes a private right of action for retaliation for the exercise of § 601's right to be free from intentional discrimination."  Id.

The reasoning of Chandamuri and Peters is persuasive and will be adopted.  Thus, Kimmel may allege a retaliation claim under § 601.[6]  To succeed on her retaliation claim, Kimmel must ultimately prove that (1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action.  Ginger v. District of Columbia, 477 F. Supp. 2d 41, 51 (D.D.C. 2007).  In the retaliation context, a material adverse action is an action that "'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  The determination of "whether a particular employment action was materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Robinson v.

---

[6]As Kimmel concedes, because § 601 protects only intentional discrimination, Kimmel's retaliation claim under Title VI is necessarily limited to alleged retaliation in response to her opposition to intentional discrimination.  (See Pl.'s Opp'n at 3.)

-14-

<u>Winter</u>, 457 F. Supp. 2d 32, 35 (D.D.C. 2006) (internal quotations
omitted).

In her complaint, Kimmel alleges that she has "been a
supporter of . . . African-American and other minority
students[.]"  (Compl. ¶ 11.)  She further alleges that "[a]t
various times in the recent past, [she] engaged in protected
activity by voicing concerns and complaints over the
discriminatory and unfair treatment of . . . African-American and
other minority" students.  (<u>Id.</u> ¶ 12.)  Kimmel also contends that
she opposed a discriminatory policy of the Mathematics Department
"and specific actions taken by the Mathematics Department on the
basis of [the] policy."  (<u>Id.</u> ¶ 20.)  She alleges that as a
result of her activities, Gallaudet retaliated against her by,
among other activities, spreading falsehoods about her to the
<u>Washington Post</u>.  (<u>Id.</u> ¶ 32.)  Although Kimmel's alleged
protected activity is helping to assert minority students' rights
under § 601, rather than asserting her own personal right under
the statute, under <u>Sullivan</u>, <u>see</u> 396 U.S. at 237, Kimmel's
alleged advocacy on behalf of minority students is a protected
activity sufficient to support a retaliation claim.  Thus, at
this early stage, with her allegations, Kimmel has stated a claim
of retaliation under Title VI.

-15-

B.   Retaliation under the DCHRA (Count II)

Kimmel's second cause of action asserts a claim for retaliation in violation of the DCHRA.  Under D.C. Code § 2-1402.61, it is "an unlawful discriminatory practice to . . . retaliate against" any person who exercised his or her rights under the DCHRA or who "aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under [the DCHRA]."  D.C. Code § 2-1402.61(a)-(b).  For her DCHRA retaliation claim, as with her Title VI retaliation claim, Kimmel must show that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two.  Carpenter v. Federal Nat'l Mortgage Ass'n, 174 F.3d 231, 235 n.3 (D.C. Cir. 1999).

Here, Kimmel alleges that Gallaudet unlawfully retaliated against her because she (1) "expos[ed] discrimination against African-American and developmental students," including on one occasion, by complaining about the discriminatory treatment of an African-American male; (2) "aid[ed] and encourag[ed] Jane Fernandes," who Kimmel contends experienced discrimination; and (3) after retaining legal counsel, notified Gallaudet that she believed Gallaudet was discriminating against her.  (Compl. ¶¶ 12, 22, 35.)  She contends that, as a result of these activities, Gallaudet retaliated against her by publicly spreading false and defamatory information about her, reducing

her job responsibilities, excluding her from participating in
administrative decisions in which she should have been included
as a Dean, and by denying her a higher merit pay raise.  (See
Pl.'s Opp'n at 6-8; Compl. ¶¶ 23-26.)  With reasonable inferences
drawn in Kimmel's favor regarding at least her allegations that
she experienced retaliation as a result of her opposition to
discrimination against protected students, her support for
Fernandes, and her attempt to challenge her own discriminatory
treatment, the complaint states a claim for retaliation under the
DCHRA.

        III. HOSTILE WORK ENVIRONMENT (COUNT IV)

        Kimmel's fourth cause of action alleges that she experienced
a hostile work environment in violation of the DCHRA.  "When the
workplace is permeated with discriminatory intimidation,
ridicule, and insult . . . that is sufficiently severe or
pervasive enough to alter the conditions of the victim's
employment and create an abusive working environment, Title VII
is violated."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21
(1993) (internal quotation marks and citation omitted).  "To
establish a prima facie case of hostile work environment,
plaintiff must demonstrate that: (1) she is a member of a
protected class; (2) she was subject to unwelcome harassment; (3)
the harassment occurred because of her . . . disability; (4) the
harassment affected a term, condition or privilege of employment;

-17-

and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it." <u>Kilby-Robb v. Spellings</u>, 522 F. Supp. 2d 148, 162 (D.D.C. 2007); <u>see</u> <u>Elam v. Bd. of Tr. of the Univ. of the District of Columbia</u>, 530 F. Supp. 2d 4, 21, n.7 (D.D.C. 2007) (noting that "[t]he elements of a DCHRA hostile work environment claim mirror the federal requirements").

Here, Kimmel alleges that Gallaudet subjected her to harassment, including "defamatory comments and ostracization" because she was not deaf/Deaf enough, and it negatively affected the conditions of her employment.  (Compl. ¶¶ 18, 47.)  Kimmel has stated a hostile work environment claim with respect to harassment that occurred because of her disability.

IV.  TORTIOUS INTERFERENCE (COUNT VI)

Count VI of the complaint asserts a claim for tortious interference with prospective business relations.  "To establish a claim for tortious interference with economic advantage under District of Columbia law, the evidence must show: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the [defendant], (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." <u>Bennett Enters., Inc. v. Domino's Pizza, Inc.</u>, 45 F.3d 493, 499 (D.C. Cir 1995).  "The first element --

-18-

business expectancy –– must be commercially reasonable to anticipate." Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks omitted).  Gallaudet contends that Kimmel has failed to state a tortious interference claim because Kimmel has not specifically identified a third party with whom she had an expectancy of a business relationship and has not sufficiently asserted that Gallaudet intended to interfere with any expectancy.

In her complaint, Kimmel alleges that Gallaudet tortiously interfered with her "valid business expectancy that she would be able to teach, and possibly also serve as an administrator, in higher education until her retirement."  (Compl. ¶ 53.)  She further contends that "agents and employees of Gallaudet intentionally interfered with this business expectancy by spreading false and defamatory lies" about her to the Washington Post and the NCAA, and that "[a]t least three potential sources of prospective employment have disappeared" as a result of Gallaudet's actions.[7]  (Id. ¶¶ 53, 54.)  Although Kimmel has not

_____

[7]In her opposition to Gallaudet's motion, Kimmel also suggests that she bases her tortious interference claim on her valid "business expectancy of lifetime employment" at Gallaudet. (Pl.'s Opp'n at 12.)  Under D.C. law, to state a claim for tortious interference, "a plaintiff must allege 'business expectancies, not grounded on present contractual relationships, but which are commercially reasonable to anticipate.'"  Dem. State Comm. of D.C. v. Bebchick, 706 A.2d 569, 573 (D.C. 1998) (quoting Carr v. Brown, 395 A.2d 79, 84 (D.C. 1978)); see McManus v. MCI Communications Corp., 748 A.2d 949, 958 (D.C. 2000) (concluding that "it is axiomatic that an employer cannot

-19-

specifically named each alleged potential source of prospective
employment or expressly asserted that Gallaudet had knowledge of
these expectancies, reasonable inferences can be drawn from
Kimmel's factual assertions that Gallaudet acted intentionally,
and notice pleading does not require the complaint to specify the
entities with whom she had an expectancy.  See Browning, 292 F.3d
at 243.  Accordingly, Gallaudet's motion to dismiss Kimmel's
tortious interference claim will be denied.

### CONCLUSION AND ORDER

Because Kimmel has abandoned her claims for intentional
infliction of emotion distress and breach of contract,
Gallaudet's motion to dismiss these claims will be granted.  With
reasonable inferences drawn in her favor, Kimmel has pled facts
sufficient to state claims against Gallaudet for retaliation
under Title VI; retaliation, disability discrimination, and
hostile work environment under the DCHRA; and tortious
interference with prospective business relations.  Thus,
Gallaudet's motion to dismiss will be denied as to these claims.
Accordingly, it is hereby

ORDERED that Gallaudet's motion [2] to dismiss the complaint
be, and hereby is, GRANTED IN PART and DENIED IN PART.  Kimmel's

interfere with its own contract").  Thus, to the extent that
Kimmel bases her tortious interfere claim on an alleged
expectancy of continued employment at Gallaudet, she has not
stated a claim entitling her to relief.

-20-

intentional infliction of emotional distress and breach of
contract claims in Counts V and VII of the complaint are
DISMISSED.  The motion is DENIED in all other respects.

SIGNED this 4th day of August, 2009.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge